## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT L. GARBER, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO. 07-cv-11422** |
| vs. ) | |
| ) | CLASS ACTION COMPLAINT |
| WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, STEPHEN J. ROTELLA, and THOMAS W. CASEY, ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff, Robert L. Garber ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Washington Mutual, Inc. ("Washington Mutual" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of Washington Mutual's securities between April 18, 2006 and December 10, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks.  The Company is a savings and loan holding company who

owns two banking subsidiaries, as well as numerous non-bank subsidiaries. The Company has four operating segments: the Retail Banking Group, which operates a retail bank network of 2,225 stores; the Card Services Group, which operates credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets, and the Home Loans Group, which engages in single-family residential real estate lending, servicing and capital markets activities.

3.      On October 17, 2007, after the market closed, Washington Mutual shocked investors when it reported its third quarter 2007 financial and operational results. For the quarter, the Company reported earnings per share ("EPS") of $0.23, against $0.92 EPS for the second quarter 2007. In addition to disclosing that it had suffered a 72 percent drop in net income, the Company also stated that it would set aside up to $1.3 billion in the following quarter to cover its loan losses. Further, during the third quarter of 2007, the Company significantly increased its loan loss provision to $967 million, compared to the $372 million reported in the prior quarter.

4.      On this news, the Company's shares fell $2.55 per share, or over 7.7 percent, to close on October 18, 2007 at $30.52 per share, on unusually heavy trading volume. The following day, the Company's shares fell an additional $1.43 per share, or 4.7 percent, to close on October 19, 2007 at $29.09 per share.

5.      Then on November 1, 2007, the New York Attorney General sued First American Corporation and its subsidiary eAppraiseIT ("EA") for conspiring with Washington Mutual to inflate real estate appraisals. According to the Attorney General, in April 2006, EA began providing appraisal services for Washington Mutual, which then became EA's biggest client. Within weeks, the Company began complaining to EA that its appraisals were not high enough

and pressured EA to exclusively employ a new panel of appraisers that Washington Mutual had hand-selected as "Proven Appraisers." This set of appraisers was chosen by Washington Mutual specifically because they inflated property appraisals, which enabled the Washington Mutual greater profit from these higher appraisals as they could close more home loans at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for Washington Mutual.

6.      On this news, the Company's shares fell an additional $2.13 per share, or over 7.6 percent, to close on November 1, 2007 at $25.75 per share, on heavy trading volume.

7.      Then on November 2, 2007, *MarketWatch.com* reported that Washington Mutual may have to set aside $412 million to $2.1 billion in extra reserves in response to the New York Attorney General's lawsuit.  The article detailed that "if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price."  Further, the lawsuit "raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans will be put back to [the Company] from bondholders on the basis of fraudulent appraisals and [the Company] would be forced to put bad loans back on its balance sheet."  One analyst estimated that the value of mortgages that could be "put back" to Washington Mutual could reach $33 billion, which would require additional reserves of $412 million, or $0.30 per share.

8.      On this news, the Company's shares fell an additional $1.94 per share, or over 7.5 percent, to close on November 2, 2007 at $23.81 per share, on heavy trading volume.

9.      Then on November 7, 2007, *MarketWatch.com* further reported that Washington Mutual indicated that its 2007 credit losses could amount to between $2.7 billion to $2.9 billion, almost double the estimates that the Company provided July 2007.  The Company's revised

estimates came on the heels of a ratings downgrade by Fitch Ratings, who revised its outlook on the Company from "stable" to "negative." On this news, the Company's shares fell an additional $4.19 per share, or over 17.3 percent, to close on November 7, 2007 at $20.19 per share, on heavy trading volume.

10.    Finally, on December 10, 2007, after the close of the market, the Company disclosed that it expected to report a net loss for the fourth quarter of 2007. This was primarily the result of the Company increasing its fourth quarter 2007 charge-offs and delinquencies in its loan portfolio. The Company stated that it expected its fourth quarter provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of the expected fourth quarter net charge-offs. Going forward, the Company stated that it expected its first quarter 2008 provision for loan losses to be in the range of $1.8 to $2.0 billion, and that it expected loan loss provisions through the end of 2008 "to remain elevated, generally consistent with its expectation for the first quarter of 2008." Additionally, the Company announced that it was offering $2.5 billion in convertible preferred stock, that its Board of Directors intended to reduce the quarterly dividend rate to $0.15 per share (compared to its most recent quarterly dividend rate of $0.56 per share), and that it would discontinue all remaining lending through its subprime mortgage channel.

11.    On this news, the Company's shares fell an additional $2.46 per share, or over 12.3 percent, to close on December 11, 2007 at $17.42 per share, on unusually heavy trading volume.

12.    The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the

Company had failed to adequately disclose the extent of its exposure to anticipated losses and defaults in its lending portfolio; (2) that contrary to earlier representations, the Company had failed to adequately reserve for losses as conditions in the credit and housing markets deteriorated; (3) that the defendants had engaged in a conspiracy with First American and EA to artificially inflate the appraised value of homes for certain mortgages to artificially inflate the Company's reported loan-to-value ratios; (4) that the Company's lending portfolio and the mortgages that it issued were substantially riskier than they were represented to investors to be; (5) that as a result, the Company's investment portfolio was impaired; (6) that, as a result of the above, the Company would be forced to take substantial charges in subsequent quarters to remedy such failures; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

13.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, Washington Mutual has offices in this Judicial District, and the Attorney General of State of New York is currently investigating the Company for alleged misconduct.

17.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.    Plaintiff, Robert L. Garber, as set forth in the accompanying certification, incorporated by reference herein, purchased Washington Mutual's securities at artificially inflated prices during the Class Period and has been damaged thereby.

19.    Defendant Washington Mutual is a Washington corporation with its principal executive offices located at 1301 Second Avenue, Seattle, Washington.

20.    Defendant Kerry K. Killinger ("Killinger") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

21.    Defendant Stephen J. Rotella ("Rotella") was, at all relevant times, the Company's President and Chief Operating Officer ("COO").

22.    Defendant Thomas W. Casey ("Casey") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and an Executive Vice President.

23.    Defendants Killinger, Rotella and Casey are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Washington Mutual's

reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks. The Company is a savings and loan holding company who owns two banking subsidiaries, as well as numerous non-bank subsidiaries. The Company has four operating segments: the Retail Banking Group, which operates a retail bank network of 2,225 stores; the Card Services Group, which operates credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets, and the Home Loans Group, which engages in single-family residential real estate lending, servicing and capital markets activities.

### Materially False and Misleading
### Statements Issued During the Class Period

25.     The Class Period begins on April 18, 2006. On this day, the Company issued a press release entitled "Washington Mutual Reports First Quarter 2006 Earnings Per Share of 98

Cents; Board of Directors Increases Cash Dividend to 51 Cents; WaMu Free Checking(TM) Account Fuels Record Account Growth; Card Services Drives Strong Cross-Sell Results."

Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE: WM) today reported first quarter 2006 net income of $985 million, or $0.98 per diluted share, compared with net income of $902 million, or $1.01 per diluted share, in the first quarter of 2005.
>
> Washington Mutual's Board of Directors declared a cash dividend of 51 cents per share on the company's common stock, up from 50 cents per share in the previous quarter. Dividends on the common stock are payable on May 15, 2006 to shareholders of record as of April 28, 2006.
>
> **"We are very pleased with our first quarter results," said Kerry Killinger, Washington Mutual chairman and chief executive officer. "The company's strong performance demonstrates the benefits of our continued diversification and enhanced operational focus.** This past quarter we had particularly strong results in Retail Banking and Card Services."
>
> **"These businesses added customers at a record pace and delivered significant revenue and earnings even in this difficult interest rate environment,"** Killinger added.
>
> * * *
>
> • **Strong credit quality results in lower provisioning. The company's credit performance continued to reflect the favorable consumer and housing environment.** The credit card portfolio, in particular, demonstrated very low loss levels and stable delinquency rates. The change in bankruptcy law during last year's fourth quarter precipitated a spike in filings in that quarter which led to an unusually low level of charge-offs this quarter and contributed to a much lower provision for Card Services during the quarter.
>
> * * *
>
> • **Lower provision reflects continuing strong credit quality. The provision for loan and lease losses was $82 million in the first quarter compared with $217 million in the previous quarter.** Card Services had a lower provision on a linked quarter basis due, in part, to a 40 percent decline in net charge-offs. During

last year's fourth quarter, the company saw an unusually large number of credit card charge-offs due to a surge in bankruptcy filings in anticipation of the new bankruptcy law. Nonperforming assets as a percentage of total assets were up slightly totaling 59 basis points at quarter end, compared with 57 basis points at the end of the prior quarter and the end of the first quarter a year ago.  [Emphasis added.]

26.    On May 10, 2006, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on April 18, 2006.   Additionally, the Company's, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There

have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

* * *

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

**<u>Credit Risk Management</u>**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

* * *

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

27.    The Company's 10-Q filed on May 10, 2006 contained Sarbanes-Oxley required

certifications, signed by Defendants Killinger and Casey, who stated:

I, [Kerry K. Killinger and Thomas W. Casey], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by

others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, [Kerry K. Killinger, the

Chief Executive Officer / Thomas W. Casey, the Chief Financial Officer] of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

28.    On July 19, 2006, the Company issued a press release entitled "Washington Mutual Reports Second Quarter Earnings Per Share of 79 Cents, 94 Cents Per Share Before the Second Quarter Impact of the Pending Sale of Mortgage Servicing Rights and Restructuring Charges; Company Announces Intention to Sell its Asset Management Company; Board of Directors Increases Cash Dividend to 52 Cents and Approves New 150 million Share Repurchase Plan."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.

Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.

*The company announced today a series of actions it is taking that will significantly improve the company's market risk profile, greatly accelerate the achievement of its operating efficiency goals, and be accretive to earnings in 2006 and 2007.*

*"Our retail banking and card services businesses produced excellent results and our business model is performing well in this challenging interest rate environment," said Kerry Killinger, Washington Mutual Chairman and Chief Executive Officer. "The transformational actions we're taking will make us an even more diversified bank positioned for improved financial performance as we move forward."*

*As part of the company's Home Loans strategy of focusing on higher-margin products, driving superior operating efficiency*

*and reducing its exposure to market risk, the company entered into a definitive agreement to sell $2.6 billion of mortgage servicing rights.* The pending sale includes all of the company's government loan servicing and a portion of its conforming, fixed-rate servicing, which is predominantly for single service customers, the majority of whom are outside the company's retail footprint. The pending sale also includes the transfer of the company's Milwaukee loan servicing operation and approximately 800 employees. In addition to the $101 million after tax adjustment booked in the second quarter, the company expects to incur additional transaction and shutdown-related costs of approximately $50 million, after tax, most of which will be incurred in the third quarter.

* * *

- *Provision reflects loan growth and charge-off level.* The provision for loan and lease losses of $224 million in the second quarter reflected a modest increase in the level of charge-offs, as well as incremental loan growth. The $82 million provision and level of charge-offs in the first quarter benefited from the surge of bankruptcy-related charge-offs in the fourth quarter as consumers sought bankruptcy protection in advance of the effective date of bankruptcy reform. The provision a year ago reflected not only the benign credit environment but also the absence of the credit card portfolio. Nonperforming assets as a percentage of total assets were up slightly to 62 basis points at quarter end, compared with 59 basis points at the end of the prior quarter and 53 basis points at the end of the last year's second quarter.

* * *

- *Home Loans refines business model for changing market environments. During the quarter, the Home Loans Group took several steps to further its long-term goals to diversify its product set, leverage distribution, and reduce its cost structure.* In May, the company announced that it was realigning its traditional correspondent business to a conduit structure. And, as part of streamlining its product line, the company announced that it will no longer engage in FHA and VA lending. The company's announced sale of $2.6 billion of mortgage servicing rights is consistent with the Home Loans strategy and will reduce the ratio of MSR to total stockholders' equity to approximately 25 percent. [Emphasis added.]

29.    On August 9, 2006, Washington Mutual filed its Quarterly Report with the SEC

on Form 10-Q.  The Company's 10-Q was signed by Defendant Casey, and reaffirmed the

Company's financial results previously announced on July 19, 2006.  The Company's 10-Q also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications

contained in ¶27, *supra*.  Additionally, the Company, in relevant part, stated:

### Controls and Procedures

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

In reaching the conclusion that disclosure controls and procedures were effective, management had considered the potential financial impact of control deficiencies associated with the matters giving rise to the restatement described in Note 2 to the Consolidated Financial Statements on page 7. Management believes this restatement is immaterial and was not the result of a material weakness in the Company's internal control over financial reporting. Accordingly, management has not changed its conclusion described above that the Company's disclosure controls and procedures were designed and operating effectively as of June 30, 2006.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies,

some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K/A, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

**Credit Risk Management**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

\* \* \*

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability

to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

30.    On October 18, 2006, the Company issued a press release entitled "Washington Mutual Reports Third Quarter Earnings Per Share of 77 Cents -- Results Included Charges Associated with the Sale of Mortgage Servicing Rights and Efficiency Initiatives."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005.

Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.

***"We continue to focus on the successful execution of our strategic plan despite the challenging operating environment,"*** said Kerry Killinger, WaMu Chairman and CEO, noting that, as anticipated, the costs associated with the MSR sale announced in the second quarter and the company's ongoing efficiency initiatives impacted third quarter results. ***"Retail Banking, Card Services and the Commercial Group produced solid results, and we continue to aggressively attack our expense base by taking out excess capacity and reducing our overall cost structure."***

*Killinger added, "We remain confident in our strategy to reposition the company and set the stage for stronger performance in 2007."*

\* \* \*

- *Credit exposure continues to be proactively managed.* The provision for loan and lease losses of $166 million in the third quarter reflected a slight decline in the loan portfolio and net charge-offs of $154 million. *The third quarter provision also reflected refinements to the company's reserve methodology* and adjustment of the provision related to the planned sale of $403 million of higher risk credit card accounts. Without the impact of these two items, the provision would have been similar to that of the second quarter. The provision was up compared with the third quarter of last year as prior year results did not include the company's credit card business acquired October 1, 2005. Nonperforming assets were up during the quarter and as a percentage of total assets totaled 69 basis points at quarter end, compared with 62 basis points at the end of the prior quarter and 52 basis points at the end of last year's third quarter.

\* \* \*

- *Company conservatively manages balance sheet.* While the company held average assets essentially flat with the prior quarter, it modestly grew balances of its targeted products of home equity lending, multi-family loans and credit cards, while reducing prime single-family residential loans. Compared with the third quarter of 2005, average assets were up 7 percent reflecting growth in targeted products and the addition of Card Services receivables. During the quarter, the company repurchased 18.8 million shares of its common stock. [Emphasis added.]

31.    Also on October 18, 2006, the Company held an earnings conference call with investors and financial analysts. During this call, Defendant Killinger, in relevant part, stated:

> KERRY KILLINGER, CHAIRMAN: Despite the challenging environment impacting the mortgage banking industry, *we feel good about the proactive steps that we have taken. Our portfolio remains in very good shape and non-performing assets remain very low.*

18

*The housing market is clearly weakening with the pace of housing price appreciation slowing in most regions of the country. We are also experiencing somewhat higher delinquencies and loan losses, however, we began preparing for this possibility quite some time ago and took defensive actions to strengthen our portfolio. So we believe we are well prepared to weather the more difficult credit environment.*

We also believe that the expansion in our net interest margin should more than offset the higher credit costs as Tom will review with you later in his guidance for 2007.

In the meantime we continue to aggressively attack the cost structure in our home loans business during the quarter and reduce non-interest expense by 21% over the same period a year ago. This was achieved through key productivity and efficiency initiatives. The technology and offshoring initiatives currently underway are expected to result in further expense reductions in future quarters.

*Now we have significantly modified our home loan strategy to be consistent with our overall business model and continue to take appropriate actions to right size the business for the contracting mortgage lending market.*

\* \* \*

*Now the quality of our option ARM portfolio remains strong. At the end of the third quarter the current estimated loan to value ratio on our option ARM portfolio was 57% with an average FICO of 707.* [Emphasis added.]

32.    On November 9, 2006, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on October 18, 2006. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*. Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure

controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the third quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K/A, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

<u>**Credit Risk Management**</u>

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations

under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

* * *

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the existence and estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared to real estate secured loans without those features are discussed in the Company's 2005 Annual Report on Form 10-K/A, "Credit Risk Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry

historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

33.    On January 17, 2007, the Company issued a press release entitled "WaMu Reports Fourth Quarter Earnings Per Share of $1.10 and 2006 Earnings Per Share of $3.64; Announces $2.7 Billion Accelerated Share Repurchase and Increases Cash Dividend to 54 Cents."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) today reported fourth quarter 2006 net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income of $3.43 billion, or $3.73 per diluted share, in 2005.

Fourth quarter 2006 earnings included an after tax gain of $415 million on the previously announced sale of WM Advisors, Inc., the company's retail mutual fund asset-management company. The gain from the sale of WM Advisors more than offset fourth quarter and full year after tax charges of $100 million and $202 million, respectively, related to the company's ongoing efficiency initiatives and after tax charges of $137 million associated with the sale in 2006 of a significant portion of the company's mortgage servicing rights and the related facility and employee transfers.

On Jan. 3, 2007, the company entered into an accelerated share repurchase agreement with a dealer, buying back $2.7 billion of its common stock. The company also increased its cash dividend to 54 cents per common share, up from 53 cents per share in the previous quarter.

***"We achieved solid performances in our Retail Banking, Card Services and Commercial Group businesses in the fourth quarter and for the full year despite a difficult interest rate and operating environment, which particularly impacted the results in our Home Loans business," said Kerry Killinger, WaMu Chairman and CEO. "For the full year, we successfully reduced our cost structure and repositioned the balance sheet while continuing to expand our consumer and small business banking franchise.*** In 2006, we opened a record 1.23 million net new checking accounts, added a record 848,000 net new retail households and experienced

strong cross-sales of the WaMu credit card to our retail banking customers."

Killinger noted that opportunities to grow the balance sheet at attractive risk-adjusted returns are limited, making the accelerated share repurchase transaction a superior use of capital.

*"Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future," Killinger added. "Those decisive actions have positioned us well to deliver stronger operating performance in 2007."* [Emphasis added.]

34.    On March 1, 2007, Washington Mutual filed its 2006 Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants Killinger and Casey, and reaffirmed the Company's financial results previously announced on January 17, 2007. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*. Additionally, the Company, in relevant part, stated:

### Controls and Procedures

### Disclosure Controls and Procedures

*The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures* as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company* in the reports that it files or furnishes under the Securities Exchange Act of 1934.

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an*

*ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. ***There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

\* \* \*

## Credit Risk Management

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

The Finance Committee of the Board of Directors, by means of a broad set of policies and principles contained in the Company's Enterprise Risk Management Policy, exercises oversight over the framework for the Company's credit risk management activities. The Credit Risk Management Committee, chaired by the Chief Credit Officer, is comprised of business line chief risk officers, and senior finance, treasury and portfolio management professionals. This Committee is responsible for management of the Company's credit risk within stated credit limits and portfolio performance metrics, to ensure alignment with the Company's credit risk appetite. The Credit Risk Management Committee is also responsible for developing credit policy and recommending credit concentration limits to the Enterprise Risk Management Committee, approving corporate credit standards, overseeing the delegation of credit authority and ensuring compliance with credit policy, standards and limits. The Chief Credit Officer's primary responsibilities include directing the activities of the Credit Risk Management Committee, monitoring the credit quality of the Company's loan portfolio, determining the reasonableness of the Company's allowance for loan and lease losses, reviewing and

approving large credit exposures, and delegating credit approval authorities.

*In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk.* As an example of proactively managing credit risk, from time to time the Company sells delinquent and nonperforming loans. These sales have had the effect of accelerating the liquidation of these assets, thereby enabling the Company to deploy its capital more effectively, while assisting the Company in reducing the ratio of nonperforming assets to total assets.

*Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country.* A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

*Certain categories of residential loans held in the Company's portfolio, the most significant being Option ARM loans, have features that may result in increased credit risk when compared with residential loans without these features.* Loans with these features, to the extent material to the Company, as well as any compensating factors and mitigating circumstances that reduce the credit risk arising from these features, are discussed in more detail in the section of Management's Discussion and Analysis – "Features of Residential Loans."

*As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance.* The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses.

\* \* \*

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.

The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.

\* \* \*

*Contingent Credit Risk Liabilities*

*In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached.* When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. *If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made to the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.*

*Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value.* Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

\* \* \*

**Features of Residential Loans**

*Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent*, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan

amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan-to-value calculation.

\* \* \*

## Underwriting and Risk Mitigation

*The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures. Risk attributes and compensating factors, which may include an applicant's credit score, the loan-to-value ratio, loan size, and debt-to-income ratio, are taken into consideration as part of the underwriting and pricing processes.* The Company's practice of not offering Option ARM loans through its subprime mortgage channel and of selectively selling Option ARM loans to secondary market participants has further limited the potential for credit risk in its Option ARM portfolio.

\* \* \*

## Impact of External Factors

*Certain external factors have, over the last five years, contributed to a reduction in the credit risk inherent in the Option ARM portfolio.* Among the two most significant economic factors affecting the Option ARM portfolio are prepayment rates, which operate to reduce the risk of payment shock in the portfolio caused by recasting events, and changes in housing prices, which affect current loan-to-value ratios. The risk of payment shock is reduced when Option ARM borrowers prepay their loans prior to the occurrence of the first recasting event. Although in 2006 housing prices experienced a decrease in the rate of appreciation nationally and declines in some geographic markets in which the Company lends, over the past five years, housing prices have generally appreciated and have served to mitigate credit risk in the Option ARM portfolio. Housing price appreciation levels experienced during the past five years may not continue.

*Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*

*Loan-to-value ratios are a key determinant of future performance.* Home loans with loan-to-value ratios of greater than

80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. ***This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.*** At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

***The Company actively monitors conditions in housing markets in which it has a concentration of home loans.*** Geographic concentrations are taken into account when deciding which home loans to sell in the secondary market. ***Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance.*** This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance.

***Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater than 80 percent***

\* \* \*

***To compensate for the increased credit risk in the home equity portfolio that arises where the combined loan-to-value ratio at origination is greater than 80 percent, the Company typically charges such borrowers a higher rate of interest than would be charged if the combined loan-to-value ratio at origination was less than 80 percent. The Company also buys pool mortgage insurance that insulates it from the risk of default on those home equity loans or lines of credit where the combined loan-to-value ratio at origination is greater than 90 percent.*** [Emphasis added.]

35.    On April 17, 2007, the Company issued a press release entitled "WaMu Reports First Quarter Earnings Per Share of $0.86 and Increases Cash Dividend to 55 Cents."  Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of $784 million, or $0.86 per diluted share, compared with net income of $985 million, or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85 million after tax partial settlement related to Home Savings goodwill litigation.
>
> Based on these earnings and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 47th consecutive quarter to 55 cents per share.
>
> "Our Retail Banking, Card Services, and Commercial groups continued to post strong results in the first quarter as we successfully attracted a growing number of new customers to our expanding national banking franchise," said Kerry Killinger, the company's chairman and CEO. ***"Overall, we delivered solid results in the first quarter despite the challenging interest rate environment and slowing housing market."***
>
> "Our Home Loans business was challenged during the first quarter by difficult market conditions," he added. ***"Over the past 12 months, we have taken a number of prudent actions to reduce our exposure to the subprime mortgage industry. These actions, along with a diversified business mix, limited our exposure to the mortgage market's downturn and position us well to expand and grow as market conditions improve."***  [Emphasis added.]

36.    On May 10, 2007, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on April 17, 2007.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*.  Additionally, the Company, in relevant part, stated:

> **Controls and Procedures**
>
> **Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2006 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. In 2006, the Company reduced its exposure to market risk and correspondingly increased its tolerance for credit risk. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

**Credit Risk Management**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions, and the existence and strength of any guarantor support.

As explained in the introductory paragraphs of the "Credit Risk Management" section of the Company's 2006 Annual Report on Form 10-K, the Company believes that loan-to-value ratios are one of the two key determinants in determining future loan performance.

\* \* \*

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared to real estate secured loans without those features are discussed in the Company's 2006 Annual Report on Form 10-K, "Credit Risk

Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

37.    On July 18, 2007, the Company issued a press release entitled "WaMu Reports Second Quarter Earnings Per Share of $0.92, up 16 Percent; Increases Cash Dividend to 56 Cents."  Therein, the Company, in relevant part, stated:

WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. Continued strong performance led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.

*"We delivered record growth in our retail banking, credit card and commercial businesses during the second quarter. Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year,"* said Chairman and CEO Kerry Killinger. "I'm pleased with the job our employees are doing in growing the franchise, delivering best-in-class customer service, as evidenced by our recent J.D. Power award recognition, and focusing on improving our operating efficiency."

* * *

- *Home Loans' results improve.* Second quarter results for Home Loans were a loss of $37 million, an improvement from a loss of $113 million in the prior quarter as a result of more stable market conditions for subprime loans in the second quarter. Net losses from the sales of subprime mortgage loans

and adjustments to reflect changes in market values of loans held for sale totaled $38 million. In addition, the company decreased the value of its subprime residuals by $93 million for a combined total loss for the quarter of $131 million, or about half the $252 million in losses recognized in the first quarter.

* * *

- **Home Loans shows improvement in a difficult environment.** While the quarter's $37 million loss was an improvement from the loss of $113 million in the prior quarter, the difficult mortgage environment continues to pressure results. Net losses from the sales of subprime mortgage loans and adjustments to reflect changes in market values of loans held for sale totaled $38 million, which was a substantial improvement from net losses of $164 million in the first quarter. During the second quarter, the company reduced the value of its subprime residuals by $93 million to a balance of $79 million at quarter end. This decline in fair value was similar to the first quarter and reflected the poor performance of subprime loans and the slowdown in home price appreciation.

- **Prime business continues to improve.** Gain on sale for the prime portion of the business remained strong, but was down slightly primarily on lower sales volume. MSR valuation and risk management results improved during the quarter with the rise in long-term interest rates and lower net hedging costs. [Emphasis added.]

38.    On August 9, 2007, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on July 18, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*. Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this

report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2006 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

* * *

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

### <u>Credit Risk Management</u>

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and

derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions, and the existence and strength of any guarantor support.

During the first half of 2007, deteriorating conditions in the U.S. housing market and increased payments on certain adjustable-rate mortgages that repriced upward at the expiration of their fixed rate periods have resulted in increased balances of nonaccrual loans and higher charge-offs. The combination of lower volumes of home sales transactions, longer marketing periods, growing inventories of unsold homes and increased foreclosure rates has exerted downward pressure on housing prices in many parts of the country, resulting in declining home price appreciation rates in many markets and absolute declines in property values in certain markets. Faced with these conditions, some borrowers have been unable to either refinance or sell their properties and consequently have defaulted on their loans. In certain circumstances, especially with loans that were funded more recently, these factors have resulted in increased severity of loss on residential loan charge-offs as lower collateral values on foreclosed properties have been insufficient to cover the recorded investment in the loan.

As explained in the introductory paragraphs of the "Credit Risk Management" section of the Company's 2006 Annual Report on Form 10-K, the Company believes that loan-to-value ratios are one of the two key determinants in determining future loan performance.

* * *

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Determining the adequacy of the allowance

is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared with real estate secured loans without those features are discussed in the Company's 2006 Annual Report on Form 10-K, "Credit Risk Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

39.    On October 5, 2007, the Company issued a press release entitled "Washington Mutual Q3 Net Income Impacted by Market and Credit Environments."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) announced today that a weakening housing market and disruptions in the secondary market through the end of the third quarter will result in a decline in net income of approximately 75% from the prior year quarter, subject to the finalization of third-quarter 2007 results.

The expected decline in third quarter net income results principally from the following items that are reported on a pre-tax basis:

- The third-quarter loan loss provision will be approximately $975 million, which exceeds net charge-offs for the quarter by approximately $550 million. The provision reflects ongoing weakness in the housing market, primarily as it affects subprime and home equity loans, as well as growth in the company's loan portfolio;

- Downward adjustments of approximately $150 million, related to approximately $17 billion in held-for-sale mortgage loans that were transferred to the company's investment portfolio due to secondary market conditions;

- Net losses of approximately $150 million in the company's trading securities portfolio, including market valuation adjustments on capital markets assets, retained interests on credit cards and other residual interests; and,

- Impairment losses of approximately $110 million on investment grade mortgage-backed securities in the company's available for sale portfolio.

WaMu Chairman and CEO Kerry Killinger said, "While we're disappointed with our anticipated third-quarter results, we look forward to an improved fourth quarter as we continue to see good operating performance in our Retail Banking, Card Services and Commercial Group businesses."

Killinger added that the company continues to have the liquidity and capital necessary to grow the company's businesses and support its current dividend, as it continues to execute its long-term strategic plans.

Washington Mutual is providing preliminary information about its third-quarter results prior to its scheduled earnings announcement date in light of the impact of the very challenging market environment. No further details will be provided concerning the company's third-quarter performance until its regularly scheduled earnings release on Oct. 17, 2007. In the conference call following its earnings release on Oct. 17, the company will update its 2007 earnings drivers, including its updated expectations for loan loss provisioning levels in the fourth quarter of 2007.    [Emphasis added.]

40.    The market did not react negatively to this news, as the Company's announcement

regarding its loan loss provisions, adjustments and losses was in line with other banks' recent announcements concerning loss provisions, adjustments and losses in connection with their loan exposure.

41.    The statements contained in ¶¶ 25 – 39 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company had failed to adequately disclose the extent of its exposure to anticipated losses and defaults in its lending portfolio; (2) that contrary to earlier representations, the Company had failed to adequately reserve for losses as conditions in the credit and housing markets deteriorated; (3) that the defendants had engaged in a conspiracy with First American and EA to artificially inflate the appraised value of homes for certain mortgages to artificially inflate the Company's reported loan-to-value ratios; (4) that the Company's lending portfolio and the mortgages that it issued were substantially riskier than they were represented to investors to be; (5) that as a result, the Company's investment portfolio was impaired; (6) that, as a result of the above, the Company would be forced to take substantial charges in subsequent quarters to remedy such failures; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

42.    On October 17, 2007, the Company shocked investors when it issued a press release entitled "WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents."  Therein, the Company, in relevant part, stated:

> WaMu (NYSE:WM) announced today ***third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in***

*the third quarter of 2006.* The company attributed the decline to a weaker housing market and disruptions in the capital markets.

"We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, and we continued to adapt our Home Loans business to meet market conditions." Killinger added that the company remains focused on executing its long-term growth plans.

\* \* \*

- *Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.* [Emphasis added.]

43.    On this news, the Company's shares fell $2.55 per share, or over 7.7 percent, to close on October 18, 2007 at $30.52 per share, on unusually heavy trading volume. The following day, the Company's shares fell an additional $1.43 per share, or 4.7 percent, to close on October 19, 2007 at $29.09 per share.

44.    Then on November 1, 2007, the New York Attorney General issued a press release entitled "NY Attorney General Sues First American and its Subsidiary for Conspiring with Washington Mutual to Inflate Real Estate Appraisals; Washington Mutual (WaMu) Demanded Appraisers Who Inflated Property Values; Internal E-Mails Show eAppraiseIT Executives Knew Their Scheme Was Illegal: 'We have agreed to roll over and just do it.'" The press release, in relevant part, stated:

Attorney General Andrew M. Cuomo today announced that he is suing one of the nation's largest real estate appraisal management companies and its parent corporation for colluding with the largest savings and loan in the country to inflate the appraisal values of homes.

*In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation, caved to pressure from Washington Mutual ("WaMu") to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.*

"The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo. *"The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."*

As First American acknowledged in its 2006 annual report, appraisal fraud can damage the entire housing market, including consumers and investors alike. Consumers are harmed because they are misled as to the value of their homes, increasing the risk of foreclosure and hindering their ability to make sound economic decisions. Investors are hurt by such fraud because it skews the value and risk of loans that are sold in financial markets.

*In April 2006, EA began providing appraisal services for WaMu, which became EA's biggest client. Within weeks, WaMu began complaining to EA that its appraisals were not high enough. WaMu pressured EA to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers." This set of appraisers was chosen by WaMu specifically because they inflated property appraisals. WaMu profited from these higher appraisals because they could close more home loans, at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for WaMu.*

Attorney General Cuomo's investigation uncovered a series of e-mails between executives at EA, First American, and WaMu that

show EA officials were willingly violating state and federal appraisal independence regulations to comply with WaMu's demands:

- On February 22, 2007, in response to a description of the WaMu "Proven Appraiser" program as one in which "we will now assign all Wamu's work to Wamu's 'Proven Appraisers'… [and] Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value," eAppraiseIT's president told senior executives at First American: ***"we have agreed to roll over and just do it..."***

- On April 4, 2007, eAppraiseIT's executive vice president stated in an e-mail to First American: "we as an AMC [Appraisal Management Company] need to retain our independence from the lender or it will look like collusion… eAppraiseIT is clearly being directed who to select. The reasoning… is bogus for many reasons including the most obvious – the proven appraisers bring in the values."

- On April 17, 2007, eAppraiseIT's president wrote an e-mail to First American explaining why its conduct was illegal: "We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."

- E-mail evidence also shows that WaMu pressured EA to inflate appraisals as a condition for doing future business together:

- On September 27, 2006, First American's vice chairman reported that a WaMu executive told him: "if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship…"

Attorney General Cuomo continued, "Just as my office stepped in when colleges and loan companies were profiting at students' expense, this lawsuit and my ongoing investigation into the mortgage industry should send a clear message: companies must play by the rules or they will have to account for their misdeeds."

Attorney General Cuomo's lawsuit seeks to end the illegal relationship between First American and EA and WaMu. It also seeks penalties and disgorgement from First American and EA. The lawsuit alleges that First American and EA violated appraiser independence laws, which regulate the conduct of real estate appraisers. The lawsuit was filed in the Supreme Court of New York, New York County. [Emphasis added.]

45.    On this news, the Company's shares fell an additional $2.13 per share, or over 7.6 percent, to close on November 1, 2007 at $25.75 per share, on heavy trading volume.

46.    On November 2, 2007, *MarketWatch.com* published an article entitled "WaMu vulnerable on securitized mortgages?"  The article, in relevant part, stated:

> **Likely to set aside extra reserves if appraisals found fraudulent: analyst**
>
> ***Washington Mutual may have to set aside some $412 million to $2.1 billion in extra reserves if a lawsuit filed by New York state's attorney general against the mortgage lender succeeds***, a Keefe Bruyette & Woods analyst estimated on Friday.
>
> Attorney General Andrew Cuomo announced the suit on Thursday, alleging that ***First American Corp. (FAF) and its eAppraiseIT unit had been "colluding" with Washington Mutual (WM) also known as WaMu, to inflate the appraisal value of homes***.
>
> WaMu suspended its relationship with eAppraiseIT and said it has no incentive to have appraisers inflate home values. First American said the complaint "has no foundation in fact or law."
>
> ***If Cuomo succeeds in proving eAppraiseIT's appraisals on WaMu home loans were fraudulent, that could create big problems for the Seattle-based lender***, KBW's Frederick Cannon wrote in a note to clients.
>
> After lenders like WaMu originate home loans, they are often packaged up into mortgage-backed securities and sold to institutional investors around the world. The process gets the loans off the lenders' books, freeing them from the risk that those loans may default and also providing fresh cash to make more new mortgages.
>
> ***But if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price. If the assets have suffered delinquencies and have dropped in value, the lender takes a financial hit.***
>
> *                    *                    *
>
> **'Considerable risk'**
>
> ***The lawsuit filed by Cuomo "raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans***

43

*will be put back to WaMu from bondholders on the basis of fraudulent appraisals and WaMu would be forced to put bad loans back on its balance sheet," Cannon said.*

*"In such a scenario, WaMu would have to buy the loans back at par and then mark them to market on its balance sheet."*

Cannon also questioned WaMu's assertion that it has no incentive to inflate the appraised value of homes that it lends against.

For mortgages that the company originates and then keeps on its balance sheet, the assertion is valid. But for home loans that WaMu sells as mortgage-backed securities, such an argument can be dubious, he said.

*"For loans that a bank plans to sell, high appraisals support a greater amount of loans that can be sold, and loan officers are generally paid on volume," Cannon explained.*

*"Further, if a mortgage loan is sold it is generally accepted by the lender that they have passed on the default risk to the security holder," he added. "Therefore, it would seem that there indeed could be an incentive for loan officers and the bank to push for inflated home values in the case of sold loans."*

Cuomo's suit claims that eAppraiseIT provided appraisals or appraisal reviews on roughly 262,000 properties for WaMu between April 2006 and October 2007. If the average loan size was $200,000 to $300,000, this would account for between $52.4 billion and $78.6 billion of loans, Cannon estimated.

*During the period in question excluding October 2007, WaMu originated $275.4 billion of real-estate loans, selling $172.5 billion as mortgage-backed securities. As a result, the loans appraised by eAppraiseIT could account for 19% to 29% of loan production, the analyst wrote.*

*The value of mortgages that could be "put back" to WaMu may be about $33 billion, Cannon estimated. That may require additional reserves of $412 million, or the equivalent of 30 cents a share, he said.*

*In a worst-case scenario -- in which inflated appraisals were systemic throughout WaMu -- the lender might need to set aside an extra $2.1 billion, or $1.57 a share, of reserves, he added.*
[Emphasis added.]

47.    On this news, the Company's shares fell an additional $1.94 per share, or over 7.5

percent, to close on November 2, 2007 at $23.81 per share, on heavy trading volume.

48.     Then on November 7, 2007, *MarketWatch.com* published an article entitled "WaMu now expects up to $2.9 billion in credit losses; More staff cuts at lender are possible, as mortgage volume may keep sinking."  The article, in relevant part, stated:

> Washington Mutual Inc. said on Wednesday that ***2007 credit losses could amount to between $2.7 billion to $2.9 billion, almost double the estimates it made in July*** when the subprime meltdown began wreaking havoc in U.S. mortgage markets.

> Washington Mutual (WM) also said that ***it expects first-quarter credit losses to be in line with those in the fourth quarter***, according to executives at an annual investors' conference in New York.

> Shares of Washington Mutual fell rapidly to their lowest levels in 20 years after the company issued its latest forecast. By midday in the session, the lender's stock had dropped 19%. Shares closed down 17.3% on more than five times their average daily trading volume.

> * * *

> ***In 2008, Washington Mutual projects between zero and 5% growth.*** It also sees noninterest expenses of $8.5 billion at the high end for 2008.

> * * *

> "It would appear that they've got enough cash on hand, but that relies on the visibility going forward," he commented. "As they look forward into the next year, Washington Mutual is going to have to be able to quantify their exposure to credit losses. If they can't do that, then that puts the dividend in much greater jeopardy."

> Loan sizes and property values are also in flux, Washington Mutual executives cautioned, making any more concrete predictions difficult. They now say that additional staff cuts might be necessary.

> But Killinger said that he saw signs of improving liquidity in credit markets.

> At the same time, Chief Financial Officer Thomas Casey warned that overall expenses in 2007 could turn out to be greater than a

broad range Washington Mutual had given in its third-quarter conference call.

In mid-October, Washington Mutual reported that its third-quarter net income had been slashed by more than two-thirds from a year earlier, due to weakening housing- and capital-market conditions. The firm's net for the period ended Sept. 30 was $210 million, or 23 cents a share, compared with $748 million or 77 cents a share for the same period a year ago.

* * *

The revised estimates came on the heels of a ratings downgrade by a leading credit agency. Fitch Ratings on Tuesday revised its outlook on Washington Mutual to negative from stable.

Separately, New York Attorney General Andrew Cuomo moved forward with his probe of the mortgage industry. According to reports by Dow Jones Newswires, the regulator's office has expanded its investigation to include Fannie Mae (FNM) and Freddie Mac (FRE) , the country's largest mortgage financing firms.

* * *

The New York regulator's office has charged that a unit of First American Corp. (FAF) worked with Washington Mutual to use a list of preferred appraisers. That had the impact of inflating mortgage appraisals, according to Cuomo's staff.

* * *

There's been concern that if appraisals for WaMu mortgages are found to have inflated property values, the company might be forced to buy back those loans at their original value.

WaMu said late Wednesday that it has a "very rigorous process" of dealing with repurchase requests and reckons it's "adequately reserved" for such liabilities.  [Emphasis added.]

49.    On this news, the Company's shares fell an additional $4.19 per share, or over

17.3 percent, to close on November 7, 2007 at $20.19 per share, on heavy trading volume.

50.    Then on December 10, 2007, after the close of the market, the Company issued a

press release entitled "WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend,

46

Resize Home Loans Business and Cut Expenses to Fortify Capital Base."   Therein, the Company, in relevant part, stated:

- ***Expects Net Loss for Fourth Quarter 2007 With Non-cash Writedown of Home Loans Segment Goodwill***

- Non-cash Writedown Will Not Affect Key Capital Ratios or Liquidity

Washington Mutual, Inc. (NYSE:WM) announced today a series of actions designed to address the unprecedented challenges in the mortgage and credit markets by strengthening the company's capital and liquidity and accelerating the alignment of its Home Loans business with its retail banking operations.

These actions include:

- ***A capital offering of convertible preferred stock with aggregate proceeds of approximately $2.5 billion;***

- A major reduction in company-wide noninterest expense of approximately $500 million for 2008 as a result of a substantial resizing of its Home Loans business and reduced corporate support expense; and

- ***A significant change in the strategic focus of its Home Loans business in response to a changed market.***

***In addition, the company said its Board of Directors intends to reduce the quarterly dividend rate to $0.15 per share from its most recent quarterly dividend rate of $0.56 per share.***

"A substantial infusion of new capital, significant expense reductions, the major change in our home loans business, and our planned dividend reduction all combine to further fortify WaMu's strong capital and liquidity position," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "These actions will also better position us to pursue various initiatives, particularly in our leading retail banking business -- which is at the core of our business strategy."

The company will generate approximately $3.7 billion of tangible equity as a result of the proposed capital issuance and the intended reduction in the common dividend in 2008.

The company believes these actions, together with a significant reduction in noninterest expense, should ensure that it has the financial strength to address difficult conditions in the credit and housing markets in 2008.

\* \* \*

WaMu will:

- *Discontinue all remaining lending through its subprime mortgage channel;*

- *Close approximately 190 of 336 home loan centers and sales offices;*

- *Close nine Home Loans processing and call centers;*

- *Eliminate approximately 2,600 Home Loans positions, or about 22 percent of its Home Loans staff;*

- *Eliminate approximately 550 corporate and other support positions; and*

- *Close WaMu Capital Corp., its institutional broker-dealer business, as well as its mortgage banker finance warehouse lending operation.*

These expense reduction steps will result in approximately $140 million in additional expenses in the fourth quarter. WaMu is targeting company-wide noninterest expense at or below $8.0 billion for 2008.

The resizing of its Home Loans business will be accompanied by an acceleration in WaMu's previously announced strategy to expand its focus on mortgage lending directly to customers through its retail banking stores and other retail distribution channels. It will also add bank loan consultants to support its profitable retail store network.

**Non-cash Charge to Write Down Goodwill**

As a result of the fundamental shift in the mortgage market and the actions the company is taking to resize its Home Loans business, *WaMu will incur a fourth quarter after-tax charge of approximately $1.6 billion for the writedown of all the goodwill associated with the Home Loans business.* This non-cash charge will result in a net loss for the fourth quarter of 2007, but will not affect the company's tangible or regulatory capital or liquidity.

**Increasing Loan Loss Provision Ahead of Charge-Offs**

Continued deterioration in the mortgage markets and declining housing prices have led to increasing fourth quarter charge-offs and delinquencies in the company's loan portfolio. As a result, the company now expects its fourth quarter provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of expected fourth quarter net charge-offs.

***The company currently expects its first quarter 2008 provision for loan losses to be in the range of $1.8 to $2.0 billion, reflecting an increase in provision well ahead of charge-offs, which are also expected to increase significantly during the quarter.*** The first quarter range reflects the company's current view that prevailing adverse conditions in the credit and housing markets will persist through 2008.

***While difficult to predict, the company also currently expects quarterly loan loss provisions through the end of 2008 to remain elevated, generally consistent with its expectation for the first quarter of 2008.*** The company noted that there may be some additional variation depending on the level of credit card securitization activity during any quarter.

**Capital Offering**

***As described above, the company has also commenced a capital offering of an aggregate of $2.5 billion in a new series of convertible preferred stock.*** Lehman Brothers, Morgan Stanley & Co., Credit Suisse and Goldman, Sachs & Co. are serving as joint book-running managers of the offering. [Emphasis added.]

51.     On this news, the Company's shares fell an additional $2.46 per share, or over 12.3 percent, to close on December 11, 2007 at $17.42 per share, on unusually heavy trading volume.

52.     As the *Associated Press* later reported on December 11, 2007:

**WaMu Shares Fall on Outlook Worries**

**WaMu Shares Crumbles After It Slashes Dividend, Cuts Jobs and Plans Massive Stock Offering**

Washington Mutual's move to slash staff and launch a massive stock offering to shore up its finances may smack of desperation,

analysts said Tuesday as the bank's shares tumbled nearly 12 percent.

*The stock price of the nation's largest savings and loan fell sharply a day after it said it would close offices, lay off more than 3,000 workers, and cut its dividend. It also worried investors by saying it would set aside up to $1.6 billion for loan losses in the fourth quarter and sell $2.5 billion worth of convertible preferred stock.*

WaMu has not yet priced its offering, but Friedman, Billings, Ramsey analyst Paul Miller wrote in a note to investors that he has heard it could yield 8 percent to 8.5 percent; Bear Stearns analyst David Hilder estimated the dividend rate closer to 10 percent.

*"We believe that cost could wipe out all of WaMu's 2008 earnings," Hilder wrote, calling the stock offering and dividend cut "desperate measures."*

Other recent deals support analysts' concerns that the stock sale will prove expensive for WaMu.

\* \* \*

*Converting preferred shares into common stock dilutes their value for existing stockholders. In a research note, Citi Investment Research analyst Bradley Ball estimated the WaMu deal will add 106.4 million shares to the float, diluting current prices by about 12 percent.*

WaMu shares fell $2.46, or 12.4 percent, to close at $17.42 Tuesday.

*What's more, analysts said Tuesday that WaMu's $2.5 billion cash infusion may not be enough. FBR's Paul Miller wrote that he expects the company to try to raise more money in coming months.*

*After cutting 1,000 jobs and dismantling much of its subprime mortgage operation in September, Seattle-based WaMu will now get out of the business entirely.* The company said Monday it will close about 190 of its 336 home loan centers and sales offices, shut down nine call centers and eliminate 2,600 home loan workers and 550 corporate and support jobs.

*The company also said it will shutter WaMu Capital Corp. and rely on third party broker-dealers to sell mortgage-backed securities.*

These changes, meant to address what WaMu called "unprecedented challenges in the mortgage and credit markets," will save the thrift $140 million in the fourth quarter. *But the company still expects to post a loss, due in part to a $1.6 billion charge for the writedown of goodwill associated with the shrinking home loans business.*

*On top of that, WaMu now expects to set aside between $1.5 billion and $1.6 billion in the fourth quarter for future loan losses, up from the $1.1 billion to $1.3 billion predicted by executives in early November.*

*For the first quarter of 2008, the company said it expects loan losses to total $1.8 billion to $2 billion. Loan losses will remain high throughout the year, WaMu added.*

*"The magnitude of the new loss guidance for 2008 is disconcerting," wrote Morgan Stanley analyst Kenneth Posner in a research note.*

*The company also slashed its quarterly dividend to 15 cents per share from its most recent dividend of 56 cents per share*, for savings of more than $1 billion.

*Moody's Investors Service downgraded several long-term and short-term ratings for WaMu and said in a statement that the move "was based on its view that credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated." The credit rating agency said it doesn't expect WaMu's profitability to begin to recover until 2010.*

*Fitch Ratings also downgraded WaMu's credit ratings*, saying it expects further weakening of quality in its residential mortgage portfolio and moderate deterioration among the bank's consumer loan portfolios, including its credit card portfolio. [Emphasis added.]

53.    Also on December 11, 2007, *Bloomberg* reported:

**Washington Mutual Will Take $1.6 Billion Writedown**

Washington Mutual Inc., the biggest U.S. savings and loan, will *write down the value of its home-lending unit by $1.6 billion in the fourth quarter and cut about 6 percent of its workforce as mortgage-market losses increase*.

Washington Mutual, led by Chief Executive Officer Kerry Killinger, also *slashed its quarterly dividend to 15 cents a share*

*from 56 cents and forecast a loss for the quarter*, according to a statement yesterday from the Seattle-based bank. *Provisions for bad loans will be $1.5 billion to $1.6 billion, more than the $1.3 billion the company previously predicted.* It plans to shutter 190 of 336 home-loan centers.

*Fitch Ratings and Moody's Investors Service Inc. lowered Washington Mutual's credit rating, citing the firm's deteriorating mortgage assets. The bank has lost 56 percent of its market value this year, the worst performance in the 24-member KBW Bank index, amid declining U.S. housing prices and record home loan delinquencies. Washington Mutual said it plans to sell $2.5 billion of convertible stock to shore up capital.*

"They're clearly concerned the industry will stay in a negative mode for an extended period," said Richard Bove, an analyst at Punk Ziegel & Co. in Lutz, Florida. *"The fact they're laying off so many people indicates they're concerned this is not just a one-time event." He rates the stock "market perform."*

Washington Mutual fell 10 percent to $17.90 as of 11:40 a.m. today in Frankfurt trading. The stock rose 4.5 percent to $19.88 in New York yesterday before the announcement.

**2010 Recovery**

*Fitch downgraded the firm's rating to A- from A, because of "worsening asset quality," and "extremely challenging conditions in the U.S. residential mortgage market." Moody's cut its rating two levels to Baa2 from A3.*

*"Credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated," and the company's profitability won't "begin to recover" until 2010, Moody's said in a statement.* [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Washington Mutual's securities between April 18, 2006 and December 10, 2007, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Washington Mutual's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Washington Mutual or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Washington Mutual; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

60.     The market for Washington Mutual's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Washington Mutual's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Washington Mutual's securities relying upon the integrity of the market price of Washington Mutual's securities and market information relating to Washington Mutual, and have been damaged thereby.

61.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Washington Mutual's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

62.     At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Washington Mutual's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Washington Mutual and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

63.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

64.    During the Class Period, Plaintiff and the Class purchased Washington Mutual's securities at artificially inflated prices and were damaged thereby.  The price of Washington Mutual's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

65.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual, their control over, and/or receipt and/or modification of Washington Mutual's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Mutual, participated in the fraudulent scheme alleged herein.

66.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 857,622 shares of the Company's stock for gross proceeds of $38,142,563.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| October 3, 2007 | Vuoto, Anthony | 1,827 | $35.89 | $66,000 |
| September 17, 2007 | Ballanger, Melissa J. | 1,100 | $35.53 | $39,000 |
| August 15, 2007 | Schneider, David C. | 1,187 | $32.57 | $39,000 |
| June 15, 2007 | Corcoran, James B. | 1,590 | $43.07 | $68,000 |
| May 22, 2007 | Brooks, Alfred R. | 3,000 | $43.82 | $131,000 |
| May 11, 2007 | Baker, Todd H. | 3,879 | $42.87 - $42.88 | $166,000 |
| May 1, 2007 | Killinger, Kerry K. | 50,000 | $42.00 - $42.13 | $2,103,000 |
| April 20, 2007 | Horvath, Debora D. | 3,003 | $42.65 | $128,000 |
| March 30, 2007 | Baker, Todd H. | 857 | $40.38 | $35,000 |
| March 30, 2007 | Horvath, Debora D. | 1,723 | $40.38 | $70,000 |
| March 30, 2007 | Casey, Thomas W. | 1,246 | $40.38 | $50,000 |
| February 21, 2007 | Brooks, Alfred R. | 1,838 | $45.10 - $45.11 | $83,000 |

| | | | | |
|---|---|---|---|---|
| February 15, 2007 | Farrell, Anne V. | 1,233 | $44.90 | $55,000 |
| February 13, 2007 | Casey, Thomas W. | 11,032 | $44.76 - $44.77 | $494,000 |
| February 1, 2007 | Horvath, Debora D. | 4,830 | $44.97 - $44.98 | $217,000 |
| February 1, 2007 | Killinger, Kerry K. | 50,000 | $44.59 - $44.73 | $2,233,000 |
| February 1, 2007 | Schneider, David C. | 2,308 | $44.59 | $103,000 |
| January 26, 2007 | Baker, Todd H. | 2,396 | $45.31 | $108,563 |
| January 26, 2007 | Brooks, Alfred R. | 662 | $45.31 | $30,000 |
| January 26, 2007 | Porter, J. Benson | 2,371 | $45.31 | $107,000 |
| January 26, 2007 | Horvath, Debora D. | 1,737 | $45.31 | $79,000 |
| January 26, 2007 | Casey, Thomas W. | 3,968 | $45.31 | $180,000 |
| January 26, 2007 | David, Daryl D. | 6,567 | $45.31 | $298,000 |
| January 26, 2007 | Rotella, Stephen J, | 4,557 | $45.31 | $206,000 |
| January 26, 2007 | Killinger, Kerry K. | 16,130 | $45.31 | $731,000 |
| January 26, 2007 | Chapman, Fay L. | 1,640 | $45.31 | $74,000 |
| January 22, 2007 | Matthews, Philip D. | 1,440 | $45.00 | $65,000 |
| January 19, 2007 | Brooks, Alfred R. | 1,984 | $44.67 | $89,000 |
| January 19, 2007 | Woods, John F. | 1,155 | $44.67 | $52,000 |
| January 19, 2007 | Porter, J. Benson | 3,933 | $44.67 | $176,000 |
| January 19, 2007 | Horvath, Debora D. | 6,433 | $44.67 | $287,000 |
| January 19, 2007 | Casey, Thomas W. | 14,300 | $44.67 | $639,000 |
| January 19, 2007 | Saunders, Joseph W. | 1,006 | $44.67 | $45,000 |
| January 19, 2007 | David, Daryl D. | 6,266 | $44.67 | $280,000 |
| January 19, 2007 | Rotella, Stephen J, | 16,666 | $44.67 | $744,000 |
| January 19, 2007 | Killinger, Kerry K. | 12,021 | $44.67 | $537,000 |
| January 19, 2007 | Schneider, David C. | 4,166 | $44.67 | $186,000 |
| January 19, 2007 | Chapman, Fay L. | 5,000 | $44.67 | $223,000 |
| December 15, 2006 | Woods, John F. | 1,464 | $45.23 | $66,000 |
| December 15, 2006 | Cathcart, Ronald J. | 1,568 | $45.23 | $71,000 |
| November 6, 2006 | Horvath, Debora D. | 6,483 | $42.68 | $277,000 |
| November 1, 2006 | Killinger, Kerry K. | 50,000 | $42.28 - $42.46 | $2,119,000 |

| October 3, 2006 | Saunders, Joseph W. | 11,665 | $42.92 | $501,000 |
| August 15, 2006 | Schneider, David C. | 821 | $44.05 | $36,000 |
| August 1, 2006 | Killinger, Kerry K. | 50,000 | $44.34 - $44.55 | $2,222,000 |
| August 1, 2006 | Killinger, Kerry K. | 1,688 | $44.40 | $75,000 |
| July 21, 2006 | Killinger, Kerry K. | 126,470 | $45.50 | $5,754,000 |
| May 30, 2006 | Casey, Thomas W. | 22,155 | $45.32 | $1,004,000 |
| May 19, 2006 | Porter, J. Benson | 2,145 | $45.43 | $97,000 |
| May 19, 2006 | Kido, Kenneth | 2,363 | $45.35 | $107,000 |
| May 18, 2006 | Kido, Kenneth | 1,019 | $45.19 | $46,000 |
| May 16, 2006 | Porter, J. Benson | 4,391 | $46.01 - $46.02 | $202,000 |
| May 8, 2006 | David, Daryl D. | 5,154 | $46.74 | $241,000 |
| May 1, 2006 | Killinger, Kerry K. | 50,000 | $44.90 - $45.00 | $2,248,000 |
| April 28, 2006 | Chapman, Fay L. | 162,419 | $45.00 | $7,309,000 |
| April 24, 2006 | Chapman, Fay L. | 102,766 | $44.17 - $44.40 | $4,551,000 |
|  | **TOTAL** | **857,622** |  | **$38,142,563** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

67.    At all relevant times, the market for Washington Mutual's securities was an efficient market for the following reasons, among others:

(a)    Washington Mutual's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Washington Mutual filed periodic public reports with the SEC and the NYSE;

(c)    Washington Mutual regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Washington Mutual was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

68.    As a result of the foregoing, the market for Washington Mutual's securities promptly digested current information regarding Washington Mutual from all publicly-available sources and reflected such information in the price of Washington Mutual's securities.  Under these circumstances, all purchasers of Washington Mutual's securities during the Class Period suffered similar injury through their purchase of Washington Mutual's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

69.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Washington Mutual who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Washington Mutual's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

72.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Washington Mutual's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

73.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Washington Mutual's financial well-being, business relationships, and prospects, as specified herein.

74.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Washington Mutual's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Washington Mutual and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Washington Mutual's securities during the Class Period.

75.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

76.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Washington Mutual's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

77.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Washington Mutual's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Washington Mutual's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Washington Mutual's securities during the Class Period at artificially high prices and were damaged thereby.

78.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Washington Mutual was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Washington Mutual securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

79.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of Washington Mutual within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.    As set forth above, Washington Mutual and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: December 19, 2007                     Respectfully submitted,

BRODSKY & SMITH, LLC

By: *s/ Evan J. Smith, Esquire*
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
Phone: 516-741-4799
Fax: 516-741-0626
Email: esmith@brodsky-smith.com

Alfred G. Yates, Jr., Esquire
Gerald L. Rutledge, Esquire
LAW OFFICE OF ALFRED G. YATES JR, PC
429 Forbes Avenue, 519 Allegheny Building
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033
Email: yateslaw@aol.com

**Attorneys for Plaintiff.**