# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

ROBERT L. GARBER, on behalf of    :
himself and all others similarly situated,    :
     :
      Plaintiff,    :
     :
     vs.    :    **Civil Action No. 1: 07-cv-11422-UA**
     :
WASHINGTON MUTUAL, INC., *et al.*,    :
     :
      Defendants.    :

---------------------------------------------------------x

JOEL ABRAMS, *et al.*, on behalf of    :
themselves and all others similarly situated,    :
     :
      Plaintiffs,    :
     :
     vs.    :
     :
WASHINGTON MUTUAL, INC., *et al.*,    :    **Civil Action No. 1:07-cv-09806-AKH**
     :
      Defendants.    :

---------------------------------------------------------x
     :
     :
DENNIS KOESTERER, on behalf of    :
himself and all others similarly situated,    :
     :
      Plaintiff,    :
     :
     vs.    :
     :
WASHINGTON MUTUAL, INC., *et al.*,    :    **Civil Action No. 1:07-cv-09801-CM**
     :
      Defendants.    :

---------------------------------------------------------x

**DECLARATION OF PETER ST. PHILLIP, JR. IN SUPPORT OF MOTION
BY THE NYC POLICE AND FIRE PENSION FUNDS FOR CONSOLIDATION,
<u>APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL</u>**

PETER D. ST. PHILLIP, JR. hereby declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a principal of the law firm of Lowey Dannenberg Cohen, P.C. ("Lowey Dannenberg"), which has been retained as counsel for certain New York City Police and Fire Pension Funds ("NYC Police and Fire Pension Funds") in this action.  I am duly admitted to practice in the State of New York.  I make this Declaration In Support of Motion of the NYC Police and Fire Pension Funds for (1) Consolidation; (2) Appointment of Lead Plaintiff; and (2) Approval of Lead Counsel.  I have personal knowledge of the facts asserted herein.

2.      Attached as Exhibit 1 are true and correct copies of the NYC Police and Fire Pension Funds' certifications and loss analyses.

3.      Attached as Exhibit 2 is a true and correct copy of the initial notice of filing of a class action against Washington Mutual, Inc., published on November 5, 2007 on PRNewswire.

4.      Attached as Exhibit 3 is a true and correct copy of the firm resume of Lowey Dannenberg.  As reflected in the resume, Lowey Dannenberg has substantial experience in the prosecution of securities class actions.  Lowey Dannenberg has been recognized as appropriate lead counsel in cases brought pursuant to the PSLRA, including appointments in *In re Bayer AG Securities Litigation*, 03 Civ. 1546 (WHP) (S.D.N.Y.) (representing the New York State Common Retirement Fund and New York State Local Retirement Systems); *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (N.D. Cal.) (representing the NYC Police and Fire Pension Funds); *In re Luminent Mortgage Capital Inc. Securities Litigation*, No. C07-4072-PJH (N.D. Cal.); *In re MedPartners Securities Litigation*, No. CV-98-B-0067-S (N.D. Ala.) (representing the Denver Employees Retirement Plan, the pension plan for employees of the city and county of Denver, Colorado, as lead plaintiff); *DiRienzo v. Philip Services Corp.*,

232 F.3d 49 (2d Cir. 2000); *Winn v. Symons Int'l Group, Inc.*, IP 00-0310C-B/S (S.D. Ind.); *LLOV Partners v. Inco Limited*, Civil Action No. 00-4999 (NHP) (D.N.J.); *In re United Healthcare Securities Litigation*, No. 98-1888 (JMR/FLN) (D. Minn.); and *In re Cinar Securities Litigation*, No. CV 00 1086 (E.D.N.Y.).

 5. Attached as Exhibit 4 is a true and correct copy of the Complaint filed in *Koesterer v. Washington Mutual, Inc., et al.*, Civil Action No. 1:07-cv-09801-CM.

 6. Attached as Exhibit 5 is a true and correct copy of the Complaint filed in *Abrams v. Washington Mutual Inc., et al.*, Civil Action No. 1:07-cv-09806-AKH.  While this version is unsigned, a copy of the filed version is not available for download on the Court's ECF system. Counsel for Plaintiffs in this action holds out the version attached hereto as the filed version.  *See* http://www.csgrr.com/cases/wamu/complaint.pdf (last visited January 4, 2008).

 7. Attached as Exhibit 6 is a true and correct copy of the Complaint filed in *Garber v. Washington Mutual, Inc., et al.*, Civil Action No. 1: 07-cv-11422-UA.


 I declare under penalty of perjury that the foregoing is true and correct.


Executed this 4th day of January, 2008, at White Plains, New York.


         **/s/ Peter D. St. Phillip, Jr.**
          PETER D. ST. PHILLIP, JR.


2100 / DECL / 00085976.WPD v1

## CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the New York City Fire Department Pension Fund (hereinafter "Fire").

2.     Fire did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, Fire adopts these claims and Class Period .

4.     Fire is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.     Fire's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.     Fire has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Take Two Interactive Securities Litigation*, Civil Action No. 1:06-CV-00803-SWK (S.D.N.Y.) (appointed); *In re Countrywide Financial Corp. Securities Litigation*, C. 07-5295 (C.D. Cal.) (appointed); and *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.     Fire will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

### New York City Fire Department Pension Fund

### Washington Mutual Inc. Common Stock Transactions

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 6/9/06 | Sell | | (170) | 45.64 | 7,750.06 |
| 6/12/06 | Buy | 3,000 | | 45.09 | (135,335.70) |
| 6/12/06 | Buy | 2,700 | | 45.05 | (121,665.51) |
| 6/30/06 | Sell | | (1,200) | 45.62 | 54,739.67 |
| 6/30/06 | Sell | | (4,300) | 45.64 | 196,242.96 |
| 6/30/06 | Sell | | (200) | 45.58 | 9,116.00 |
| 7/5/06 | Sell | | (3,700) | 45.88 | 169,658.65 |
| 7/20/06 | Buy | 400 | | 45.77 | (18,315.16) |
| 7/20/06 | Buy | 400 | | 45.79 | (18,321.44) |
| 7/24/06 | Sell | | (904) | 45.89 | 41,429.67 |
| 8/7/06 | Sell | | (513) | 45.09 | 23,108.44 |
| 9/26/06 | Buy | 300 | | 43.44 | (13,032.00) |
| 10/9/06 | Sell | | (4,400) | 43.52 | 191,397.20 |
| 10/10/06 | Buy | 23,500 | | 43.79 | (1,030,235.30) |
| 10/10/06 | Buy | 2,400 | | 43.6 | (104,724.00) |
| 10/10/06 | Sell | | (2,100) | 43.7 | 91,745.13 |
| 10/12/06 | Buy | 3,300 | | 43.6 | (144,045.33) |
| 10/13/06 | Buy | 400 | | 43.69 | (17,485.24) |
| 10/17/06 | Buy | 300 | | 43.64 | (13,095.99) |
| 11/3/06 | Buy | 1,700 | | 42.74 | (72,700.50) |
| 11/3/06 | Buy | 400 | | 42.41 | (16,972.00) |
| 11/14/06 | Buy | 600 | | 42.96 | (25,791.54) |
| 11/21/06 | Buy | 4,900 | | 42.9 | (210,430.50) |
| 11/21/06 | Buy | 2,700 | | 42.94 | (116,080.56) |
| 12/7/06 | Buy | 2,200 | | 44.4 | (97,691.00) |
| 12/19/06 | Buy | 1,500 | | 45.23 | (67,870.20) |
| 2/2/07 | Buy | 81,100 | | 45.57 | (3,697,170.58) |
| 2/7/07 | Sell | | (1,630) | 45.36 | 73,889.54 |
| 2/7/07 | Buy | 500 | | 45.36 | (22,685.50) |
| 2/9/07 | Buy | 1,150 | | 43.33 | (49,844.80) |
| 2/13/07 | Buy | 3,100 | | 44.49 | (137,988.44) |
| 2/14/07 | Buy | 2,600 | | 45.3 | (117,822.64) |
| 2/15/07 | Buy | 1,900 | | 45.01 | (85,555.29) |
| 2/16/07 | Buy | 1,900 | | 45.14 | (85,808.94) |
| 2/20/07 | Buy | 2,700 | | 45.42 | (122,693.13) |
| 2/27/07 | Sell | | (3,900) | 42.45 | 165,351.40 |
| 2/28/07 | Buy | 1,000 | | 43.13 | (43,153.00) |
| 2/28/07 | Sell | | (35,800) | 42.99 | 1,537,197.59 |
| 3/2/07 | Buy | 400 | | 42.86 | (17,147.00) |
| 3/6/07 | Buy | 16,900 | | 41.73 | (705,532.75) |
| 3/13/07 | Buy | 3,400 | | 40.98 | (139,416.32) |
| 3/30/07 | Sell | | (5,800) | 40.38 | 234,142.41 |
| 3/30/07 | Sell | | (4,100) | 40.38 | 165,500.11 |
| 4/12/07 | Buy | 400 | | 38.9 | (15,566.00) |
| 5/31/07 | Buy | 2,500 | | 43.71 | (109,275.00) |
| 6/22/07 | Sell | | (3,700) | 42.66 | 157,831.07 |

*New York City Fire Department Pension Fund*

*Washington Mutual Inc. Common Stock Transactions*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 6/22/07 | Sell | | (5,500) | 42.65 | 234,555.46 |
| 6/26/07 | Sell | | (1,300) | 42.98 | 55,861.18 |
| 7/5/07 | Sell | | (36,900) | 43.26 | 1,595,657.03 |
| 8/3/07 | Sell | | (4,100) | 34.67 | 141,933.67 |
| 8/21/07 | Buy | 4,600 | | 37.69 | (173,471.52) |
| 9/12/07 | Buy | 700 | | 35.12 | (24,591.14) |
| 11/27/07 | Buy | 15,900 | | 17.27 | (274,860.12) |
| 11/30/07 | Buy | 717 | | 19.50 | (13,981.50) |
| 11/30/07 | Sell | | (2,150) | 20.62 | 44,306.95 |
| 11/30/07 | Sell | | (717) | 19.24 | 13,787.33 |

## CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the New York City Police Pension Fund (hereinafter "Police").

2.     Police did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, Police adopts these claims and Class Period.

4.     Police is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.     Police's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.     Police has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Take Two Interactive Securities Litigation*, Civil Action No. 1:06-CV-00803-SWK (S.D.N.Y.) (appointed); *In re Countrywide Financial Corp. Securities Litigation*, C. 07-5295 (C.D. Cal.) (appointed); and *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.     Police will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

## New York City Police Pension Fund Article 2

## Washington Mutual Inc. Common Stock Transactions

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 4/18/06 | Buy | 1,100 | | 43.68 | (48,075.50) |
| 6/7/06 | Buy | 700 | | 45.04 | (31,542.00) |
| 6/12/06 | Buy | 12,400 | | 45.09 | (559,387.56) |
| 6/12/06 | Buy | 10,900 | | 45.05 | (491,168.17) |
| 6/30/06 | Sell | | (19,900) | 45.64 | 908,194.18 |
| 6/30/06 | Sell | | (700) | 45.58 | 31,906.00 |
| 6/30/06 | Sell | | (9,000) | 45.62 | 410,547.59 |
| 7/3/06 | Buy | 8,100 | | 45.99 | (372,567.60) |
| 7/20/06 | Buy | 1,600 | | 45.77 | (73,260.64) |
| 7/20/06 | Buy | 1,700 | | 45.79 | (77,866.12) |
| 9/26/06 | Buy | 1,100 | | 43.44 | (47,784.00) |
| 10/9/06 | Sell | | (18,100) | 43.52 | 787,338.48 |
| 10/10/06 | Buy | 63,600 | | 43.79 | (2,788,211.28) |
| 10/10/06 | Buy | 6,400 | | 43.6 | (279,264.00) |
| 10/10/06 | Sell | | (8,500) | 43.7 | 371,349.34 |
| 10/12/06 | Buy | 8,900 | | 43.6 | (388,485.89) |
| 10/13/06 | Buy | 1,200 | | 43.69 | (52,455.72) |
| 10/13/06 | Buy | 5,100 | | 43.84 | (223,658.97) |
| 11/3/06 | Buy | 1,200 | | 42.41 | (50,916.00) |
| 11/14/06 | Buy | 1,600 | | 42.96 | (68,777.44) |
| 11/21/06 | Buy | 7,300 | | 42.94 | (313,847.44) |
| 11/21/06 | Buy | 12,700 | | 42.9 | (545,401.50) |
| 12/11/06 | Buy | 2,800 | | 44.2 | (123,760.00) |
| 12/19/06 | Buy | 4,700 | | 45.23 | (212,659.96) |
| 1/25/07 | Buy | 300 | | 44.96 | (13,488.00) |
| 2/13/07 | Buy | 14,000 | | 44.49 | (623,173.60) |
| 2/14/07 | Buy | 11,900 | | 45.3 | (539,265.16) |
| 2/15/07 | Buy | 8,700 | | 45.01 | (391,753.17) |
| 2/16/07 | Buy | 8,300 | | 45.14 | (374,849.58) |
| 2/20/07 | Buy | 12,300 | | 45.42 | (558,935.37) |
| 2/27/07 | Buy | 30,200 | | 43.43 | (1,311,978.60) |
| 2/27/07 | Sell | | (10,700) | 42.45 | 453,656.42 |
| 2/28/07 | Sell | | (96,900) | 42.99 | 4,160,738.73 |
| 3/6/07 | Buy | 31,400 | | 41.73 | (1,310,871.50) |
| 3/13/07 | Buy | 17,400 | | 40.98 | (713,466.12) |
| 3/30/07 | Sell | | (16,480) | 40.38 | 665,229.73 |
| 3/30/07 | Sell | | (25,000) | 40.38 | 1,009,234.55 |
| 4/12/07 | Buy | 1,800 | | 38.9 | (70,047.00) |
| 4/13/07 | Buy | 15,700 | | 39.51 | (620,420.04) |
| 6/22/07 | Sell | | (22,000) | 42.65 | 938,221.84 |
| 6/22/07 | Sell | | (19,200) | 42.66 | 819,015.30 |
| 6/26/07 | Sell | | (5,300) | 42.98 | 227,714.72 |
| 8/21/07 | Buy | 18,200 | | 37.7 | (686,525.84) |
| 9/12/07 | Buy | 2,700 | | 35.12 | (94,851.54) |
| 11/27/07 | Buy | 78,200 | | 17.27 | (1,351,827.76) |

# CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of the New York City Police Superior Officers' Variable Supplements Fund (hereinafter "PSOVSF").

2.      PSOVSF did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, PSOVSF adopts these claims and Class Period.

4.      PSOVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.      PSOVSF's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.      PSOVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.      PSOVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

*New York City Police Superior Officers Var. Supl. Fund*

*Washington Mutual Inc. Common Stock Transactions*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 4/18/06 | Buy | 200 | | 43.68 | (8,741.00) |
| 6/30/06 | Sell | | (3,200) | 45.64 | 146,041.27 |
| 6/30/06 | Sell | | (100) | 45.58 | 4,558.00 |
| 9/26/06 | Buy | 100 | | 43.44 | (4,344.00) |
| 11/3/06 | Buy | 2,700 | | 42.74 | (115,465.50) |
| 12/11/06 | Sell | | (1,200) | 44.32 | 53,164.36 |
| 12/11/06 | Sell | | (2,300) | 44.2 | 101,660.00 |
| 1/25/07 | Buy | 100 | | 44.96 | (4,496.00) |
| 3/13/07 | Buy | 2,000 | | 40.98 | (82,007.00) |
| 3/30/07 | Sell | | (2,600) | 40.38 | 104,951.29 |
| 4/12/07 | Buy | 1,100 | | 38.9 | (42,806.50) |
| 6/22/07 | Sell | | (3,500) | 42.65 | 149,262.56 |
| 8/21/07 | Buy | 3,000 | | 37.7 | (113,174.40) |
| 9/12/07 | Buy | 400 | | 35.12 | (14,052.08) |

## CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of the New York City Fire Officers' Variable Supplements Fund (hereinafter "FOVSF").

2.    FOVSF did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, FOVSF adopts these claims and Class Period.

4.    FOVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.    FOVSF's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.    FOVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.    FOVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

*New York City Fire Officers Var. Supl. Fund*

*Washington Mutual Inc. Common Stock Transactions*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 6/16/06 | Sell | | (367) | 44.54 | 16,347.51 |
| 7/25/06 | Buy | 100 | | 45.51 | (4,552.00) |
| 10/6/06 | Buy | 100 | | 43.46 | (4,347.00) |
| 10/6/06 | Buy | 100 | | 43.46 | (4,347.00) |
| 10/6/06 | Sell | | (100) | 43.32 | 4,331.86 |
| 1/26/07 | Sell | | (200) | 45.31 | 9,059.72 |
| 3/16/07 | Sell | | (717) | 39.88 | 28,596.67 |
| 3/26/07 | Buy | 500 | | 41.45 | (20,730.00) |
| 6/15/07 | Sell | | (300) | 43.08 | 12,922.75 |

## CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the New York City Police Officers' Variable Supplements Fund (hereinafter "POVSF").

2.     POVSF did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, POVSF adopts these claims and Class Period.

4.     POVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.     POVSF's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.     POVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.     POVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

_____
LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

*New York City Police Officers Var. Supl. Fund*

*Washington Mutual Inc. Common Stock Transactions*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 4/18/06 | Buy | 200 | | 43.68 | (8,741.00) |
| 6/30/06 | Sell | | (3,100) | 45.64 | 141,477.48 |
| 6/30/06 | Sell | | (100) | 45.58 | 4,558.00 |
| 9/26/06 | Buy | 100 | | 43.44 | (4,344.00) |
| 11/3/06 | Buy | 1,100 | | 42.74 | (47,041.50) |
| 12/11/06 | Sell | | (500) | 44.2 | 22,100.00 |
| 3/30/07 | Sell | | (2,560) | 40.38 | 103,336.65 |
| 4/12/07 | Buy | 2,000 | | 38.9 | (77,830.00) |
| 6/22/07 | Sell | | (3,400) | 42.65 | 144,997.92 |
| 8/21/07 | Buy | 2,900 | | 37.68 | (109,337.54) |
| 9/12/07 | Buy | 500 | | 35.17 | (17,594.80) |

## CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the New York City Firefighters' Variable Supplements Fund (hereinafter "FFVSF").

2.     FFVSF did not purchase or acquire the securities of Washington Mutual Inc. ("WMI") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     I have reviewed the Class Action Complaint filed against WMI and others, captioned *Garber v. Washington Mutual Inc., et al.*, 07 Civ. 11422 (S.D.N.Y.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired WMI securities from April 18, 2006 through and including December 10, 2007 (the "Class Period"). As of this date, FFVSF adopts these claims and Class Period.

4.     FFVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.     FFVSF's transactions in the securities of WMI during the Class Period are identified in the annexed chart.

6.     FFVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Juniper Networks, Inc. Securities Litigation*, No. C06-04327-JW (appointed).

7.     FFVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2008

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and
General Counsel for the Office of the New
York City Comptroller

*New York City Firefighters Var. Supl. Fund*

*Washington Mutual Inc. Common Stock Transactions*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 6/30/06 | Sell | | (1,000) | 45.62 | 45,616.39 |
| 8/24/06 | Buy | 300 | | 43.71 | (13,115.01) |
| 10/6/06 | Buy | 100 | | 43.26 | (4,327.00) |
| 10/6/06 | Buy | 100 | | 43.27 | (4,328.00) |
| 11/21/06 | Buy | 100 | | 42.91 | (4,292.00) |
| 12/22/06 | Buy | 800 | | 45.51 | (36,416.00) |
| 3/30/07 | Sell | | (2,300) | 40.38 | 92,849.57 |
| 6/22/07 | Sell | | (500) | 42.66 | 21,328.52 |
| 6/25/07 | Buy | 100 | | 42.7 | (4,271.00) |
| 10/3/07 | Buy | 800 | | 36.29 | (29,036.96) |

**NYCERS**
**Summary of Analyses: Last-In First-Out ("LIFO") Share Accounting**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| System: | FFVSF | FIRE | FOVSF | POLICE | POVSF | PSOVSF | Total |
|---|---|---|---|---|---|---|---|
| **Trading Analysis** | | | | | | | |
| Shares Held @ 04/18/2006 | 18,801 | 118,483 | 13,074 | 424,348 | 35,119 | 36,056 | 645,881 |
| Class Period Purchases | | | | | | | |
| Shares | 2,300 | 192,167 | 800 | 404,200 | 6,800 | 9,600 | 615,867 |
| Dollars | $ 95,785.97 | $ 8,060,355.64 | $ 33,976.00 | $ 15,410,543.07 | $ 264,888.84 | $ 385,086.48 | $ 24,250,636.00 |
| Class Period Sales | | | | | | | |
| Shares | 3,600 | 123,084 | 1,684 | 251,780 | 9,660 | 12,900 | 402,908 |
| Dollars | $ 159,794.48 | $ 5,205,201.52 | $ 71,258.51 | $ 10,783,146.88 | $ 416,470.05 | $ 559,637.48 | $ 17,195,508.92 |
| Shares Held 12/10/2007 | 17,301 | 187,566 | 12,190 | 576,768 | 32,259 | 32,756 | 858,840 |
| "Lookback Period" Sales (1) | | | | | | | |
| Shares | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dollars | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Shares Held @ 12/31/2007 (2) | 17,301 | 187,566 | 12,190 | 576,768 | 32,259 | 32,756 | 858,840 |
| **Net Expenditure Analysis** | | | | | | | |
| Net Class Period Expenditures (Sales)(1) | | | | | | | |
| Shares | (1,500) | 69,083 | (884) | 152,420 | (2,860) | (3,300) | 212,959 |
| Dollars Net Expenditures (Net Proceeds) | $ (64,008.51) | $ 2,855,154.12 | $ (37,282.51) | $ 4,627,396.19 | $ (151,581.21) | $ (174,551.00) | $ 7,055,127.08 |
| Net Class Period + "Lookback Period" Purchases (Sales)(1) | | | | | | | |
| Shares | (1,500) | 69,083 | (884) | 152,420 | (2,860) | (3,300) | 212,959 |
| Dollars Net Expenditures (Net Proceeds) | $ (64,008.51) | $ 2,855,154.12 | $ (37,282.51) | $ 4,627,396.19 | $ (151,581.21) | $ (174,551.00) | $ 7,055,127.08 |
| **Gain (Loss) Analysis** | | | | | | | |
| Gain (Loss) on Class Period Purchases (3) | $ (26,077.41) | $ (2,100,364.62) | $ (4,730.24) | $ (2,694,162.08) | $ (70,277.97) | $ (70,633.36) | $ (4,966,245.68) |

Notes:
(1) Sales attributable to Pre-Class Period Holdings and Class Period Purchases only. Figures may not be equal under FIFO and LIFO as under LIFO, post-Class Period sales are first allocated to post-Class Period purcha
(2) Holdings attributable to Pre-Class Period Holdings and Class Period Purchases only. Figures may not be equal under FIFO and LIFO as under LIFO, post-Class Period sales are first allocated to post-Class Period purc
(3) Class Period Purchases held as of 12/31/2007 valued at $14.6571, the average closing price of Washington Mutual, Inc. Common Stock common stock between 12/11/2007 and 12/31/2007 (21-Day "Lookback Period"

**NYCERS**
**Summary of Analyses: First-In First-Out ("FIFO") Share Accounting**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

System:

| | FFVSF | FIRE | FOVSF | POLICE | POVSF | PSOVSF | Total |
|---|---|---|---|---|---|---|---|
| **Trading Analysis** | | | | | | | |
| Shares Held @ 04/18/2006 | 18,801 | 118,483 | 13,074 | 424,348 | 35,119 | 36,056 | 645,881 |
| Class Period Purchases | | | | | | | |
| Shares | 2,300 | 192,167 | 800 | 404,200 | 6,800 | 9,600 | 615,867 |
| Dollars | $ 95,785.97 | $ 8,060,355.64 | 33,976.00 | $ 15,410,543.07 | 264,888.84 | 385,086.48 | $ 24,250,636.00 |
| Class Period Sales | | | | | | | |
| Shares | 3,800 | 123,084 | 1,684 | 251,780 | 9,660 | 12,900 | 402,908 |
| Dollars | 159,794.48 | 5,205,201.52 | 71,282.51 | 10,783,146.88 | 416,470.05 | 559,637.48 | 17,195,508.92 |
| Shares Held 12/10/2007 | 17,301 | 187,566 | 12,190 | 576,768 | 32,259 | 32,756 | 858,840 |
| "Lookback Period" Sales (1) | | | | | | | |
| Shares | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dollars | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Shares Held @ 12/31/2007 (2) | 17,301 | 187,566 | 12,190 | 576,768 | 32,259 | 32,756 | 858,840 |
| **Net Expenditure Analysis** | | | | | | | |
| Net Class Period Purchases (Sales) (1) | | | | | | | |
| Shares | (1,500) | 69,083 | (884) | 152,420 | (2,860) | (3,300) | 212,959 |
| Dollars Net Expenditures (Net Proceeds) | $ (64,008.51) | $ 2,855,154.12 | $ (37,282.51) | $ 4,627,396.19 | $ (151,581.21) | $ (174,551.00) | $ 7,055,127.08 |
| Net Class Period "Lookback Period" Purchases (Sales) (1) | | | | | | | |
| Shares | (1,500) | 69,083 | (884) | 152,420 | (2,860) | (3,300) | 212,959 |
| Dollars Net Expenditures (Net Proceeds) | $ (64,008.51) | $ 2,855,154.12 | $ (37,282.51) | $ 4,627,396.19 | $ (151,581.21) | $ (174,551.00) | $ 7,055,127.08 |
| **Gain (Loss) Analysis** | | | | | | | |
| Gain (Loss) on Class Period Purchases (3) | $ (62,074.54) | $ (5,193,052.15) | $ (22,250.29) | $ (9,486,125.93) | $ (165,220.27) | $ (244,377.91) | $ (15,173,101.08) |

Notes:
(1) Sales attributable to Pre-Class Period Holdings and Class Period Purchases only. Figures may not be equal under FIFO and LIFO as under LIFO, post-Class Period sales are first allocated to post-Class Period purcha
(2) Holdings attributable to Pre-Class Period Holdings and Class Period Purchases only. Figures may be equal under FIFO and LIFO and LIFO as under LIFO, post-Class Period sales are first allocated to post-Class Period purc
(3) Class Period Purchases held at 12/31/2007 valued at $14.6571, the average closing price of Washington Mutual, Inc. Common Stock common stock between 12/11/2007 and 12/31/2007 (21-Day "Lookback Period"

FireFighters Variable Supplemental Fund (FFVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | | |
|---|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | 18,801 | |

**IA. Pre-Class Period Holdings**

**IA. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | 06/30/2006 | $45.616 | 1,000 | $ 45,616.39 | 0 | $ | $ 30,959.25 |
| Pre-Class Period Holdings | 03/30/2007 | $40.369 | 900 | 36,332.44 | 0 | $ | 23,141.01 |
| Pre-Class Period Holdings | 06/22/2007 | $42.657 | 500 | 21,328.52 | 0 | $ | 13,999.95 |
| **IA. Total** | | | **2,400** | **$ 103,277.35** | **0** | **$** | **$ 68,100.21** |

**FireFighters Variable Supplemental Fund (FFVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**IB. Pre-Class Period Holdings Sold During "Lookback Period"**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | | | | | | | | $14.6571 |
| **IB. Total** | | | **0** | | | | | **$ -** | **0** | **$ -** | **$ -** | |

**FireFighters Variable Supplemental Fund (FFVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1C. Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 16,401 | 16,401 | | | | | | 16,401 | | $14.6571 |
| **1C. Total** | | | **16,401** | | | | | **0** | **$        -** | **16,401** | **$        -** | |

FireFighters Variable Supplemental Fund (FFVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

## 2A. Class Period Purchases Sold Prior to End of Class Period

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 08/24/2006 | $43.717 | 300 | $ 13,115.01 | Sale | 03/30/2007 | $40.369 | 300 | $ 12,110.81 | 0 | $ (1,004.20) | $14.6571 |
| Purchase | 10/06/2006 | $43.270 | 100 | $ 4,327.00 | Sale | 03/30/2007 | $40.369 | 100 | $ 4,036.94 | 0 | $ (290.06) | |
| Purchase | 10/06/2006 | $43.280 | 100 | $ 4,328.00 | Sale | 03/30/2007 | $40.369 | 100 | $ 4,036.94 | 0 | $ (291.06) | |
| Purchase | 11/21/2006 | $42.920 | 100 | $ 4,292.00 | Sale | 03/30/2007 | $40.369 | 100 | $ 4,036.94 | 0 | $ (255.06) | |
| Purchase | 12/22/2006 | $45.520 | 800 | $ 36,416.00 | Sale | 03/30/2007 | $40.369 | 800 | $ 32,295.50 | 0 | $ (4,120.50) | |
| **2A. Total** | | | **1,400** | **$ 62,478.01** | | | | **1,400** | **$ 56,517.13** | **0** | **$ (5,960.88)** | **$ -** |

**FireFighters' Variable Supplemental Fund (FFVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| **2B. Total** | | | 0 | $    - |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Purchase | | | 0 | $    - | 0 | $    - | $14.6571 |
| **2B. Total** | | | 0 | $    - | | | |

FireFighters Variable Supplemental Fund (FFVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C. Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 06/25/2007 | $42.710 | 100 | $ 4,271.00 | | | | | | 100 | $ (2,805.29) | $14.6571 |
| Purchase | 10/03/2007 | $36.296 | 800 | $ 29,036.96 | | | | | | 800 | $ (17,311.25) | $14.6571 |

Firefighters' Variable Supplemental Fund (FFVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2C. Total | | | 900 | $ 33,307.96 | | | | 0 | $ - | 900 | $ (20,116.53) | $14.6571 |
| Class Period Purchase Total | | | 2,300 | $ 95,785.97 | | | | 1,400 | $ 56,517.13 | 900 | $ (26,077.41) | |
| Grand Total | | | 2,300 | $ 95,785.97 | | | | 3,800 | $ 159,794.48 | 17,301 | | $14.6571 |

FireFighters Variable Supplemental Fund (FFVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $14.6571 |
| | | | | | | | | | | | | $14.6571 |

[1] For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

Fire Fighters (FIRE)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**Pre-Class Period Holdings**          118,483

**1A.  Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | Sale | 06/09/2006 | $45.589 | 170 | $ 7,750.06 | 0 | $ | $ 5,258.35 |
| Pre-Class Period Holdings | | | | | Sale | 07/05/2006 | $45.854 | 3,700 | 169,658.65 | 0 | $ | 115,427.22 |
| Pre-Class Period Holdings | | | | | Sale | 07/24/2006 | $45.829 | 104 | 4,766.25 | 0 | $ | 3,241.90 |
| Pre-Class Period Holdings | | | | | Sale | 08/07/2006 | $45.046 | 513 | 23,108.44 | 0 | $ | 15,589.33 |
| Pre-Class Period Holdings | | | | | Sale | 10/09/2006 | $43.499 | 4,100 | 178,347.39 | 0 | $ | 118,253.11 |
| **1A.  Total** | | | **8,587** | | | | | **8,587** | **$ 383,630.79** | **0** | **$** | **$ 257,769.90** |

**Fire Fighters (FIRE)**
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Total** | | | 0 | | | | | 0 | $ - | 0 | $ - | $14.6571 | $ - |

Fire Fighters (FIRE)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | | | | | |
|---|---|---|---|---|---|
| Class Period Beginning: | | | 4/18/2006 |
| Class Period End: | | | 12/10/2007 |
| "Lookback Period" Beginning: | | | 12/11/2007 |
| "Lookback Period" End: | | | 12/31/2007 |
| Days in "Lookback Period": | | | 21 |
| "Lookback Period" Average Closing Price: | | | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 109,896 | | | | | | | 109,896 | | |
| | | | | | | | | | | | | |
| 1C: Total | | | 109,896 | | | | | $ | - | 109,896 | $ | - |

1C: Pre-Class Period Holdings Held at End of "Lookback Period"

**Fire Fighters (FIRE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

**2A. Class Period Purchases Sold Prior to End of Class Period**

| Class Period Beginning: | 4/18/2006 |
| --- | --- |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

Offset for Shares Sold Into Class Above: $14.6571

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Purchase | 06/12/2006 | $45.061 | 1,300 | 58,579.69 | Sale | 06/30/2006 | $45.638 | 1,300 | 59,329.27 | 0 | $ 749.58 |
| Purchase | 06/12/2006 | $45.061 | 1,200 | 54,073.56 | Sale | 06/30/2006 | $45.616 | 1,200 | 54,739.67 | 0 | $ 666.11 |
| Purchase | 06/12/2006 | $45.061 | 200 | 9,012.26 | Sale | 06/30/2006 | $45.580 | 200 | 9,116.00 | 0 | $ 103.74 |
| Purchase | 06/12/2006 | $45.112 | 3,000 | 135,335.70 | Sale | 06/30/2006 | $45.638 | 3,000 | 136,913.69 | 0 | $ 1,577.99 |
| Purchase | 07/20/2006 | $45.788 | 400 | 18,315.16 | Sale | 07/24/2006 | $45.829 | 400 | 18,331.71 | 0 | $ 16.55 |
| Purchase | 07/20/2006 | $45.804 | 400 | 18,321.44 | Sale | 07/24/2006 | $45.829 | 400 | 18,331.71 | 0 | $ 10.27 |
| Purchase | 09/26/2006 | $43.440 | 300 | 13,032.00 | Sale | 10/09/2006 | $43.499 | 300 | 13,049.81 | 0 | $ 17.81 |
| Purchase | 10/10/2006 | $43.840 | 2,100 | 92,063.58 | Sale | 10/10/2006 | $43.688 | 2,100 | 91,745.13 | 0 | $ (318.45) |
| Purchase | 02/02/2007 | $45.588 | 1,130 | 51,514.21 | Sale | 02/07/2007 | $45.331 | 1,130 | 51,224.04 | 0 | $ (290.18) |
| Purchase | 02/02/2007 | $45.588 | 25,350 | 1,155,650.73 | Sale | 02/28/2007 | $42.938 | 25,350 | 1,088,490.47 | 0 | $ (67,160.26) |
| Purchase | 02/02/2007 | $45.588 | 33,700 | 1,536,308.86 | Sale | 07/05/2007 | $43.243 | 33,700 | 1,457,280.27 | 0 | $ (79,028.59) |
| Purchase | 02/07/2007 | $45.371 | 4,100 | 186,909.98 | Sale | 08/03/2007 | $34.618 | 4,100 | 141,933.67 | 0 | $ (44,976.31) |
| Purchase | 02/07/2007 | $45.371 | 500 | 22,685.50 | Sale | 02/07/2007 | $45.331 | 500 | 22,665.50 | 0 | $ (20.00) |
| Purchase | 02/09/2007 | $43.343 | 1,150 | 49,844.80 | Sale | 02/28/2007 | $42.938 | 1,150 | 49,379.25 | 0 | $ (465.55) |
| Purchase | 02/13/2007 | $44.512 | 3,100 | 137,988.44 | Sale | 02/28/2007 | $42.938 | 3,100 | 133,109.29 | 0 | $ (4,879.15) |
| Purchase | 02/14/2007 | $45.316 | 2,600 | 117,822.64 | Sale | 02/28/2007 | $42.938 | 2,600 | 111,640.05 | 0 | $ (6,182.59) |
| Purchase | 02/15/2007 | $45.029 | 1,900 | 85,555.29 | Sale | 02/28/2007 | $42.938 | 1,900 | 81,583.11 | 0 | $ (3,972.18) |
| Purchase | 02/16/2007 | $45.163 | 1,200 | 54,195.12 | Sale | 02/27/2007 | $42.398 | 1,200 | 50,877.35 | 0 | $ (3,317.77) |
| Purchase | 02/16/2007 | $45.163 | 700 | 31,613.82 | Sale | 02/28/2007 | $42.938 | 700 | 30,056.94 | 0 | $ (1,556.88) |
| Purchase | 02/20/2007 | $45.442 | 2,700 | 122,693.13 | Sale | 02/27/2007 | $42.398 | 2,700 | 114,474.05 | 0 | $ (8,219.08) |
| Purchase | 02/28/2007 | $43.153 | 1,000 | 43,153.00 | Sale | 02/28/2007 | $42.938 | 1,000 | 42,938.48 | 0 | $ (214.52) |
| Purchase | 03/02/2007 | $42.868 | 400 | 17,147.00 | Sale | 07/05/2007 | $43.243 | 400 | 17,297.10 | 0 | $ 150.10 |
| Purchase | 03/06/2007 | $41.748 | 2,400 | 100,194.00 | Sale | 03/30/2007 | $40.369 | 2,400 | 96,886.51 | 0 | $ (3,307.49) |
| Purchase | 03/06/2007 | $41.748 | 4,100 | 171,164.75 | Sale | 03/30/2007 | $40.366 | 4,100 | 165,500.11 | 0 | $ (5,664.64) |
| Purchase | 03/06/2007 | $41.748 | 2,600 | 108,543.50 | Sale | 06/22/2007 | $42.646 | 2,600 | 110,880.76 | 0 | $ 2,337.26 |
| Purchase | 03/06/2007 | $41.748 | 3,700 | 154,465.75 | Sale | 06/22/2007 | $42.657 | 3,700 | 157,831.07 | 0 | $ 3,365.32 |
| Purchase | 03/06/2007 | $41.748 | 1,300 | 54,271.75 | Sale | 06/26/2007 | $42.970 | 1,300 | 55,861.18 | 0 | $ 1,589.43 |
| Purchase | 03/06/2007 | $41.748 | 2,800 | 116,893.00 | Sale | 07/05/2007 | $43.243 | 2,800 | 121,079.67 | 0 | $ 4,186.67 |
| Purchase | 03/13/2007 | $41.005 | 3,400 | 139,416.32 | Sale | 03/30/2007 | $40.369 | 3,400 | 137,255.90 | 0 | $ (2,160.42) |
| Purchase | 04/12/2007 | $38.915 | 400 | 15,566.00 | Sale | 06/22/2007 | $42.646 | 400 | 17,058.58 | 0 | $ 1,492.58 |
| Purchase | 05/31/2007 | $43.710 | 2,500 | 109,275.00 | Sale | 06/22/2007 | $42.646 | 2,500 | 106,616.12 | 0 | $ (2,658.88) |
| Purchase | 11/27/2007 | $17.287 | 2,150 | 37,166.62 | Sale | 11/30/2007 | $20.608 | 2,150 | 44,306.95 | 0 | $ 7,140.33 |
| Purchase | 11/30/2007 | $19.500 | 717 | 13,981.50 | Sale | 11/30/2007 | $19.229 | 717 | 13,787.33 | 0 | $ (194.17) |
| **2A. Total** | | | **114,497** | **$ 5,032,754.10** | | | | **114,497** | **$ 4,821,570.73** | **0** | **$ (211,183.37)** |

**Fire Fighters (FIRE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|

**2B.  Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| **2B. Total** | | | 0 $ | - | 0 $ | - | 0 $ | - | $14.6571 |

Fire Fighters (FIRE)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | | | | Shares | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|
| Class Period Beginning: | 4/18/2006 | | | | |
| Class Period End: | 12/10/2007 | | | | |
| "Lookback Period" Beginning: | 12/11/2007 | | | | |
| "Lookback Period" End: | 12/31/2007 | | | | |
| Days in "Lookback Period": | 21 | | | | |
| "Lookback Period" Average Closing Price: | $14.6571 | | | $14.6571 | |

**2C.  Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 10/10/2006 | $43.635 | 2,400 | $ 104,724.00 | | | | | | 2,400 | $ (69,546.86) |
| Purchase | 10/10/2006 | $43.840 | 21,400 | 938,171.72 | | | | | | 21,400 | $ (624,508.86) |
| Purchase | 10/12/2006 | $43.650 | 3,300 | 144,045.33 | | | | | | 3,300 | $ (95,676.76) |
| Purchase | 10/13/2006 | $43.713 | 400 | 17,485.24 | | | | | | 400 | $ (11,622.38) |
| Purchase | 10/17/2006 | $43.653 | 300 | 13,095.99 | | | | | | 300 | $ (8,698.85) |
| Purchase | 11/03/2006 | $42.430 | 400 | 16,972.00 | | | | | | 400 | $ (11,109.14) |
| Purchase | 11/03/2006 | $42.765 | 1,700 | 72,700.50 | | | | | | 1,700 | $ (47,783.36) |
| Purchase | 11/14/2006 | $42.986 | 600 | 25,791.54 | | | | | | 600 | $ (16,997.25) |
| Purchase | 11/21/2006 | $42.993 | 2,700 | 116,080.56 | | | | | | 2,700 | $ (76,506.27) |
| Purchase | 11/21/2006 | $42.945 | 4,900 | 210,430.50 | | | | | | 4,900 | $ (138,610.50) |
| Purchase | 12/07/2006 | $44.405 | 2,200 | 97,691.00 | | | | | | 2,200 | $ (65,445.29) |
| Purchase | 12/19/2006 | $45.247 | 1,500 | 67,870.20 | | | | | | 1,500 | $ (45,884.49) |
| Purchase | 02/02/2007 | $45.588 | 16,820 | 766,786.80 | | | | | | 16,820 | $ (520,253.65) |
| Purchase | 08/21/2007 | $37.711 | 4,600 | 173,471.52 | | | | | | 4,600 | $ (106,048.66) |
| Purchase | 09/12/2007 | $35.130 | 700 | 24,591.14 | | | | | | 700 | $ (14,331.14) |
| Purchase | 11/27/2007 | $17.287 | 13,750 | 237,693.50 | | | | | | 13,750 | $ (36,157.79) |
| **2C. Total** | | | 77,670 | $ 3,027,601.54 | | | | | 0 | 77,670 | $ (1,889,181.25) |

# Fire Fighters (FIRE)
## Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
### Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | | | 192,167 | $ 8,060,355.64 | | | | 114,497 | $ 4,821,570.73 | 77,670 | $ (2,100,364.62) | $14.6571 |
| Grand Total | | | 192,167 | $ 8,060,355.64 | | | | 123,084 | $ 5,205,201.52 | 187,566 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

Fire Officers' Variable Supplemental Fund (FOVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above @ $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | **13,074** | | | | | | | | | |
| | | | | | | | | | | | | |
| **1A. Pre-Class Period Holdings Sold Through End of Class Period** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | | | Sale | 06/16/2006 | $44.544 | 367 | $ 16,347.51 | 0 | $ | $ 10,968.34 |
| Pre-Class Period Holdings | | | | | Sale | 03/16/2007 | $39.884 | 717 | 28,596.67 | 0 | $ | 18,087.50 |
| **1A. Total** | | | **1,084** | | | | | **1,084** | **$ 44,944.18** | **0** | **$** | **$ 29,055.84** |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1B.  Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Total** | | | 0 | | | | | 0 | $    - | 0 | $    - | $14.6571 | $    - |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1C.  Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 11,990 | | | | | | | 11,990 | | $14.6571 |
| **1C. Total** | | | **11,990** | | | | | | **$      0** | **11,990** | **$         -** | **$      -** |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2A.  Class Period Purchases Sold Prior to End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 07/25/2006 | $45.520 | 100 | $ 4,552.00 | Sale | 01/26/2007 | $45.299 | 100 | $ 4,529.86 | 0 | $ (22.14) | |
| Purchase | 10/06/2006 | $43.470 | 100 | $ 4,347.00 | Sale | 01/26/2007 | $45.299 | 100 | $ 4,529.86 | 0 | 182.86 | |
| Purchase | 10/06/2006 | $43.470 | 100 | $ 4,347.00 | Sale | 10/06/2006 | $43.319 | 100 | $ 4,331.86 | 0 | (15.14) | |
| Purchase | 03/26/2007 | $41.460 | 300 | $ 12,438.00 | Sale | 06/15/2007 | $43.076 | 300 | $ 12,922.75 | 0 | 484.75 | |
| **2A.  Total** | | | **600** | **$ 25,684.00** | | | | **600** | **$ 26,314.33** | **0** | **$ 630.33** | **$ -** |

Fire Officers' Variable Supplemental Fund (FOVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

2B. Class Period Purchases Sold During "Lookback Period"

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B. Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $14.6571 |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C. Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 03/26/2007 | $41.460 | 200 | $ 8,292.00 | | | | | $ - | 200 | $ (5,360.57) | $14.6571 |
| **2C. Total** | | | **200** | **$ 8,292.00** | | | | | **0 $ -** | **200** | **$ (5,360.57)** | |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | **800** | **$ 33,976.00** | | | | **600** | **$ 26,314.33** | **200** | **$ (4,730.24)** | **$14.6571** |
| **Grand Total** | | | **800** | **$ 33,976.00** | | | | **1,684** | **$ 71,258.51** | **12,190** | | **$14.6571** |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share
Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | **424,348** | | | | | | | | | |
| | | | | | | | | | | | | |
| **1A.  Pre-Class Period Holdings Sold Through End of Class Period** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 3,800 | | Sale | 06/30/2006 | $45.616 | 3,800 | $ 173,342.32 | 0 | $ | 117,645.17 |
| Pre-Class Period Holdings | | | 700 | | Sale | 06/30/2006 | $45.580 | 700 | $ 31,906.00 | 0 | $ | 21,646.00 |
| Pre-Class Period Holdings | | | 5,600 | | Sale | 10/09/2006 | $43.499 | 5,600 | $ 243,596.44 | 0 | $ | 161,516.44 |
| **1A.  Total** | | | **10,100** | | | | | 10,100 | $ 448,844.75 | 0 | $ | 300,807.61 |

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)¹ | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Total** | | | 0 | | | | | 0 | $ - | 0 | $ - | $14.6571 |

**Police Officers (POLICE)**
**Last-in First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**IC.  Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 414,248 | | | | | | | 414,248 | | $14.6571 |
| **IC. Total** | | | **414,248** | | | | | **0** | **$      -** | **414,248** | **$      -** | **$14.6571** |

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2A. Class Period Purchases Sold Prior to End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 04/18/2006 | $43.705 | 1,100 | $ 48,075.50 | Sale | 06/30/2006 | $45.616 | 1,100 | $ 50,178.04 | 0 | $ 2,102.54 | |
| Purchase | 06/07/2006 | $45.060 | 700 | 31,542.00 | Sale | 06/30/2006 | $45.616 | 700 | 31,931.48 | 0 | 389.48 | |
| Purchase | 06/12/2006 | $45.061 | 7,500 | 337,959.75 | Sale | 06/30/2006 | $45.638 | 7,500 | 342,284.24 | 0 | 4,324.49 | |
| Purchase | 06/12/2006 | $45.061 | 3,400 | 153,208.42 | Sale | 06/30/2006 | $45.616 | 3,400 | 155,095.76 | 0 | 1,887.34 | |
| Purchase | 06/12/2006 | $45.112 | 12,400 | 559,387.56 | Sale | 06/30/2006 | $45.638 | 12,400 | 565,909.94 | 0 | 6,522.38 | |
| Purchase | 07/03/2006 | $45.996 | 8,100 | 372,567.60 | Sale | 10/09/2006 | $43.499 | 8,100 | 352,344.84 | 0 | (20,222.76) | |
| Purchase | 07/20/2006 | $45.788 | 1,600 | 73,260.64 | Sale | 10/09/2006 | $43.499 | 1,600 | 69,598.98 | 0 | (3,661.66) | |
| Purchase | 07/20/2006 | $45.804 | 1,700 | 77,866.12 | Sale | 10/09/2006 | $43.499 | 1,700 | 73,948.92 | 0 | (3,917.20) | |
| Purchase | 09/26/2006 | $43.440 | 1,100 | 47,784.00 | Sale | 10/09/2006 | $43.499 | 1,100 | 47,849.30 | 0 | 65.30 | |
| Purchase | 10/10/2006 | $43.840 | 8,500 | 372,638.30 | Sale | 10/10/2006 | $43.688 | 8,500 | 371,349.34 | 0 | (1,288.96) | |
| Purchase | 10/12/2006 | $43.650 | 1,680 | 73,332.17 | Sale | 06/22/2007 | $42.657 | 1,680 | 71,663.84 | 0 | (1,668.33) | |
| Purchase | 10/12/2006 | $43.650 | 5,300 | 231,345.53 | Sale | 05/26/2007 | $42.965 | 5,300 | 227,714.72 | 0 | (3,630.81) | |
| Purchase | 10/12/2006 | $43.713 | 1,200 | 52,455.72 | Sale | 06/22/2007 | $42.657 | 1,200 | 51,188.46 | 0 | (1,267.26) | |
| Purchase | 10/13/2006 | $43.855 | 5,100 | 223,658.97 | Sale | 06/22/2007 | $42.657 | 5,100 | 217,550.94 | 0 | (6,108.03) | |
| Purchase | 11/03/2006 | $42.430 | 1,200 | 50,916.00 | Sale | 06/22/2007 | $42.657 | 1,200 | 51,188.46 | 0 | 272.46 | |
| Purchase | 11/14/2006 | $42.986 | 1,600 | 68,777.44 | Sale | 06/22/2007 | $42.657 | 1,600 | 68,251.28 | 0 | (526.17) | |
| Purchase | 11/21/2006 | $42.993 | 1,700 | 73,087.76 | Sale | 06/22/2007 | $42.938 | 1,700 | 72,995.42 | 0 | (92.34) | |
| Purchase | 11/21/2006 | $42.993 | 5,600 | 240,759.68 | Sale | 06/22/2007 | $42.657 | 5,600 | 238,879.46 | 0 | (1,880.22) | |
| Purchase | 11/21/2006 | $42.945 | 12,700 | 545,401.50 | Sale | 02/28/2007 | $42.938 | 12,700 | 545,318.70 | 0 | (82.80) | |
| Purchase | 12/11/2006 | $44.200 | 2,800 | 123,760.00 | Sale | 02/28/2007 | $42.938 | 2,800 | 120,227.74 | 0 | (3,532.26) | |
| Purchase | 12/19/2006 | $45.247 | 4,700 | 212,659.96 | Sale | 02/28/2007 | $42.938 | 4,700 | 201,810.86 | 0 | (10,849.10) | |
| Purchase | 01/25/2007 | $44.960 | 300 | 13,488.00 | Sale | 02/28/2007 | $42.938 | 300 | 12,881.54 | 0 | (606.46) | |
| Purchase | 02/13/2007 | $44.512 | 14,000 | 623,173.60 | Sale | 02/28/2007 | $42.938 | 14,000 | 601,138.72 | 0 | (22,034.88) | |
| Purchase | 02/14/2007 | $45.316 | 11,900 | 539,265.16 | Sale | 02/28/2007 | $42.938 | 11,900 | 510,967.91 | 0 | (28,297.25) | |
| Purchase | 02/15/2007 | $45.029 | 8,700 | 391,753.17 | Sale | 02/28/2007 | $42.938 | 8,700 | 373,564.78 | 0 | (18,188.39) | |
| Purchase | 02/16/2007 | $45.163 | 8,300 | 374,849.58 | Sale | 02/28/2007 | $42.938 | 8,300 | 356,389.39 | 0 | (18,460.19) | |
| Purchase | 02/20/2007 | $45.442 | 12,300 | 558,935.57 | Sale | 02/28/2007 | $42.938 | 12,300 | 528,143.31 | 0 | (30,792.06) | |
| Purchase | 02/27/2007 | $43.443 | 10,700 | 464,840.10 | Sale | 02/27/2007 | $42.398 | 10,700 | 453,656.42 | 0 | (11,183.68) | |
| Purchase | 02/27/2007 | $43.443 | 19,500 | 847,138.50 | Sale | 02/28/2007 | $42.938 | 19,500 | 837,300.36 | 0 | (9,838.14) | |
| Purchase | 03/06/2007 | $41.748 | 7,600 | 317,281.00 | Sale | 03/30/2007 | $40.369 | 7,600 | 306,807.30 | 0 | (10,473.70) | |
| Purchase | 03/06/2007 | $41.748 | 16,480 | 687,998.80 | Sale | 03/30/2007 | $40.366 | 16,480 | 665,229.73 | 0 | (22,769.07) | |
| Purchase | 03/06/2007 | $41.748 | 4,500 | 187,863.75 | Sale | 06/22/2007 | $42.646 | 4,500 | 191,909.01 | 0 | 4,045.26 | |
| Purchase | 03/06/2007 | $41.748 | 2,820 | 117,727.95 | Sale | 06/22/2007 | $42.657 | 2,820 | 120,292.87 | 0 | 2,564.92 | |
| Purchase | 03/12/2007 | $41.000 | 17,400 | 713,466.12 | Sale | 06/22/2007 | $40.369 | 17,400 | 702,427.25 | 0 | (11,038.87) | |
| Purchase | 04/12/2007 | $38.915 | 1,800 | 70,047.00 | Sale | 06/22/2007 | $42.646 | 1,800 | 76,763.61 | 0 | 6,716.61 | |
| Purchase | 04/13/2007 | $39.517 | 15,700 | 620,420.04 | Sale | 06/22/2007 | $42.646 | 15,700 | 669,549.22 | 0 | 49,129.18 | |
| **2A. Total** | | | **241,680** | **$ 10,498,692.76** | | | | **241,680** | **$ 10,334,302.13** | **0** | **$ (164,390.63)** | **$ -** |

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | $14.6571 |

Police Officers (POLICE)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

2B. Class Period Purchases Sold During "Lookback Period"

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B. Total** | | | | $  0  - | | | | | $  0  - | 0 | $  - | $14.6571 |

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C.  Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 10/10/2006 | $43.635 | 6,400 | $ 279,264.00 | | | | | | 6,400 | $ (185,458.29) | |
| Purchase | 10/10/2006 | $43.840 | 55,100 | $ 2,415,572.98 | | | | | | 55,100 | $ (1,607,964.41) | |
| Purchase | 10/12/2006 | $43.650 | 1,920 | $ 83,808.19 | | | | | | 1,920 | $ (55,666.48) | |
| Purchase | 08/21/2007 | $37.721 | 18,200 | $ 686,525.84 | | | | | | 18,200 | $ (419,765.84) | |
| Purchase | 09/12/2007 | $35.130 | 2,700 | $ 94,851.54 | | | | | | 2,700 | $ (55,277.25) | |
| Purchase | 11/27/2007 | $17.287 | 78,200 | $ 1,351,827.76 | | | | | | 78,200 | $ (205,639.19) | |
| **2C. Total** | | | **162,520** | **$ 4,911,850.31** | | | | **0** | **$   -** | **162,520** | **$ (2,529,771.45)** | **$14.6571** |

**Police Officers (POLICE)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | | | 404,200 | $ 15,410,543.07 | | | | 241,680 | $ 10,334,302.13 | 162,520 | $ (2,694,162.08) | $14.6571 |
| Grand Total | | | 404,200 | $ 15,410,543.07 | | | | 251,780 | $ 10,783,146.88 | 576,768 | | $14.6571 |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

**Police Officers' Variable Supplemental Fund (POVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | 35,119 | | | | | | | | | |

**1A. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Pre-Class Period Holdings | Sale | 06/30/2006 | $45.638 | 2,900 | $ 132,349.90 | 0 | $ 89,844.19 |
| | | | | | Pre-Class Period Holdings | Sale | 06/30/2006 | $45.580 | 100 | $ 4,558.00 | 0 | $ 3,092.29 |
| | | | | | Pre-Class Period Holdings | Sale | 03/30/2007 | $40.366 | 1,860 | $ 75,080.53 | 0 | $ 47,818.25 |
| | | | | | Pre-Class Period Holdings | Sale | 06/22/2007 | $42.646 | 1,400 | $ 59,705.03 | 0 | $ 39,185.03 |
| **1A. Total** | | | **6,260** | | | | | **6,260** | **$ 271,693.46** | **0** | **$ 179,939.75** |

Police Officers' Variable Supplemental Fund (POVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Total** | | | | 0 | | | | 0 | $ - | 0 | $ - | $14.6571 $ - |

**Police Officers' Variable Supplemental Fund (POVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1C. Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 28,859 | | | | | | | 28,859 | | $14.6571 |
| **1C. Total** | | | **28,859** | | | | | | **$ 0** | **28,859** | **$ -** | **$14.6571** |

Police Officers' Variable Supplemental Fund (POVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2A.  Class Period Purchases Sold Prior to End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $14.6571 |
| Purchase | 04/18/2006 | $43.705 | 200 | $ 8,741.00 | Sale | 06/30/2006 | $45.638 | 200 | $ 9,127.58 | 0 | 386.58 | |
| Purchase | 09/26/2006 | $43.440 | 100 | $ 4,344.00 | Sale | 03/30/2007 | $40.366 | 100 | $ 4,036.59 | 0 | (307.41) | |
| Purchase | 11/03/2006 | $42.765 | 500 | $ 21,382.50 | Sale | 12/11/2006 | $44.200 | 500 | $ 22,100.00 | 0 | 717.50 | |
| Purchase | 11/03/2006 | $42.765 | 600 | $ 25,659.00 | Sale | 03/30/2007 | $40.366 | 600 | $ 24,219.53 | 0 | (1,439.47) | |
| Purchase | 04/12/2007 | $38.915 | 2,000 | $ 77,830.00 | Sale | 06/22/2007 | $42.646 | 2,000 | $ 85,292.89 | 0 | 7,462.89 | |
| **2A.  Total** | | | 3,400 | $ 137,956.50 | | | | 3,400 | $ 144,776.59 | 0 $ | 6,820.09 $ | - |

**Police Officers' Variable Supplemental Fund (POVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2B.  Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B.  Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $14.6571 |

Police Officers' Variable Supplemental Fund (POVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | | | | | | |
|---|---|---|---|---|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| | | | | |

**2C.  Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 08/21/2007 | $37.703 | 2,900 | $ 109,337.54 | | | | | | 2,900 | $ (66,831.83) | |
| Purchase | 09/12/2007 | $35.190 | 500 | $ 17,594.80 | | | | | | 500 | $ (10,266.23) | $14.6571 |
| **2C. Total** | | | **3,400** | **$ 126,932.34** | | | | | **0** | **3,400** | **$ (77,098.05)** | **$ -** |

**Police Officers' Variable Supplemental Fund (POVSF)**
**Last-in First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | | | 6,800 | $ 264,888.84 | | | | 3,400 | $ 144,776.59 | 3,400 | $ (70,277.97) | $14.6571 |
| Grand Total | | | 6,800 | $ 264,888.84 | | | | 9,660 | $ 416,470.05 | 32,259 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share. Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
| --- | --- |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

### Pre-Class Period Holdings

| Transaction Type | Trade Date | Price | Shares | Total Cost |
| --- | --- | --- | --- | --- |
| Pre-Class Period Holdings | | | 36,056 | |

### 1A. Pre-Class Period Holdings Sold Through End of Class Period

| Transaction Type | Trade Date | Price | Shares | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Pre-Class Period Holdings | | | 3,000 | Sale | 06/30/2006 | $45.638 | 3,000 | $ 136,913.69 | 0 | | $ 92,942.26 |
| Pre-Class Period Holdings | | | 100 | Sale | 06/30/2006 | $45.580 | 100 | $ 4,558.00 | 0 | | $ 3,092.29 |
| Pre-Class Period Holdings | | | 700 | Sale | 12/11/2006 | $44.304 | 700 | $ 31,012.54 | 0 | | $ 20,752.54 |
| Pre-Class Period Holdings | | | 500 | Sale | 03/30/2007 | $40.366 | 500 | $ 20,182.94 | 0 | | $ 12,854.37 |
| Pre-Class Period Holdings | | | 2,400 | Sale | 06/22/2007 | $42.646 | 2,400 | $ 102,351.47 | 0 | | $ 67,174.33 |
| **1A. Total** | | | **6,700** | | | | **6,700** | **$ 295,018.64** | **0** | **$** | **$ 196,815.79** |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)¹ | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Total** | | | 0 | | | | | 0 | $ - | 0 | $ - | $14.6571 - |

Police Superior Officers' Variable Supplemental Fund (PSOVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $14.6571 |

**1C. Pre-Class Period Holdings Held at End of "Lookback Period"**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 29,356 | | | | | | | 29,356 | | |

| **1C. Total** | | | **29,356** | | | | | **0** | **$    -** | **29,356** | **$    -** | |

Police Superior Officers' Variable Supplemental Fund (PSOVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

### 2A. Class Period Purchases Sold Prior to End of Class Period

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 04/18/2006 | $43.705 | 200 | $ 8,741.00 | Sale | 06/30/2006 | $45.638 | 200 | $ 9,127.58 | 0 $ | 386.58 | |
| Purchase | 09/26/2006 | $43.440 | 100 | $ 4,344.00 | Sale | 12/11/2006 | $44.304 | 100 | $ 4,430.36 | 0 $ | 86.36 | |
| Purchase | 11/03/2006 | $42.765 | 2,300 | $ 98,359.50 | Sale | 12/11/2006 | $44.200 | 2,300 | $ 101,660.00 | 0 $ | 3,300.50 | |
| Purchase | 11/03/2006 | $42.765 | 400 | $ 17,106.00 | Sale | 12/11/2006 | $44.304 | 400 | $ 17,721.45 | 0 $ | 615.45 | |
| Purchase | 01/25/2007 | $44.960 | 100 | $ 4,496.00 | Sale | 03/30/2007 | $40.366 | 100 | $ 4,036.59 | 0 $ | (459.41) | |
| Purchase | 03/13/2007 | $41.004 | 2,000 | $ 82,007.00 | Sale | 03/30/2007 | $40.366 | 2,000 | $ 80,731.76 | 0 $ | (1,275.24) | |
| Purchase | 04/12/2007 | $38.915 | 1,100 | $ 42,806.50 | Sale | 06/22/2007 | $42.646 | 1,100 | $ 46,911.09 | 0 $ | 4,104.59 | |
| **2A. Total** | | | **6,200** | **$ 257,860.00** | | | | **6,200** | **$ 264,618.84** | **0 $** | **6,758.84** | **$14.6571** |
| | | | | | | | | | | | | - |

Police Superior Officers' Variable Supplemental Fund (PSOVSF)
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B. Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $14.6571 |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C. Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 08/21/2007 | $37.725 | 3,000 | $ 113,174.40 | | | | | | 3,000 | $ (69,202.97) | $14.6571 |
| Purchase | 09/12/2007 | $35.130 | 400 | $ 14,052.08 | | | | | | 400 | $ (8,189.22) | |
| **2C. Total** | | | **3,400** | **$ 127,226.48** | | | | **0** | **$ -** | **3,400** | **$ (77,392.19)** | |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained (@ 12/31/2007) | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | 9,600 | $ 385,086.48 | | | | 6,200 | $ 264,618.84 | 3,400 | $ (70,633.36) | $14.6571 |
| **Grand Total** | | | 9,600 | $ 385,086.48 | | | | 12,900 | $ 559,637.48 | 32,756 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share.
Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

FireFighters Variable Supplemental Fund (FFVSF)
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**Pre-Class Period Holdings**    18,801

**1A. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 1,000 | | Sale | 06/30/2006 | $45.616 | 1,000 | $ 45,616.39 | 0 | $ | $ 30,959.25 |
| Pre-Class Period Holdings | | | 2,300 | | Sale | 03/30/2007 | $40.369 | 2,300 | $ 92,849.57 | 0 | $ | $ 59,138.14 |
| Pre-Class Period Holdings | | | 500 | | Sale | 06/22/2007 | $42.657 | 500 | $ 21,328.52 | 0 | $ | $ 13,999.95 |
| **1A. Total** | | | **3,800** | | | | | **3,800** | **$ 159,794.48** | **0** | **$** | **$ 104,097.34** |

**FireFighters Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | | | | |
|---|---|---|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|

**IB. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 0 | $ - | 0 | $ - | $14.6571 |
| IB. Total | | | 0 | 0 $ - | 0 | $ - | - |

**FireFighters Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**1C. Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 15,001 | | | | | 0 | $ - | 15,001 | | $14.6571 |
| **1C. Total** | | | **15,001** | | | | | **0** | **$ -** | **15,001** | | **$ -** |

**FireFighters Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2A. Class Period Purchases Sold Prior to End of Class Period**

| Purchase | | | | | Transaction | Trade | | | Total | Shares Retained | Gain | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction Type | Trade Date | Price | Shares | Total Cost | Type | Date | Price | Shares | Proceeds | @ 12/31/2007 | (Loss) [1] | |
| 2A. Total | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $ - |

**FireFighters Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| Purchase | | | 0 | $  - |
| **2B. Total** | | | **0** | **$  -** |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Purchase | | | | | 0 | $  - | $14.6571 |
| **2B. Total** | | | **0** | **$  -** | **0** | **$  -** | **$14.6571** |

**FireFighters Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C. Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 08/24/2006 | $43.717 | 300 | $ 13,115.01 | | | | | | 300 | $ (8,717.87) | |
| Purchase | 10/06/2006 | $43.270 | 100 | 4,327.00 | | | | | | 100 | (2,861.29) | |
| Purchase | 10/06/2006 | $43.280 | 100 | 4,328.00 | | | | | | 100 | (2,862.29) | |
| Purchase | 11/21/2006 | $42.920 | 100 | 4,292.00 | | | | | | 100 | (2,826.29) | |
| Purchase | 12/22/2006 | $45.520 | 800 | 36,416.00 | | | | | | 800 | (24,690.29) | |
| Purchase | 06/25/2007 | $42.710 | 100 | 4,271.00 | | | | | | 100 | (2,805.29) | |
| Purchase | 10/03/2007 | $36.296 | 800 | 29,036.96 | | | | | | 800 | (17,311.25) | |
| **2C. Total** | | | **2,300** | **$ 95,785.97** | | | | **0** | **$ -** | **2,300** | **$ (62,074.54)** | **$14.6571** |

**FireFighters' Variable Supplemental Fund (FFVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | | |
|---|---|---|
| Class Period Beginning: | | 4/18/2006 |
| Class Period End: | | 12/10/2007 |
| "Lookback Period" Beginning: | | 12/11/2007 |
| "Lookback Period" End: | | 12/31/2007 |
| Days in "Lookback Period": | | 21 |
| "Lookback Period" Average Closing Price: | | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | **2,300** | **$ 95,785.97** | | | | **0** | **$ -** | **2,300** | **$ (62,074.54)** | **$14.6571** |
| **Grand Total** | | | **2,300** | **$ 95,785.97** | | | | **3,800** | **$ 159,794.48** | **17,301** | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | | |
|---|---|---|
| Class Period Beginning: | | 4/18/2006 |
| Class Period End: | | 12/10/2007 |
| "Lookback Period" Beginning: | | 12/11/2007 |
| "Lookback Period" End: | | 12/31/2007 |
| Days in "Lookback Period": | | 21 |
| "Lookback Period" Average Closing Price: | | $14.6571 |

**1A. Pre-Class Period Holdings**    118,483

**1A. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | Sale | 06/09/2006 | $45.589 | 170 | $ 7,750.06 | 0 | $ | $ 5,258.35 |
| Pre-Class Period Holdings | | | | | Sale | 06/30/2006 | $45.638 | 4,300 | 196,242.96 | 0 | | 133,217.25 |
| Pre-Class Period Holdings | | | | | Sale | 06/30/2006 | $45.616 | 1,200 | 54,739.67 | 0 | | 37,151.10 |
| Pre-Class Period Holdings | | | | | Sale | 06/30/2006 | $45.580 | 200 | 9,116.00 | 0 | | 6,184.57 |
| Pre-Class Period Holdings | | | | | Sale | 07/05/2006 | $45.854 | 3,700 | 169,658.65 | 0 | | 115,427.22 |
| Pre-Class Period Holdings | | | | | Sale | 07/24/2006 | $45.829 | 904 | 41,429.67 | 0 | | 28,179.61 |
| Pre-Class Period Holdings | | | | | Sale | 08/07/2006 | $45.046 | 513 | 23,108.44 | 0 | | 15,589.33 |
| Pre-Class Period Holdings | | | | | Sale | 10/09/2006 | $43.499 | 4,400 | 191,397.20 | 0 | | 126,905.77 |
| Pre-Class Period Holdings | | | | | Sale | 10/10/2006 | $43.688 | 2,100 | 91,745.13 | 0 | | 60,965.13 |
| Pre-Class Period Holdings | | | | | Sale | 02/07/2007 | $45.331 | 1,630 | 73,889.54 | 0 | | 49,998.40 |
| Pre-Class Period Holdings | | | | | Sale | 02/27/2007 | $42.398 | 3,900 | 165,351.40 | 0 | | 108,188.54 |
| Pre-Class Period Holdings | | | | | Sale | 02/28/2007 | $42.938 | 35,800 | 1,537,197.59 | 0 | | 1,012,471.88 |
| Pre-Class Period Holdings | | | | | Sale | 03/30/2007 | $40.369 | 5,800 | 234,142.41 | 0 | | 149,130.98 |
| Pre-Class Period Holdings | | | | | Sale | 03/30/2007 | $40.366 | 4,100 | 165,500.11 | 0 | | 105,405.82 |
| Pre-Class Period Holdings | | | | | Sale | 06/22/2007 | $42.657 | 5,500 | 234,555.46 | 0 | | 153,941.17 |
| Pre-Class Period Holdings | | | | | Sale | 06/22/2007 | $42.646 | 3,700 | 157,831.07 | 0 | | 103,599.64 |
| Pre-Class Period Holdings | | | | | Sale | 06/26/2007 | $42.970 | 1,300 | 55,861.18 | 0 | | 36,806.89 |
| Pre-Class Period Holdings | | | | | Sale | 07/05/2007 | $43.243 | 36,900 | 1,595,657.03 | 0 | | 1,054,808.46 |
| Pre-Class Period Holdings | | | | | Sale | 08/03/2007 | $34.618 | 2,366 | 81,906.11 | 0 | | 47,227.31 |
| **1A. Total** | | | **118,483** | | | | | **118,483** | **$ 5,087,079.68** | **0** | **$** | **$ 3,350,457.43** |

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

Pre-Class Period Holdings

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|

| 1B. Total | 0 | $ | - | 0 | $ | - |
|---|---|---|---|---|---|---|

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1C:  Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 0 | | | | | 0 | $ - | 0 | $ | $14.6571 |
| **1C: Total** | | | **0** | | | | | **0** | **$ -** | **0** | **$ -** | **$14.6571** |

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2A. Class Period Purchases Sold Prior to End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 06/12/2006 | $45.061 | 1,734 | $ 78,136.29 | Sale | 08/03/2007 | $34.618 | 1,734 | $ 60,027.56 | 0 | $ (18,108.74) | $14.6571 |
| Purchase | 06/12/2006 | $45.061 | 717 | 32,308.95 | Sale | 11/30/2007 | $19.229 | 717 | 13,787.33 | 0 | $ (18,521.62) | |
| Purchase | 06/12/2006 | $45.061 | 249 | 11,220.26 | Sale | 11/30/2007 | $20.608 | 249 | 5,131.36 | 0 | $ (6,088.90) | |
| Purchase | 06/12/2006 | $45.112 | 1,901 | 85,757.72 | Sale | 11/30/2007 | $20.608 | 1,901 | 39,175.59 | 0 | $ (46,582.13) | |
| **2A. Total** | | | **4,601** | **$ 207,423.23** | | | | **4,601** | **$ 118,121.84** | **0** | **$ (89,301.39)** | **$ -** |

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**28. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | | | |
| **2B. Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $14.6571 |

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

**2C.  Class Period Purchases Held At End of "Lookback Period"**

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/11/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 06/12/2006 | $45.112 | 1,099 | 49,577.98 | | | | | | 1,099 | (33,469.78) | |
| Purchase | 07/20/2006 | $45.788 | 400 | 18,315.16 | | | | | | 400 | (12,452.30) | |
| Purchase | 07/20/2006 | $45.804 | 400 | 18,321.44 | | | | | | 400 | (12,458.58) | |
| Purchase | 09/26/2006 | $43.440 | 300 | 13,032.00 | | | | | | 300 | (8,654.86) | |
| Purchase | 10/10/2006 | $43.635 | 2,400 | 104,724.00 | | | | | | 2,400 | (69,546.86) | |
| Purchase | 10/10/2006 | $43.840 | 23,500 | 1,030,235.30 | | | | | | 23,500 | (685,792.44) | |
| Purchase | 10/12/2006 | $43.650 | 3,300 | 144,045.33 | | | | | | 3,300 | (95,676.76) | |
| Purchase | 10/13/2006 | $43.713 | 400 | 17,485.24 | | | | | | 400 | (11,622.38) | |
| Purchase | 10/17/2006 | $43.653 | 300 | 13,095.99 | | | | | | 300 | (8,698.85) | |
| Purchase | 11/03/2006 | $42.430 | 400 | 16,972.00 | | | | | | 400 | (11,109.14) | |
| Purchase | 11/03/2006 | $42.765 | 1,700 | 72,700.50 | | | | | | 1,700 | (47,783.36) | |
| Purchase | 11/14/2006 | $42.986 | 600 | 25,791.54 | | | | | | 600 | (16,997.25) | |
| Purchase | 11/21/2006 | $42.993 | 2,700 | 116,080.56 | | | | | | 2,700 | (76,506.27) | |
| Purchase | 11/21/2006 | $42.945 | 4,900 | 210,430.50 | | | | | | 4,900 | (138,610.50) | |
| Purchase | 12/07/2006 | $44.405 | 2,200 | 97,691.00 | | | | | | 2,200 | (65,445.29) | |
| Purchase | 12/19/2006 | $45.247 | 1,500 | 67,870.20 | | | | | | 1,500 | (48,884.49) | |
| Purchase | 02/02/2007 | $45.598 | 81,100 | 3,697,170.58 | | | | | | 81,100 | (2,508,476.29) | |
| Purchase | 02/07/2007 | $45.371 | 500 | 22,685.50 | | | | | | 500 | (15,356.93) | |
| Purchase | 02/09/2007 | $43.343 | 1,150 | 49,844.80 | | | | | | 1,150 | (32,989.09) | |
| Purchase | 02/13/2007 | $44.512 | 3,100 | 137,988.44 | | | | | | 3,100 | (92,551.30) | |
| Purchase | 02/14/2007 | $45.316 | 2,600 | 117,822.64 | | | | | | 2,600 | (79,714.07) | |
| Purchase | 02/15/2007 | $45.029 | 1,900 | 85,555.29 | | | | | | 1,900 | (57,706.72) | |
| Purchase | 02/16/2007 | $45.163 | 1,900 | 85,808.94 | | | | | | 1,900 | (57,960.37) | |
| Purchase | 02/20/2007 | $45.442 | 2,700 | 122,693.13 | | | | | | 2,700 | (83,118.84) | |
| Purchase | 02/28/2007 | $43.153 | 1,000 | 43,153.00 | | | | | | 1,000 | (28,495.86) | |
| Purchase | 03/02/2007 | $42.868 | 400 | 17,147.00 | | | | | | 400 | (11,284.14) | |
| Purchase | 03/06/2007 | $41.748 | 16,900 | 705,532.75 | | | | | | 16,900 | (457,827.04) | |
| Purchase | 03/13/2007 | $41.005 | 3,400 | 139,416.32 | | | | | | 3,400 | (89,582.03) | |
| Purchase | 04/12/2007 | $38.915 | 400 | 15,566.00 | | | | | | 400 | (9,703.14) | |
| Purchase | 05/31/2007 | $43.710 | 2,500 | 109,275.00 | | | | | | 2,500 | (72,632.14) | |
| Purchase | 08/21/2007 | $37.711 | 4,600 | 173,471.52 | | | | | | 4,600 | (106,048.66) | |
| Purchase | 09/07/2007 | $35.130 | 700 | 24,591.14 | | | | | | 700 | (14,331.14) | |
| Purchase | 11/27/2007 | $17.287 | 15,900 | 274,860.12 | | | | | | 15,900 | (41,811.55) | |
| Purchase | 11/30/2007 | $19.500 | 717 | 13,981.50 | | | | | | 717 | (3,472.33) | |
| **2C Total** | | | **187,566** | **$ 7,852,932.41** | | | | **0** | **$ -** | **187,566** | **$ (5,103,750.75)** | **$14.6571** |

**Fire Fighters (FIRE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | 192,167 | $  8,060,355.64 | | | | 4,601 | $  118,121.84 | 187,566 | $  (5,193,052.15) | $14.6571 |
| **Grand Total** | | | 192,167 | $  8,060,355.64 | | | | 123,084 | $  5,205,201.52 | 187,566 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**Pre-Class Period Holdings**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 13,074 | | | | | | | | | $14.6571 |

**1A. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | Sale | 06/16/2006 | $44.544 | 367 | $ 16,347.51 | 0 | $ | 10,968.34 |
| Pre-Class Period Holdings | | | | | Sale | 10/06/2006 | $43.319 | 100 | $ 4,331.86 | 0 | $ | 2,866.15 |
| Pre-Class Period Holdings | | | | | Sale | 01/26/2007 | $45.299 | 200 | $ 9,059.72 | 0 | $ | 6,128.29 |
| Pre-Class Period Holdings | | | | | Sale | 03/16/2007 | $39.884 | 717 | $ 28,596.67 | 0 | $ | 18,087.50 |
| Pre-Class Period Holdings | | | | | Sale | 06/15/2007 | $43.076 | 300 | $ 12,922.75 | 0 | $ | 8,523.61 |
| **1A. Total** | | | 1,684 | | | | | 1,684 | $ 71,258.51 | 0 | $ | $ 46,575.88 |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 0 | | | | | | | 0 | | $14.6571 |

**IB. Pre-Class Period Holdings Sold During "Lookback Period"**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IB. Total | | | 0 | | | | | 0 | $ - | 0 | $ - | $ - |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1C: Pre-Class Period Holdings Held at End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 11,390 | | | | | | | | 11,390 | | $14.6571 |
| **1C: Total** | | | **11,390** | | | | | | **0** | **$ -** | **11,390** | **$ -** | |

Fire Officers' Variable Supplemental Fund (FOVSF)
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

## 2A. Class Period Purchases Sold Prior to End of Class Period

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | | | $14.6571 |
| **2A. Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $ - |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | | | |
| 2B. Total | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $14.6571 |

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

### 2C. Class Period Purchases Held At End of "Lookback Period"

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 07/25/2006 | $45.520 | 100 | $ 4,552.00 | | | | | | 100 | $ (3,086.29) |
| Purchase | 10/06/2006 | $43.470 | 100 | $ 4,347.00 | | | | | | 100 | $ (2,881.29) |
| Purchase | 10/06/2006 | $43.470 | 100 | $ 4,347.00 | | | | | | 100 | $ (2,881.29) |
| Purchase | 03/26/2007 | $41.460 | 500 | $ 20,730.00 | | | | | | 500 | $ (13,401.43) |
| **2C. Total** | | | **800** | **$ 33,976.00** | | | | **0** | **$  -** | **800** | **$ (22,250.29)** |

Offset for Shares Sold Into Class Above    $14.6571

**Fire Officers' Variable Supplemental Fund (FOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | | | 800 | $ 33,976.00 | | | | 0 | $ - | 800 | $ (22,250.29) | $14.6571 |
| Grand Total | | | 800 | $ 33,976.00 | | | | 1,684 | $ 71,258.51 | 12,190 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1A.  Pre-Class Period Holdings**

Pre-Class Period Holdings — 424,348

**1A.  Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 19,900 | | Sale | 06/30/2006 | $45.638 | 19,900 | $ 908,194.18 | 0 | $ | $ 616,517.04 |
| Pre-Class Period Holdings | | | 9,000 | | Sale | 06/30/2006 | $45.616 | 9,000 | $ 410,547.59 | 0 | $ | 278,633.30 |
| Pre-Class Period Holdings | | | 700 | | Sale | 06/30/2006 | $45.580 | 700 | $ 31,906.00 | 0 | $ | 21,646.00 |
| Pre-Class Period Holdings | | | 18,100 | | Sale | 10/09/2006 | $43.499 | 18,100 | $ 787,338.48 | 0 | $ | 522,044.19 |
| Pre-Class Period Holdings | | | 8,500 | | Sale | 10/10/2006 | $43.688 | 8,500 | $ 371,349.34 | 0 | $ | 246,763.63 |
| Pre-Class Period Holdings | | | 10,700 | | Sale | 02/27/2007 | $42.398 | 10,700 | $ 453,656.42 | 0 | $ | 296,824.99 |
| Pre-Class Period Holdings | | | 96,900 | | Sale | 02/28/2007 | $42.938 | 96,900 | $ 4,160,738.73 | 0 | $ | 2,740,461.59 |
| Pre-Class Period Holdings | | | 25,000 | | Sale | 03/30/2007 | $40.369 | 25,000 | $ 1,009,234.55 | 0 | $ | 642,805.98 |
| Pre-Class Period Holdings | | | 16,480 | | Sale | 03/30/2007 | $40.366 | 16,480 | $ 665,229.73 | 0 | $ | 423,680.02 |
| Pre-Class Period Holdings | | | 22,000 | | Sale | 06/22/2007 | $42.646 | 22,000 | $ 938,221.84 | 0 | $ | 615,764.70 |
| Pre-Class Period Holdings | | | 19,200 | | Sale | 06/22/2007 | $42.657 | 19,200 | $ 819,015.30 | 0 | $ | 537,598.16 |
| Pre-Class Period Holdings | | | 5,300 | | Sale | 06/26/2007 | $42.965 | 5,300 | $ 227,714.72 | 0 | $ | 150,031.86 |
| **1A.  Total** | | | **251,780** | | | | | **251,780** | **$ 10,783,146.88** | **0** | **$** | **$ 7,092,771.45** |

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

Pre-Class Period Holdings

| 1B. Total | | | **0** | | | | | **0** | **$ -** | **0** | **$ -** | **$14.6571** |

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1C: Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 172,568 | 172,568 | | | | | 0  $  - | 172,568 | $ | @ 12/31/2007  $14.6571 |
| **1C: Total** | | | **172,568** | **172,568** | | | | | **0  $  -** | **172,568** | **$** | **-** |

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | | | | | |
|---|---|---|---|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 0 | $ | - | | | | | 0 | $ | - | - | | $14.6571 |

**2A.  Class Period Purchases Sold Prior to End of Class Period**

| | | | | | |
|---|---|---|---|---|---|
| Purchase | | | | | 0 | $ | - | - | $14.6571 |
| 2A.  Total | 0 | $ | - | 0 | $ | - | - | $ | - |

Police Officers (POLICE)
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| 2B. Total | | | 0 | $ - |

2B. Class Period Purchases Sold During "Lookback Period"

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Purchase | | | 0 | $ - | 0 | $ - | $14.6571 |
| 2B. Total | | | 0 | $ - | 0 | $ - | - |

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

**2C: Class Period Purchases Held At End of "Lookback Period"**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $14.6571 |
| Purchase | 04/18/2006 | $43.705 | 1,100 | $ 48,075.50 | | | | | | 1,100 | $ (31,952.64) | |
| Purchase | 06/07/2006 | $45.060 | 700 | 31,542.00 | | | | | | 700 | (21,282.00) | |
| Purchase | 06/12/2006 | $45.061 | 10,900 | 491,168.17 | | | | | | 10,900 | (331,405.31) | |
| Purchase | 06/12/2006 | $45.112 | 12,400 | 559,387.56 | | | | | | 12,400 | (377,638.99) | |
| Purchase | 07/03/2006 | $45.996 | 8,100 | 372,567.60 | | | | | | 8,100 | (253,844.74) | |
| Purchase | 07/20/2006 | $45.788 | 1,600 | 73,260.64 | | | | | | 1,600 | (49,809.21) | |
| Purchase | 07/20/2006 | $45.804 | 1,700 | 77,866.12 | | | | | | 1,700 | (52,948.98) | |
| Purchase | 09/26/2006 | $43.440 | 1,100 | 47,784.00 | | | | | | 1,100 | (31,661.14) | |
| Purchase | 10/10/2006 | $43.635 | 6,400 | 279,264.00 | | | | | | 6,400 | (185,458.29) | |
| Purchase | 10/10/2006 | $43.840 | 63,600 | 2,788,211.28 | | | | | | 63,600 | (1,856,016.99) | |
| Purchase | 10/12/2006 | $43.650 | 8,900 | 388,485.89 | | | | | | 8,900 | (258,037.32) | |
| Purchase | 10/13/2006 | $43.713 | 1,200 | 52,455.72 | | | | | | 1,200 | (34,867.15) | |
| Purchase | 10/13/2006 | $43.855 | 5,100 | 223,658.97 | | | | | | 5,100 | (148,907.54) | |
| Purchase | 11/03/2006 | $42.430 | 1,200 | 50,916.00 | | | | | | 1,200 | (33,327.43) | |
| Purchase | 11/14/2006 | $42.986 | 1,600 | 68,777.44 | | | | | | 1,600 | (45,326.01) | |
| Purchase | 11/21/2006 | $42.993 | 7,300 | 313,847.44 | | | | | | 7,300 | (206,850.30) | |
| Purchase | 11/21/2006 | $42.945 | 12,700 | 545,401.50 | | | | | | 12,700 | (359,255.79) | |
| Purchase | 12/11/2006 | $44.200 | 2,800 | 123,760.00 | | | | | | 2,800 | (82,720.00) | |
| Purchase | 12/19/2006 | $45.247 | 4,700 | 212,659.96 | | | | | | 4,700 | (143,771.39) | |
| Purchase | 01/25/2007 | $44.960 | 300 | 13,488.00 | | | | | | 300 | (9,090.86) | |
| Purchase | 02/13/2007 | $44.512 | 14,000 | 623,173.60 | | | | | | 14,000 | (417,973.60) | |
| Purchase | 02/14/2007 | $45.316 | 11,900 | 539,265.16 | | | | | | 11,900 | (364,845.16) | |
| Purchase | 02/15/2007 | $45.029 | 8,700 | 391,753.17 | | | | | | 8,700 | (264,236.03) | |
| Purchase | 02/16/2007 | $45.163 | 8,300 | 374,849.58 | | | | | | 8,300 | (253,195.29) | |
| Purchase | 02/20/2007 | $45.442 | 12,300 | 558,935.37 | | | | | | 12,300 | (378,652.51) | |
| Purchase | 02/27/2007 | $43.443 | 30,200 | 1,311,978.60 | | | | | | 30,200 | (869,332.89) | |
| Purchase | 03/06/2007 | $41.748 | 31,400 | 1,310,871.50 | | | | | | 31,400 | (850,637.21) | |
| Purchase | 03/13/2007 | $41.004 | 17,400 | 713,466.12 | | | | | | 17,400 | (458,431.83) | |
| Purchase | 04/12/2007 | $38.915 | 1,800 | 70,047.00 | | | | | | 1,800 | (43,664.14) | |
| Purchase | 04/13/2007 | $39.517 | 15,700 | 620,420.04 | | | | | | 15,700 | (390,302.90) | |
| Purchase | 08/21/2007 | $37.721 | 18,200 | 686,525.84 | | | | | | 18,200 | (419,765.84) | |
| Purchase | 09/12/2007 | $35.130 | 2,700 | 94,851.54 | | | | | | 2,700 | (55,277.25) | |
| Purchase | 11/27/2007 | $17.287 | 78,200 | 1,351,827.76 | | | | | | 78,200 | (205,639.19) | |
| **2C: Total** | | | **404,200** | **$ 15,410,543.07** | | | | **0** | **$ -** | **404,200** | **$ (9,486,125.93)** | **$14.6571** |

**Police Officers (POLICE)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | **404,200** | **$ 15,410,543.07** | | | | **0** | **$        -** | **404,200** | **$ (9,486,125.93)** | **$14.6571** |
| **Grand Total** | | | **404,200** | **$ 15,410,543.07** | | | | **251,780** | **$ 10,783,146.88** | **576,768** | | |

[1] For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| Pre-Class Period Holdings | | | 35,119 | |

**IA. Pre-Class Period Holdings**

**IA. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | 06/30/2006 | $45.638 | 3,100 | 141,477.48 | 0 | $ | $ 96,040.34 |
| Pre-Class Period Holdings | 06/30/2006 | $45.580 | 100 | 4,558.00 | 0 | $ | $ 3,092.29 |
| Pre-Class Period Holdings | 12/11/2006 | $44.200 | 500 | 22,100.00 | 0 | $ | $ 14,771.43 |
| Pre-Class Period Holdings | 03/30/2007 | $40.366 | 2,560 | 103,336.65 | 0 | $ | $ 65,814.36 |
| Pre-Class Period Holdings | 06/22/2007 | $42.646 | 3,400 | 144,997.92 | 0 | $ | $ 95,163.63 |
| **IA. Total** | | | **9,660** | **$ 416,470.05** | **0** | **$** | **$ 274,882.05** |

(Transaction Type: Sale for each row above)

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| | | | 0 | |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | | | |
| **1B. Total** | | | 0 | $ - | 0 | $ - | $14.6571 $ - |

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IC: Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 25,459 | | | | | | | 25,459 | | $14.6571 |
| **IC: Total** | | | 25,459 | | | | | | $ 0 | 25,459 | $ - | $ - |

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $14.6571 |

**2A. Class Period Purchases Sold Prior to End of Class Period**

Purchase

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2A. Total | | | 0 | $  - | | | | 0 | $  - | 0 | $  - | $  - |

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | 0 $ - | | |
| **2B. Total** | | | **0** | **$ -** | | | | **0** | **$ -** | **0 $ -** | **-** | **$14.6571** |

**Police Officers' Variable Supplemental Fund (POVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C: Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 04/18/2006 | $43.705 | 200 | $ 8,741.00 | | | | | | 200 | $ (5,809.57) |
| Purchase | 09/26/2006 | $43.440 | 100 | $ 4,344.00 | | | | | | 100 | $ (2,878.29) |
| Purchase | 11/03/2006 | $42.765 | 1,100 | $ 47,041.50 | | | | | | 1,100 | $ (30,918.64) |
| Purchase | 04/12/2007 | $38.915 | 2,000 | $ 77,830.00 | | | | | | 2,000 | $ (48,515.71) |
| Purchase | 08/21/2007 | $37.703 | 2,900 | $ 109,337.54 | | | | | | 2,900 | $ (66,831.83) |
| Purchase | 09/12/2007 | $35.190 | 500 | $ 17,594.80 | | | | | | 500 | $ (10,266.23) |
| **2C: Total** | | | **6,800** | **$ 264,888.84** | | | | **0** | **$ -** | **6,800** | **$ (165,220.27)** |

Offset for Shares Sold Into Class Above $14.6571

Police Officers' Variable Supplemental Fund (POVSF)
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Washington Mutual, Inc. Common Stock
Class Period: April 18, 2006 - December 10, 2007

| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | | Transaction Type | Trade Date | Price | Shares | Total Proceeds | | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | $14.6571 |
| Class Period Purchase Total | | | 6,800 | $ 264,888.84 | | | | | 0 | $ - | | 6,800 | $ (165,220.27) | | |
| Grand Total | | | 6,800 | $ 264,888.84 | | | | | 9,660 | $ 416,470.05 | | 32,259 | | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

Page 7 of 7

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**1A. Pre-Class Period Holdings**

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| Pre-Class Period Holdings | | | 36,056 | |

**1A. Pre-Class Period Holdings Sold Through End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | 06/30/2006 | $45.638 | 3,200 | 146,041.27 | 0 | | $ 99,138.41 |
| Pre-Class Period Holdings | 06/30/2006 | $45.580 | 100 | 4,558.00 | 0 | | $ 3,092.29 |
| Pre-Class Period Holdings | 12/11/2006 | $44.200 | 2,300 | 101,660.00 | 0 | | $ 67,948.57 |
| Pre-Class Period Holdings | 12/11/2006 | $44.304 | 1,200 | 53,164.36 | 0 | | $ 35,575.79 |
| Pre-Class Period Holdings | 03/30/2007 | $40.366 | 2,600 | 104,951.29 | 0 | | $ 66,842.72 |
| Pre-Class Period Holdings | 06/22/2007 | $42.646 | 3,500 | 149,262.56 | 0 | | $ 97,962.56 |
| **1A. Total** | | | **12,900** | **$ 559,637.48** | **0** | **$** | **$ 370,560.34** |

Note: Transaction Type "Sale" applies to each of the sold holdings rows.

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost |
|---|---|---|---|---|
| Pre-Class Period Holdings | | | | |
| **1B. Total** | | | **0** | |

**1B. Pre-Class Period Holdings Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)¹ | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | | | | | |
| **1B. Total** | | | **0** | **$ -** | **0** | **$ -** | **$14.6571** |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| Class Period Beginning: | 4/18/2006 |
|---|---|
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**1C.  Pre-Class Period Holdings Held at End of "Lookback Period"**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | 23,156 | | | | | | | 23,156 | | $14.6571 |
| **1C.  Total** | | | **23,156** | | | | | **0** | **$        -** | **23,156** | **$** | **-** |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period **Beginning**: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" **Beginning**: | 12/11/2007 |
| "Lookback Period" End: | 12/11/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" **Average** Closing Price: | $14.6571 |

**2A. Class Period Purchases Sold Prior to End of Class Period**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | | | |
| **2A. Total** | | | 0 | $ - | | | | 0 | $ - | 0 | $ - | $ - |
| | | | | | | | | | | | | $14.6571 |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2B. Class Period Purchases Sold During "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | | 0 $    - | | $14.6571 |
| **2B. Total** | | | | 0 $    - | | | | 0 $    - | | 0 $    - | | |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

**2C. Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss) [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Offset for Shares Sold Into Class Above $14.6571 |
| Purchase | 04/18/2006 | $43.705 | 200 | $ 8,741.00 | | | | | | 200 | $ (5,809.57) |
| Purchase | 09/26/2006 | $43.440 | 100 | $ 4,344.00 | | | | | | 100 | $ (2,878.29) |
| Purchase | 11/03/2006 | $42.765 | 2,700 | $ 115,465.50 | | | | | | 2,700 | $ (75,891.21) |
| Purchase | 01/25/2007 | $44.960 | 100 | $ 4,496.00 | | | | | | 100 | $ (3,030.29) |
| Purchase | 03/13/2007 | $41.004 | 2,000 | $ 82,007.00 | | | | | | 2,000 | $ (52,692.71) |
| Purchase | 04/12/2007 | $38.915 | 1,100 | $ 42,806.50 | | | | | | 1,100 | $ (26,683.64) |
| Purchase | 08/21/2007 | $37.725 | 3,000 | $ 113,174.40 | | | | | | 3,000 | $ (69,202.97) |
| Purchase | 09/12/2007 | $35.130 | 400 | $ 14,052.08 | | | | | | 400 | $ (8,189.22) |
| **2C. Total** | | | **9,600** | **$ 385,086.48** | | | | **0** | **$  -** | **9,600** | **$ (244,377.91)** |

**Police Superior Officers' Variable Supplemental Fund (PSOVSF)**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Washington Mutual, Inc. Common Stock**
**Class Period: April 18, 2006 - December 10, 2007**

| | |
|---|---|
| Class Period Beginning: | 4/18/2006 |
| Class Period End: | 12/10/2007 |
| "Lookback Period" Beginning: | 12/11/2007 |
| "Lookback Period" End: | 12/31/2007 |
| Days in "Lookback Period": | 21 |
| "Lookback Period" Average Closing Price: | $14.6571 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 12/31/2007 | Gain (Loss)[1] | Offset for Shares Sold Into Class Above $14.6571 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | 9,600 | $ 385,086.48 | | | | 0 | $ - | 9,600 | $ | $14.6571 |
| **Grand Total** | | | 9,600 | $ 385,086.48 | | | | 12,900 | $ 559,637.48 | 32,756 | $ (244,377.91) | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $14.6571 per share

Page 7 of 7

Yahoo!  My Yahoo!  Mail        Make Y! your home page          Search:                                    Web Search

**YAHOO!** FINANCE    Welcome, kvogel1_2000        Finance Home - Help
                      [Sign Out, My Account]                                    PR Newswire

Welcome [Sign In]                                    To track stocks & more, Register

**Financial News**

                Enter symbol(s)        Basic        Get    Symbol Lookup

**Press Release**                                                    Source: Wolf Popper LLP

# Wolf Popper Announces Filing of Securities Class Action Lawsuit Against Washington Mutual, Inc. - WM

Monday November 5, 2:18 pm ET

NEW YORK, Nov. 5 /PRNewswire/ -- Wolf Popper LLP has filed a class action lawsuit against Washington Mutual, Inc. ("Washington Mutual") (NYSE: WM - News) and certain of its officers and directors in the United States District Court for the Southern District of New York, on behalf of investors who purchased Washington Mutual common stock on the open market from July 19, 2006 through October 31, 2007 (the "Class Period"). This is the first action filed against Washington Mutual and alleges claims for securities fraud. The case has been assigned Civil Action No. 07 Civ. 9801.

The complaint charges that during the Class Period Washington Mutual improperly exerted pressure on a third-party appraisal firm, eAppraiseIT (a division of the First American Corporation), to inflate the appraised value of homes used as collateral for loans originated by Washington Mutual. Washington Mutual failed to disclose this scheme, which violated federal and state laws and regulations requiring an independent appraisal process. The inflated appraisals caused Washington Mutual's financial results to be misstated, including causing its loan assets to be overstated while its provision for doubtful accounts and reserves for loan losses were materially understated.

On October 17, 2007, Washington Mutual revealed that its anticipated fourth quarter 2007 writedowns of home loan assets would be $1.3 billion greater than previously disclosed. These writedowns were caused, at least in part, by the impairment of loan assets that were originated based on the inflated appraisals fraudulently orchestrated by the defendants. Between October 17 and October 31, Washington Mutual's stock price declined by $5.19 per share, or 15.6%.

On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American Corporation and eAppraiseIT, alleging their complicity in a scheme to provide inflated appraisals to Washington Mutual. On November 1, 2007 and November 2, 2007, following the announcement of the NY AG's lawsuit against First American, Washington Mutual shares fell further, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the October 31, 2007 closing price.

If you purchased or acquired Washington Mutual common stock during the Class Period, you may move the court no later than January 4, 2008, and request that the Court appoint you as lead plaintiff. A lead plaintiff is a representative party acting on behalf of other class members in directing the litigation. To be appointed lead plaintiff, the Court must decide that your claim is typical of the claims of other class members, and that you will adequately represent the class. Your share in any recovery will not be enhanced or diminished by the decision whether or not to serve as a lead plaintiff.

Wolf Popper LLP has extensive experience representing shareholders in class actions and has successfully recovered billions of dollars for defrauded investors and shareholders. The reputation and expertise of the firm in shareholder and other class action litigation has been repeatedly recognized by the courts, which have appointed the firm to major positions in complex multi-district and consolidated litigations.

        For more information or to pursue your right to be appointed lead
plaintiff, please contact:

        Wolf Popper LLP
        James Harrod, Esq.
        845 Third Avenue
        New York, NY 10022
        Tel.: 212.759.4600 or 877.370.7703 (toll free)
        Fax: 212.486.2093 or 877.370.7704 (toll free)
        Email: irrep@wolfpopper.com
        website: www.wolfpopper.com

## RESUME OF
## LOWEY DANNENBERG COHEN, P.C.

**White Plains Plaza**          **Four Tower Bridge**
**One North Broadway - Suite 509**   **200 Barr Harbor Drive, Suite 400**
**White Plains, NY l060l-2310**    **West Conshohocken, PA 19428-2977**
**Telephone:  914-997-0500**      **Telephone:  610-941-2760**
**Fax:  914-997-0035**         **Fax:  610-862-9777**

**lowey@WestNet.com (E-Mail)**
**www.lowey.com**

Since the 1960s, Lowey Dannenberg Cohen, P.C. (The "Lowey firm" or "the firm") has specialized in complex litigation, generally representing plaintiffs.  The firm employs seventeen lawyers and an experienced paralegal and support staff.

Our regular clients are institutional and other large investors and health benefit insurers.  The Lowey firm has achieved many notable successes over the years that have resulted in recoveries aggregating billions of dollars.

### Investor Litigation

The Lowey firm represents investors.  Our clients' cases involve securities and commodities fraud, coercive mergers and tender offers, statutory appraisal proceedings, proxy contests and election irregularities, failed corporate governance, stockholder agreement disputes, and customer/brokerage firm arbitration proceedings.

Our investor litigation practice group has recovered billions of dollars in the aggregate for our clients.  But the value of our accomplishments is measured by more than dollars.  We have also achieved landmark, long term corporate governance changes at public companies, including reversing results of elections and returning corporate control to the companies' rightful owners, its stockholders.

The firm's institutional investor clients have included the New York City Pension Funds, the New York State Common Retirement Fund, Federated Investors, Glickenhaus & Co., the Denver Employees Retirement Plan, Millennium Partners and Karpus Investment Management.

## Prescription Drug Overcharge Litigation

The Lowey firm has become the nation's premier litigation firm for health insurers to recover overcharges for prescription drug and other medical products and services. Our skills in this area are recognized by the largest payers for pharmaceuticals in the United States, including Aetna, CIGNA, Humana, and Wellpoint, who frequently retain the firm to assert claims against pharmaceutical manufacturers for conduct resulting in overpriced medication.

## Commitment to Clients

In both the investor litigation and prescription overcharge litigation fields, the Lowey firm has distinguished itself from its competitors by departing from the norms of plaintiff's class action law firm practices, advising its clients to do things differently in ways which benefit the clients, whereas more traditional routes would have been to the Lowey firm's greater short-term benefit.  However, the firm's reward has been its retention as the plaintiff's law firm of choice by the most diverse blue chip clientele of any U.S. plaintiff's law firm.

Through contingency or other flexible fee arrangements, the Lowey firm commits its financial and intellectual resources to achieving the best possible results for its clients. The firm takes on cutting-edge legal issues, and has brought about significant expansions

of the rights of plaintiffs under federal and state securities, antitrust, corporation, and deceptive practice laws.

### Client Recoveries

Recent achievements for our clients include the following:

- On March 19, 2007, the United States District Court for the Southern District of New York approved a $79,750,000 settlement of a class action, in which the Lowey firm acted as Co-Lead Counsel, on behalf of United States investors of Philip Services Corp., a bankrupt Canadian resource recovery company. $50,500,000 of the settlement was paid by the Canadian accounting firm of Deloitte & Touche, LLP, which the Lowey firm believes is the largest recovery from a Canadian auditing firm in a securities class action, and among the largest obtained from any accounting firm. In re Philip Services Corp., Securities Litigation, 98 Civ. 835 (AKH) (S.D.N.Y.) Earlier in the litigation, the United States Court of Appeals for the Second Circuit issued a landmark decision protecting the rights of United States citizens to sue foreign companies who fraudulently sell their securities in the United States. DiRienzo v. Philip Services Corp., 294 F.3d (2d Cir.), cert. denied, 123 S.Ct. 556 (2002).

- The Lowey firm's innovative strategy and aggressive prosecution produced an extraordinary recovery in the fall of 2005 for the New York City Pension Funds in the WorldCom Securities Litigation, substantially superior to that of any other WorldCom investor in either class or opt-out litigation. Following our advice to opt out of a class action in order to litigate their claims separately, the New York City Pension Funds recovered almost $79 million, including 100% of their damages resulting from investments in WorldCom bonds.

- On May 19, 2006, the United States District Court for the Southern District of New York approved a $72,762,500 partial settlement of a class action on behalf of entities and persons who traded New York Mercantile Exchange natural gas futures contracts. Since that hearing, additional settlements which were preliminarily approved by the Court on February 12, 2007, have brought the total settlements to date to $100 million. The Lowey firm is co-lead counsel for a class of plaintiffs who allege that the defendants manipulated the prices of natural gas futures and options contracts by reporting inaccurate, misleading, and false information concerning physical commodity trades to trade publications that compile and publish indices of natural gas spot prices. In re Natural Gas Commodity Litigation, No. 03 CV 6186 (VM) (S.D.N.Y.).

- On September 25, 2006 the Lowey firm helped Laddcap Value Partners win an emergency appeal, reversing a federal district court's order disqualifying the votes Laddcap had solicited to replace the board of directors of Delcath Systems, Inc. Prior to our involvement in the case, on September 20, 2006, Laddcap, which was Delcath's largest stockholder, had been enjoined by the district court from submitting stockholder consents it had solicited on the grounds of unproven claimed violations of federal securities law. After losing an injunction proceeding in the district court on September 20, 2006 and with the election scheduled to close on September 25, 2006, Laddcap hired the Lowey firm to prosecute an emergency appeal, which was won on September 25, 2006, the last day of the election period. Shortly thereafter, the case was settled with Laddcap gaining seats on the board, reimbursement of expenses, and other benefits. Delcath Systems, Inc. v. Laddcap Value Partners, 2006 WL 27239981 (2d Cir. Sept. 25, 2006).

- The Lowey firm represented Karpus Investment Management in its successful proxy contest and subsequent litigation to prevent the transfer of management by Citigroup to Legg Mason of the Salomon Brothers Municipal Partners Fund. We defeated the Fund's preliminary injunction action which sought to compel Karpus to vote shares it had solicited by proxy but withheld from voting in order to defeat a quorum and prevent approval of the transfer. Salomon Brothers Mun. Partners Fund, Inc. v. Thornton, 410 F. Supp. 2d 330 (S.D.N.Y. 2006).

- The Lowey firm acted as co-lead counsel for a class of seatholders seeking to enjoin the merger between the New York Stock Exchange and Archipelago Holdings, Inc. As a result of the action, the merger terms were revised, providing the seatholders with more than $250 million in additional consideration. In addition, the NYSE agreed to retain an independent financial adviser to report to the Court as to the fairness of the deal to the NYSE seatholders. Plaintiffs also provided the Court with their expert's analysis of the new independent financial adviser's report. Both reports were provided to the seatholders prior to the merger vote. The Court noted that "these competing presentations provide a fair and balanced view of the proposed merger and present the NYSE Seatholders with an opportunity to exercise their own business judgment with eyes wide open. The presentation of such differing viewpoints ensures transparency and complete disclosure." In re New York Stock Exchange/Archipelago Merger Litigation, (N.Y. Sup. Ct. December 5, 2005).

- On July 8, 2005, the United States District Court for the Southern District of Florida approved a $28,700,000 settlement of a class action on behalf of consumers and third party payers against Abbott Laboratories and Geneva Pharmaceuticals, charging that they monopolized and unreasonably restrained trade in the market for the prescription drug Hytrin and its generic equivalents. The Lowey firm was lead counsel for the class in this six-year

litigation. The Court had previously certified a 17-state class of indirect purchasers consisting of consumers and third party payers in In re Terazosin Hydrochloride Antitrust Litig., 2004 U.S. Dist. LEXIS 6176 (S.D. Fla. April 8, 2004). The Court complimented our performance and experience in this hard-fought case.

- The Lowey firm represented Glickenhaus & Co., a major registered investment advisor and, at the time, the second largest stockholder of Chrysler, in a non-class securities lawsuit against DaimlerChrysler AG. Successful implementation of the firm's opt-out strategy led to a recovery for its clients far in excess of that received by other class members. See In re DaimlerChrysler AG Sec. Litig., 197 F. Supp. 2d 42 (D. Del. 2002); In re DaimlerChrysler AG Sec. Litig., Civ. Action Nos. 00-993/00-984/01-004JJF Cons. Action, 2003 U.S. Dist. LEXIS 10964, Fed. Sec. L. Rep. (CCH) ¶92,244 (D. Del. June 25, 2003).

- Following a three day bench trial in a statutory appraisal proceeding, the Delaware Chancery Court awarded our clients, an institutional investor and investment advisor, $30.43 per share plus compounded prejudgment interest, for a transaction in which the public shareholders who did not seek appraisal were cashed out at $28 per share. Doft & Co. v. Travelocity.com, Inc., No. Civ. A. 19734, 2004 WL 1152338 (May 20, 2004), modified, 2004 WL 1366994 (Del. Ch. June 10, 2004).

- The United States District Court for the Eastern District of Michigan approved an $80,000,000 settlement of a class action on behalf of consumers and third party payers against Aventis S.A. and Andrx Corp., charging that they monopolized and unreasonably restrained trade in the United States market for Cardizem CD and its generic bioequivalents. In re Cardizem CD Antitrust Litigation, 218 F.R.D. 508 (E.D. Mich. 2003) appeal dismissed, 391 F.3d 812 (6th Cir. 2004), cert. denied, 125 S. Ct. 2297 (2005). Previously, the United States Court of Appeals for the Sixth Circuit unanimously affirmed a landmark summary judgment of per se liability against defendants. In re Cardizem CD Antitrust Litig., 332 F.3d 896 (6th Cir. 2003), affirming, 105 F. Supp. 2d 682 (E.D. Mich. 2000). The Lowey firm was lead counsel for the class and argued both successful appeals.

- In an action in which the Lowey firm acted on behalf of an institutional investor as Co-Lead Counsel, the Delaware Supreme Court enjoined a proposed merger between NCS Healthcare, Inc. and Genesis Health Ventures, Inc., accepting our argument that the NCS board had breached its fiduciary obligations by agreeing to irrevocable merger lock-up provisions. As a result of the injunction, the NCS shareholders were able to obtain the benefit of a competing takeover proposal by Omnicare, Inc. of 300% more than that offered in the enjoined transaction, providing NCS's shareholders with an additional $99 million. Omnicare, Inc. v. NCS Healthcare, Inc., 818 A.2d 914 (Del. 2003).

- The Supreme Court of the State of New York, County of New York, approved a $22.8 million settlement on behalf of a class of current and former holders of credit cards issued by MBNA bank who took cash advances in response to an MBNA promotion. The Court noted that the Lowey firm is an "able law firm having long-standing experience in commercial class action litigation." Broder v. MBNA Corp., No. 605153/98 (Sup. Ct., N.Y. County, April 11, 2003).

- The United States District Court for the District of Delaware approved, and the Third Circuit Court of Appeals affirmed, a $44.5 million class action settlement paid by DuPont Pharmaceuticals to consumers and third party payers nationwide to settle claims of unfair marketing practices in connection with the prescription blood thinner Coumadin. The Lowey firm, which had been appointed by the District Court to the plaintiffs' executive committee as the representative of third party payers, argued the successful appeal. In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516 (3rd Cir. 2004).

- The Lowey firm successfully represented an affiliate of Millennium Partners, a major private investment fund, in litigation in the Delaware Chancery Court that resulted in the voiding of two elections of directors of meVC Draper Fisher Jurvetson Fund 1, Inc., a NYSE-listed closed end mutual fund, on grounds of breach of fiduciary duty, and in a subsequent proxy contest litigation in the United States District Court for the Southern District of New York, that resulted in the replacement of the entire board of directors with Millennium's slate. meVC Draper Fisher Jurvetson Fund 1, Inc. v. Millennium Partners, 260 F. Supp. 2d 616 (S.D.N.Y. 2003); Millenco L.P. v. meVC Draper Fisher Jurvetson Fund 1, Inc., 824 A.2d 11 (Del. Ch. 2002).

- In a case in which the Lowey firm acted as Lead Counsel, the Firm obtained a $27.25 million settlement on behalf of our client the Federated Kaufmann Fund and a class of purchasers of securities of CINAR Corporation. The court found that "the quality of [the Lowey firm's] representation has been excellent." In re CINAR Securities Litigation, Master File No. 00 CV 1086 (E.D.N.Y., Dec. 2, 2002).

- In proceedings in which the Lowey firm acted as co-counsel to a Bankruptcy Court-appointed Estate Representative, the firm obtained recoveries in a fraudulent conveyance action totaling $106 million. In re Reliance Securities Litigation, MDL 1304 (D. Del. 2002).

The Lowey firm represents numerous institutional investors. After a highly competitive selection process, we were selected by the New York State Common Retirement Fund (the "CRF"), the third largest public pension fund in the United States,

with assets exceeding $140 billion, to serve as one of its designated securities litigation counsel. We currently represent the CRF as Lead Counsel in a securities class action in which the CRF is serving as the court appointed Lead Plaintiff. In re Bayer AG Securities Litigation, 03 Civ. 1546 (WHP) (S.D.N.Y.).

Similarly, the Lowey firm was selected to serve as one of the securities litigation counsel to represent the New York City Pension Funds (the "NYC Funds") having combined assets of more than $110 billion. We currently represent the NYC Funds as Lead Counsel in a securities class action in which the NYC Funds are serving as the court appointed Lead Plaintiffs. In re Juniper Networks, Inc. Sec. Litig., No. C-06-05303 JW (N.D. Cal). In addition, as noted above, we represented the NYC Funds in the WorldCom litigation. Because of the firm's expertise, the firm was also appointed by the Court to serve as Liaison Counsel for the non-class lawsuits arising out of the WorldCom fraud; in that capacity, the firm was responsible for coordinating discovery in more than 80 actions related to the largest financial fraud in United States history.[1]  See In re WorldCom Securities Litigation, Master File No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 8979 (S.D.N.Y. May 28, 2003). The Lowey firm was also recently appointed Lead Counsel in In re Luminent Mortgage Capital Inc. Securities Litigation, No. C07-4073-PJH (N.D. Cal.).

**The Lowey Firm's Recognized Expertise**

The attorneys of the Lowey firm have been repeatedly recognized by the courts as expert practitioners in the field of complex litigation. For example, in the WorldCom Securities Litigation, the Court repeatedly praised the contributions and efforts of the firm's

---

[1]    Prior to the WorldCom matter, the Lowey firm was retained to represent the NYC Funds in securities litigations involving Enron and McKesson HBOC, Inc.

principal Neil L. Selinger: "I want to thank Mr. Selinger again publicly. I have done it many a time during the course of this litigation. He has performed a marvelous service." <u>In re WorldCom, Inc. Securities Litigation</u>, 02 Civ. 3288 (DLC), hearing transcript of November 5, 2004 at 76. Similarly, on November 10, 2004, the Court found that "the Lowey Firm, and in particular Neil Selinger of that firm, has worked tirelessly to promote harmony and efficiency in this sprawling litigation. . . . [the Lowey firm] has done a superb job in its role as Liaison Counsel, conducting itself with professionalism and efficiency. . . ." <u>In re WorldCom, Inc. Securities Litigation</u>, 2004 WL 2549682 (S.D.N.Y. Nov. 10, 2004).

Similarly, in the <u>Oracle Securities Litigation</u>, Judge Vaughn Walker repeatedly praised the performance of the firm. <u>See</u> <u>In re Oracle Securities Litigation</u>, 852 F. Supp. 1437, 1454, 1459 (N.D. Cal. 1994) ["The Lowey firm's high caliber representation of the class against the Oracle defendants served as tangible evidence of its ability to represent the class against Andersen.... Class counsel's able, persistent and patient performance in achieving the present recovery has not gone unnoticed"]. <u>See also</u> related opinions 829 F. Supp. 1176 (N.D. Cal. 1993); and 136 F.R.D. 639, 649 n.23 (N.D. Cal. 1991) ["The Lowey firm's papers have been thoughtful and to the point...."].

The Court in <u>Winston v. Mezzanine Investments, L.P.</u>, Index No. 28657/91 (Sup. Ct. N.Y. Co. Dec. 22, 1997), following victory at trial and an $8,000,000 recovery for a class of investors, expressed the view that the attorneys of the Lowey firm "are highly experienced specialists" whose work is "of very high quality." The Court in <u>In re Seagate Technology, Inc. Shareholders Litigation</u>, CA No. 17932 (Del. Ch. Apr. 9, 2001), in approving a $200 million settlement in an action in which the Lowey firm served as co-lead counsel, stated that the attorneys of the Lowey firm "did highly skilled work against highly skilled opposition. I read the opening brief carefully ... it was very well done and a piece

of work ... there was some high-wall lawyering done here." <u>Snyder v. Nationwide</u>

<u>Insurance Company</u>, Index No. 97/0633 (Sup. Ct. Onondaga Co. December 17, 1998)

(finding that the attorneys of the Lowey firm are "great attorneys" who did a "very, very

good job" for the class, and that the Lowey firm makes "attorneys look good"); <u>In re</u>

<u>MobileMedia Securities Litigation</u>, Civil No. 96-5723 (D.N.J. February 7, 2000) (describing

the firm as "expeditious," "efficient," and "professional").


**<u>Other Recoveries For Our Clients</u>**

Other examples of the firm's successful efforts include:

- A recovery by settlement of approximately $100 million in policy refunds or adjustments, discounted premiums, and discounted products for a national class of purchasers of life insurance policies issued by Nationwide Mutual Insurance. <u>Snyder v. Nationwide Insurance Company</u>, Index No. 97/0633 (Sup. Ct. Onondaga Co. 1998). Firm acted as co-lead counsel.

- A recovery by settlement of approximately $110,000,000 for a class of purchasers of various taxable municipal bonds. <u>In re Taxable Municipal Bond Securities Litigation</u>, Master File No. MDL 863 (E.D. La. 1995). Firm acted as member of the executive committee of plaintiffs' counsel.

- The recovery by settlement of approximately $618,000,000 for the public shareholders of Standard Oil Company in connection with the acquisition by its controlling stockholder, British Petroleum Acquisition p.l.c. <u>In re The Standard Oil Company/British Petroleum Litigation</u>, Consolidated Case No. 126760 (Court of Common Pleas, Cuyahoga County, Ohio 1987). Firm acted as co-lead counsel.

- A recovery by settlement of more than $180,000,000 for public shareholders of Shell Oil Company after a successful motion for a preliminary injunction against a tender offer by the Royal Dutch/Shell group of companies, the majority shareholder. See <u>Joseph v. Shell Oil Co.</u>, 501 A.2d 409 (Del. Sup. 1985). Firm acted as co-lead counsel.

- A recovery by settlement of approximately $75,000,000 for former public shareholders of Triangle Industries, Inc. See <u>In re Triangle Industries, Inc. Shareholders Litigation</u>, Delaware Chancery Court, Consolidated Action No. 10466. Firm acted as co-lead counsel.

- A recovery by settlement of $72,500,000 for sellers of the stock of RJR Nabisco, Inc. In re RJR Nabisco, Inc. Securities Litigation, M.D.L. Docket No. 818 (MBM) (S.D.N.Y. 1992). Firm acted as sole lead counsel.

- A recovery by settlement of more than $44 million in policy refunds or adjustments or additional paid-up life insurance policies for a national class of purchasers of life insurance policies issued by the Country Life Insurance Company. Duckworth v. Country Life Insurance Company, 98 CH 01046 (Cir. Ct., Cook Co., Ill. 2000).

- A recovery by settlement of approximately $35,500,000 for public bondholders of Burlington Northern Railroad Co. Rievman v. Burlington Northern Railroad Co., 118 F.R.D. 29 (S.D.N.Y. 1987). During the course of the action, the firm obtained a preliminary injunction against a tender offer and defeasance plan by Burlington Northern Railroad Co. relating to certain railroad bonds. 618 F. Supp. 592 and 644 F. Supp. 168 (S.D.N.Y.). Firm was sole lead counsel.

- Recoveries by settlement exceeding $30,000,000 for classes of third-party payers and patients for alleged overcharges for clinical laboratory testing. In re SmithKline Beecham Clinical Laboratories, Inc. Laboratory Test Billing Practices Litigation, 3: 97-CV-1795 (AVC) (D. Ct. 2001); May v. SmithKline Beecham Clinical Laboratories, Inc., C.A. No. 97-L-1230 (Cir. Ct., Madison Co., Ill. 2001). Firm acted as co-lead counsel.

- A recovery by settlement exceeding $27,000,000 for a class of purchasers of securities of MobileMedia, Inc. In re MobileMedia Securities Litigation, Civil No. 96-5723 (D.N.J. 2000). Firm acted as co-lead counsel.

- A recovery by settlement of $25,300,000 for a class of third-party payers settling claims for overcharges for the generic versions of the prescription drugs lorazepam and clorazepate. In re Lorazepam and Clorazepate Antitrust Litigation, MDL No. 99-1290 (TFH) (D.D.C. 2002). Firm acted as lead counsel.

- A recovery by settlement of $25,000,000 for a class of purchasers of securities of Oracle Systems Corporation. In re Oracle Securities Litigation, Master File C-90-0931 (VRW) (N.D. Cal. 1994). Firm acted as sole lead counsel.

- A recovery by settlement of $25,000,000 for a class of sellers of shares of Columbia Pictures Entertainment, Inc. The firm acted as sole lead counsel in the case, which was prosecuted for more than five years and involved, among many other hurdles, a motion to dismiss (In re Columbia Securities Litigation, 747 F. Supp. 237 (S.D.N.Y. 1990)), a motion for summary judgment (155 F.R.D. 466 (S.D.N.Y. 1994)) and considerable discovery in and from Japan.

- A recovery by settlement of $24,000,000 for a class of purchasers of securities of Arakis Energy Corporation. In re Arakis Energy Corp. Securities Litigation, Fed. Sec. L. Rep. (CCH) ¶91,646 (E.D.N.Y. August 17, 2001). Firm acted as co-lead counsel.

- A recovery by settlement of $21,100,000 for holders of rights to purchase the common stock of Crown Zellerbach Corporation, in connection with the acquisition of Crown Zellerbach assets. In re Crown Zellerbach Corporation Rights Plan, No. 85-C-3286 (N.D. Ill. 1986). Firm acted as co-lead counsel.

- A recovery by settlement of more than $20,000,000 for a class of purchasers of securities of Pepsi Cola Puerto Rico Bottling Co. Turabo Medical Center v. Beach, No. 96-2250 (DRD) (D. P.R. 1997). Firm acted as co-lead counsel.

- A recovery by settlement of $19,500,000 for a class of purchasers of securities of Raychem Corporation. Cytryn v. Cook, 89-20801-RFP (N.D. Cal. 1992). Firm acted as co-lead counsel.

- A recovery by settlement of $19,000,000 for a class of purchasers of shares of General Electric Company. The Lowey firm acted as sole lead counsel in the case, which was prosecuted for more than six years and involved, among many obstacles to recovery, motions to dismiss (In re Kidder Peabody Securities Litigation, Fed. Sec. L. Rep. (CCH) ¶99,030 (S.D.N.Y. 1995)), motions for summary judgment (10 F. Supp. 2d 398 (S.D.N.Y. 1998)), and a leading decision compelling production by defendants' counsel of witness interview notes (168 F.R.D. 459 (S.D.N.Y. 1996)).

- A recovery by settlement of $17,600,000 for former preferred shareholders of Genesco Inc. after successful trial and appeal. See Denco v. Genesco, 427 N.Y.S.2d 434 (1st Dep't 1980). Firm was sole lead counsel.

- A recovery after trial of approximately $13,000,000 for 115 residents of Mexico and Latin America, whose status as depositors of the insolvent American Bank and Trust Co. had been challenged by the Federal Deposit Insurance Corporation. In the Matter of American Bank & Trust Co., Index No. 18649/76 (Sup. Ct., N.Y. Co. 1979). Firm acted as sole lead counsel.

In other cases, the Lowey firm has achieved substantial relief of a non-monetary nature which ultimately led to important benefits for investors. Examples include:

- In connection with a successful takeover fight involving meVC Draper Fisher Jurvetson Fund I, we successfully persuaded ISS, the largest proxy advisory service company in the United States, and the New York Stock Exchange,

to revise their previous approvals of meVC's proxy proposal to approve investment advisor contracts which would have been renewable without shareholder approval. That resulted in all NYSE broker-dealers withdrawing their proxies previously given to management, and led to the defeat of the management proposal at the shareholders' meeting.

• Establishing the standing of purchasers of call options to sue under Section 10(b) of the Securities Exchange Act of 1934, Deutschman v. Beneficial Corp., 841 F.2d 502 (3d Cir. 1988), reversing 668 F. Supp. 358 (D. Del. 1987).

• Protecting shareholder voting rights in connection with a merger through an expedited trial. Kansas City Power & Light v. Western Resources, 939 F. Supp. 688 (W.D. Mo. 1996).

• As co-lead class counsel, obtaining a temporary restraining order and then a preliminary injunction barring a restructuring of Macmillan, Inc. Robert M. Bass Group, Inc. v. Evans, 552 A.2d 1227 (Del. Ch. 1988); and later in the litigation, obtained an injunction from the Delaware Supreme Court enjoining a lockup agreement given to a favored bidder. Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261 (Del. 1989).

• Effecting modifications valued at between $16,000,000 to $37,600,000 of compensation and pension benefits granted to the chief executive officer of Citizens Utilities Company. In re Citizens Utilities Company Shareholders Litigation, Civil Action No. 12992 (Del. Ch. 1995). Firm acted as co-lead counsel.

• Obtaining, following the hearing of a motion for a preliminary injunction, the return of more than $10,000,000 withdrawn by insiders from Simplicity Pattern Company. Roth v. Lacey, No. 09391/82 (Sup. Ct. N.Y. Co. 1982).

• Preserving for the Dreyfus Fund its ownership rights in the valuable lion trademark, Korenstein v. Dreyfus Corp., 77 Civ. 2521, 78 Civ. 3794 (S.D.N.Y. 1980), and similarly preserving for the Oppenheimer Fund its ownership rights in the valuable clasped hands trademark, The Leslie Katz Retirement Plan v. Oppenheimer Management Corp., 212 U.S.P.Q. 191 (S.D.N.Y. 1980). Firm was sole lead counsel.

*Judge McMahon*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 9801

---

DENNIS KOESTERER, on behalf of himself
and all others similarly situated,

                        Plaintiff,

        v.

WASHINGTON MUTUAL, INC., KERRY
K. KILLINGER, DAVID C. SCHNEIDER
and THOMAS W. CASEY,

                      Defendants.

Civil Action No.:

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

---

Plaintiff, Dennis Koesterer ("Plaintiff"), alleges the following based upon the

investigation of Plaintiff's counsel, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission (the "SEC") filings, wire and press releases

published by and regarding Washington Mutual, Inc. ("Washington Mutual" or the "Company"),

securities analysts' reports and advisories about the Company, the complaint filed by the

Attorney General of the State of New York against the First American Corporation and

information readily obtainable on the Internet.

### NATURE OF THE ACTION

1.     This is a federal securities class action brought by Plaintiff on behalf of all

purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and

October 31, 2007 (the "Class Period"). The complaint seeks to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act").

1

2.      Washington Mutual is the nation's largest savings and loan. The Company is incorporated in Washington, and headquartered in Seattle, Washington, with well over twenty bank branches and "home loan" centers in this District.

3.      On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American Corporation ("First American") and First American's real estate appraisal subsidiary, eAppraiseIT (the "First American Complaint"). Washington Mutual is eAppraiseIT's largest customer and it provides real estate appraisal services to Washington Mutual on mortgages and "second lien" home loans, such as home equity loans and home equity lines of credit. According to allegations against First American, during the Class Period, Washington Mutual used only two outside appraisal firms, eAppraiseIT and Lender's Service, Inc. The First American Complaint alleges that beginning in 2006, eAppraiseIT provided over 260,000 appraisals for Washington Mutual.

4.      Andrew Cuomo, the New York Attorney General, alleges in the complaint that beginning in "Summer 2006" Washington Mutual put pressure on eAppraiseIT to increase the appraised value of homes:

> First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its

wrongful conduct.

5.      Throughout the Class Period, however, Defendants failed to disclose the undue and improper pressure placed on First American by Washington Mutual executives in attempt to obtain higher appraisal values. As stated in the First American Complaint such inflated appraisals create an enhanced risk of "loss of value in a foreclosure proceeding."

6.      Defendants' improper appraisal practices during the Class Period (1) rendered the Company's statements about its compliance with ethical and legal guidelines materially false and misleading; (2) rendered defendants' statements about the adequacy of the Company's internal controls materially false and misleading; (3) were not disclosed and thus constitute an ongoing omission of material fact related to the Company's core home loan business; (4) caused certain of the Company's reported financial information, including assets associated with home loans held in portfolio or held for sale and income from home loans sold to third parties, to be materially overstated throughout the Class Period; (4) caused the Company's loan loss reserves, provisions for doubtful account and contingent liabilities to be materially understated during the Class Period; and (5) caused Defendants to report financial results that were in violation of GAAP.

7.      On October 17, 2007, after the close of the financial markets, Washington Mutual announced its results for the third quarter of 2007 and during a conference call to discuss those results revealed that its anticipated fourth quarter 2007 writedowns of home loan assets would be $1.3 billion greater than previously disclosed. These writedowns were caused, at least in part, by the impairment of loan assets that were originated based on inflated appraisals. Over the ten trading days following this announcement, Washington Mutual's stock price decline by $5.19 per share, or 15.6%, from its $33.07 closing price on October 17, 2007.

8.    On November 1, 2007, following the announcement of the First American Complaint, Washington Mutual shares fell further over the next two trading days, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88 per share closing price on October 31, 2007.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Certain of the acts and transactions alleged herein occurred in substantial part in this Judicial District, Washington Mutual has a substantial presence in this judicial district and the First American Complaint was filed in this judicial district in the Supreme Court of the State of New York, County of New York.

12.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

13.    As set forth in the attached Certification, Plaintiff purchased Washington Mutual securities during the Class Period at artificially inflated prices and was damaged thereby.

Doc. 158816

4

14.     Defendant Washington Mutual is a Washington corporation, with its principal place of business located at 1301 Second Avenue, Seattle, Washington, 98101. In its Form 10-K for fiscal 2006, the Company acknowledged that it was subject to regulation by the Office of Thrift Supervision, among other state and federal authorities:

> As a savings and loan holding company, Washington Mutual, Inc. is subject to regulation by the Office of Thrift Supervision (the "OTS"). The Company's banking subsidiaries are subject to regulation and examination by the OTS (their primary federal regulator) as well as the Federal Deposit Insurance Corporation ("FDIC"). Its nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

15.     Defendant Kerry K. Killinger ("Killinger") is, and was at all times relevant hereto, the Chief Executive Officer and Chairman of WaMu's Board.

16.     Defendant Thomas W. Casey ("Casey") is, and was at all times relevant hereto, Executive Vice President, Chief Financial Officer and a member of the Executive Committee of WaMu. Casey oversees all aspects of Washington Mutual's corporate finance, strategic planning and investor relations functions.

17.     Defendant David C. Schneider ("Schneider") is, and was at all times relevant hereto, Executive Vice President and President, Home Loans and a member of the Executive Committee. Schneider oversees all aspects of the Company's home loans business including prime mortgage lending, subprime mortgage lending, mortgage banker finance, and specialty mortgage finance.

18.     Defendants Killinger, Casey and Schneider are collectively referred to hereinafter as the Individual Defendants. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Washington Mutual's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and

5

institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information available to them, each of

these defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations which were being made were

then materially false and misleading. The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group published" information, the result of the

collective actions of the Individual Defendants and should also be deemed "control persons" of the

Company.

## SUBSTANTIVE ALLEGATIONS

### Background - Home Loan Industry and the Role of Appraisers

19.    The First American Complaint provides as background the following description of

the structure of the home lending business and the reasons why banks that originate mortgages no

longer have an incentive to ensure that home loans are predicated upon fair and accurate appraisals

(emphasis added):

> 12.    Most people interested in purchasing or refinancing a home
> ("borrowers") seek a financial institution (a "lender") to lend them money on the
> most favorable repayment terms available. Traditionally the lender, as part of
> agreeing to loan the funds, wanted to ensure that the borrower was able to repay the
> loan and that the loan was adequately collateralized in case the borrower defaulted.
> The borrower and the lender had a common interest in accurately valuing the
> underlying collateral because both wanted to be sure the borrower was not paying too
> much for the property and would be able to meet the repayment terms, or that – in the
> event of default and foreclosure – the property value could support the loan.
>
> 13.    Today, the landscape of the mortgage industry is quite different from

this traditional model. Rather than holding the mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. Today, the vast majority of mortgage loans are sold to investment banks or GSEs, leaving the original lender holding far fewer mortgages in its portfolio.

14.    This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. **Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.**

20.    The First American Complaint states as follows concerning the legal requirements

enacted to ensure independent appraisals of real estate:

18.    Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

19.    Federal law sets independence standards for appraisers involved in federally regulated transactions. See 12 U.S.C. §§ 3331, *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states

7

that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

20.    In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3.    Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?
>
> Answer:    The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. Loan production staff should not select appraisers.
>
> * * *
>
> 5.    When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?
>
> Answer:    Yes, loan production staff may use a revolving, board approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . . Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

21.    Generally, USPAP and the federal laws and regulations which incorporate the provisions set forth above, preclude lenders from exerting influence over the appraisal process or appraisal value.

Doc. 158816                                 8

**Washington Mutual's Improper Manipulation**
**of eAppraiseIT to Obtain Infalted Appraisals**

22.    The First American Complaint alleges a complex scheme undertaken by senior

Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT. The

relevant allegations are excerpted as follows:

> 28.    By email dated September 29, 2006, a WaMu executive wrote to
> eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's
> ABMs as to ROVs and value disputes:
>
> > . . . the four appraisers/reviewers would be directly involved in
> > escalations dealing with: ROVs, Valuation issues where the purchase
> > price and appraised value differ with no reconciliations/justifications
> > by the appraiser, Value cuts which we continue to receive from your
> > third party reviewers (Wholesale), proactively making a decision to
> > override and correct the third party appraiser's value or reviewer's
> > value cut, when considered appropriate and supported . . . .
>
> In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that
> appraisals did not come in lower than WaMu wanted.
>
> ***
>
> 29.    Almost immediately after WaMu retained eAppraiseIT to provide
> appraisals in early Summer 2006, WaMu's loan production staff began complaining
> that the appraisal values provided by eAppraiseIT's appraisers were too low. It was
> clear, and eAppraiseIT well understood, that WaMu's dissatisfaction was largely due
> to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that
> is, were appraising homes at a value too low to permit loans to close.
>
> ***
>
> 31.    A week later, on August 15, 2006, eAppraiseIT's Executive Vice
> President advised eAppraiseIT's President that WaMu's loan officers would often
> pressure WaMu's internal appraisal field managers for an "extra few thousand," or
> "tell[] them specifically what they needed," or would "ask for several ROVs on the
> same property." eAppraiseIT's Executive Vice President explained that "[h]aving
> loan officers ask for a few thousand dollars because it is within the range is
> something we do not currently do for any client. . . . It is also direct pressure on the
> appraiser for a higher value without any additional information."
>
> ***
>
> 34.    During this period, First American was seeking additional business
> from WaMu in other areas. But WaMu expressly conditioned giving any future
> business to First American on success with eAppraiseIT. By email dated September

27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President of WaMu Mortgage about long-term business prospects.

The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.

\*\*\*

37.     In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.     By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

> We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers". . . . We will pay their appraisers whatever they demand. Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV. (Emphasis added).

\*\*\*

41.     In February 2007, eAppraiseIT simply capitulated to WaMu's demands. In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it." He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does

not mean that they can grab all the fees. They agreed." In other words, for the right price in fees, eAppraiseIT was willing to go along with the Proven Panel.

\*\*\*

43.    On March 5, 2007, WaMu confirmed the primary role of its loan origination staff in picking appraisers in a follow-up email, in which it explained that the Proven Appraiser List is being created. This will replace the WaMu preferred list. The initial list of names will be provided by lending with a minimum of two appraisers per area/county. The list will then be reviewed and approved by the Appraisal Business Oversight Team and will be checked against our most recent ineligible list. Final list will be provided to VMC's [vendor management companies]. Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority Basis. (Emphasis added).

\*\*\*

48.    On April 17, 2007, eAppraiseIT's President wrote to senior executives at First American, describing the issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.** (Emphasis added).

\*\*\*

57.    On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

\*\*\*

71.    In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.    Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high

value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel.    In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be reinstated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in NY and CT until right after the WaMu Proven Panel was formed. They were both removed very soon after for no apparent reason. We were having value issues, however, I felt their work was very defendable and supportable, and kept copious notes on our dealings. They have continued to keep in touch with me, in order to find out why they were removed from the panel. (Emphasis added).

75.    On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as the list went around he was REMOVED. The probability that a loan officer requested him to be removed is pretty high I think because that is what they did with the Master List; they sent it out to Lending to choose.

76.    To date, Appraiser A remains off the Proven Panel.

***

81.    Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete. Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed

that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.    Appraiser C wrote this email after having been pressured and harassed to increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

***

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original). Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

87.    On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.    eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties. For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.    eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 desk reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90.    This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

**Washington Mutual's Business
and Use of Inflated Appraisals**

23.    In its Annual Report for 2006 on Form 10-K, filed with the SEC on March 1, 2007,

Washington Mutual describes its business as follows:

The Company has four operating segments for the purpose of management reporting: the Retail Banking Group, the Card Services Group, the Commercial Group and the Home Loans Group. The Retail Banking Group, the Card Services Group and the Home Loans Group are consumer-oriented while the Commercial Group serves commercial customers. In addition, the category of Corporate Support/Treasury and Other includes the community lending and investment operations as well as the Treasury function – which manages the Company's interest rate risk, liquidity position and capital. The Corporate Support function provides facilities, legal, accounting and finance, human resources and technology services.

24.    The Company's Home Loan business is described as follows in the 2006 Form 10-K:

The principal activities of the Home Loans Group include: (1) originating and servicing home loans; (2) managing the Company's capital market operations–which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance-related products and participating in reinsurance activities with other insurance companies.

The segment offers a wide variety of real-estate secured residential loan products and services primarily consisting of fixed-rate home loans, adjustable-rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel. Such loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter-segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related

to any retained mortgage servicing rights.

As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company purchases loans from other lenders, warehouses the loans for a period of time and sells the loans in the form of whole loans, private label mortgage-backed securities or agency-guaranteed securities. The Company recognizes a gain or loss at the time the loans are sold and receives interest income while the loans are held for sale. The Company also provides ongoing servicing and bond administration for all securities issued.

25.    Through its home loan operating segment, Washington Mutual provides financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit. These loans are either held by Washington Mutual "in portfolio" or sold to investors - "home loans held for sale."

26.    Loans held for sale are typically pooled and so called "structured finance" securities, such as "mortgage backed-securities" (MBS), "collateralized debt obligations" (CDO) and "collateralized mortgage obligations" (CMO), are issued against that pool. In determining the interest rates and prices that such securities will be issued at, the underwriters and purchasers try to assess the default risk of the underlying mortgages.

27.    An important measure of the risk in a home loan is the loan-to-value ratio ("LTV"), which is the measure of equity retained by the homeowner. A homeowner's equity is generally the difference between the value of the home and the amount of borrowing the homeowner has taken out that is collateralized by the home. For example, if a home has a value of $100,000 and a homeowner has borrowed $80,000 against that home, the homeowner has $20,000 in equity. The "loan-to-value" ratio in that situation is 8:10, or 80%. The value of the appraisal in the loan file is critical to investors in determining the LTV and the associated risk of default in the loan.

28.    In its Form 10-K for 2006, Washington Mutual acknowledges that the less equity a

homeowner has in his or her home, the greater the credit risk to the borrower:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

29.    In the prior example, the homeowner's property was valued at $100,000. If that homeowner wanted to borrow an additional $20,000 against the value of the home, it may not be able to because such additional borrowing would reduce their equity to 0% and would result in an LTV of 1:1. This loan would be extremely high risk and the bank may not be able to sell it or would only be able to sell it at a very steep discount or very high interest rate.

30.    Washington Mutual also acknowledges that it uses the LTV to determine the default risk of loans it holds in portfolio. The risk of default is expressed on the Company's balance sheet as a reserve which reduces the carrying value of the loan. Loans with high LTVs carry greater risk of nonperformance and thus must carry higher reserves.

31.    Washington Mutual's practice of inducing appraisers to overvalue real property causes increased risk of loss both for loans held in Washington Mutual's portfolio and for loans securitized and sold to third parties.

32.    In certain circumstances, investors who purchase loans from Washington Mutual have recourse against it if the borrower defaults or if there are errors or misrepresentations made in the origination or sale of the loan. In its 2006 Form 10-K, Washington Mutual explained this as follows:

> In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an**

investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.

33.     Inflated, non-independent appraisals of homes that serve as collateral for loans that are securitized, are among the errors or misrepresentations that would allow the purchaser of a loan to have recourse against Washington Mutual - creating undisclosed contingent risk of loss for Washington Mutual in the event it is required to repurchase non-performing loans at face value.

34.     Inflated, non-independent appraisals also cause the present value of the loans held in portfolio by Washington Mutual to be overstated, on a net basis.  As described in further detail below, Washington Mutual's 2006 Form 10-K states that the "loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance" and that it uses the loan-to-value ratio in determining risk of default or non-performance on loans held in portfolio.  Inflated appraisal values will cause the loan-to-value ratios used by Washington Mutual to establish reserves to be distorted - resulting in understated reserves for loan losses.

35.     Further, Washington Mutual's reserves for losses on loans held for sale should have been higher in light of the substantially increased risk of default and high "loan-to-value" ratios associated with loans issued pursuant to inflated appraisals.

36.     Knowing that issuing loans at such high LTVs would require the loans to be sold at a discount or held at a substantial discount to face value, Washington Mutual obtained inflated appraisals, which would result in a more favorable LTV. In the example, if the home were appraised

at a value greater than $100,000, it would provide additional, yet illusory, collateral for Washington Mutual to lend against. Despite its acknowledgment of the increased risk associated with loans secured at LTVs of greater than 80%, Washington Mutual engaged in a practice that resulted in the issuance of loans with far less equity than stated due to the inflated appraisal values it obtained through eAppraiseIT. Washington Mutual assumed that the majority of loans for which it had obtained inflated appraisals would be sold off to third party investors and that its practice of obtaining inflated appraisals would remain undiscovered - leaving the investors on the hook for the excessive risk of the loan. Loans that were held in portfolio would have loan files that reflected inflated values and auditors or others who reviewed those files would not require additional reserves.

**Washington Mutual's Relationship
With First American's eAppraiseIT**

37. According to the First American Complaint, Washington Mutual initiated a business relationship with eAppraiseIT on the pretense that this would create an independent appraisal process:

> 25.   WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to close its internal appraisal office and terminate its staff appraisers. WaMu quickly became eAppraiseIT's largest client, providing nearly 30 percent of its business in New York. Over the course of the business relationship, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

> 26.   Initially, eAppraiseIT employed a combination of in-house staff and third-party fee appraisers, including some "preferred appraisers" identified by WaMu, to conduct appraisals of residential property for WaMu. eAppraiseIT also hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party appraisers. One-third of eAppraiseIT's staff appraisers are former WaMu employees, and all of the ABMs are former WaMu employees. eAppraiseIT's President advised the leadership of First American that "we have hired and on boarded many of Wamu's regional mangers and appraisers last week. They will be instrumental in our relational

and operational success with the sales force."

27.    Under contractual arrangements between WaMu and eAppraiseIT, WaMu can challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when WaMu disagrees with an appraised home value set forth in an appraisal report. Practically speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT.

**False and Misleading Statements and**
**Material Omissions Made During the Class Period**

38.    On July 19, 2006, after the close of the financial markets, Washington Mutual issued

a press release to report its financial results for the second quarter of 2006, which stated as follows

in relevant part:

> Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.

39.    On August 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with

the SEC, which substantially incorporated the financial results released on July 19, 2006 and

disclosed that the Company's portfolio of home loans held for sale was $23.3 billion; net loans held

in portfolio included $145.7 billion of home loans and $53.0 billion in home equity loans and lines

of credit. The Company reported reserves for loan and lease losses of $1.6 billion.

40.    The August 9, 2006 10-Q included Defendants Killinger's and Casey's certifications

under Section 302 of Sarbanes-Oxley Act, as follows:

CERTIFICATION

I, Kerry K. Killinger, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board

of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                          /s/ KERRY K. KILLINGER

Kerry K. Killinger
Chairman and Chief Executive Officer
of Washington Mutual, Inc.

***

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

Doc. 158816                          21

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006          /s/ THOMAS W. CASEY
                               Thomas W. Casey
                               Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.

41.    The August 9, 2006 Form 10-Q also contained certifications by Defendants Killinger and Casey pursuant to Section 906 of the Sarbanes-Oxley Act which stated in pertinent part that each certified "that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc."

42.    Defendants' July 19, 2006 and August 9, 2006 disclosures, referenced above, were materially false and misleading because:

Doc. 158816

22

      a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

      b.     The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

      c.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

      d.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

      e.     Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

      43.     On October 18, 2006, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the third quarter of 2006, which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005.
> Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.
>
>                       \*\*\*
>
> • Credit exposure continues to be proactively managed. The provision for loan and lease losses of $166 million in the third quarter reflected a slight decline in the loan portfolio and net charge-offs of $154 million.

44.     On November 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on October 18, 2006 and disclosed that the Company's portfolio of home loans held for sale was $23.7 billion; loans held in portfolio included $141.2 billion of home loans and $54.4 billion in home equity loans and lines of credit.  The Company reported reserves for loan and lease losses of $1.6 billion.

45.     The November 9, 2006 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

46.     Defendants' October 18, 2006 and November 9, 2006 disclosures, referenced above, were materially false and misleading because:

      a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

      b.     The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

      c.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

      d.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

      e.     Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

    47.    On January 17, 2007 after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the fourth quarter of and full year 2006,

which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported fourth quarter 2006 net
> income of $1.06 billion, or $1.10 per diluted share, compared with net income of
> $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income
> for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income
> of $3.43 billion, or $3.73 per diluted share, in 2005.
>                          ***
> Killinger noted that opportunities to grow the balance sheet at attractive
> risk-adjusted returns are limited, making the accelerated share repurchase
> transaction a superior use of capital.
>
> "Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the
> company for the future," Killinger added. "Those decisive actions have positioned
> us well to deliver stronger operating performance in 2007."
>                          ***
> Provision driven by credit card growth. The increase in the fourth quarter
> provision for loan and lease losses to $344 million in part reflected the growth of
> the company's on-balance sheet credit card receivables, which increased the
> provision by $95 million compared with the prior quarter.

    48.    On March 1, 2007, the Company filed its annual report on Form 10-K with the

SEC, which disclosed that the Company's portfolio of home loans held for sale was $44.9

billion; loans held in portfolio included $99.5 billion of home loans, $52.9 billion in home equity

loans and lines of credit, $18.7 billion in subprime home loans, and $2 billion in subprime home

equity loans and lines of credit. The Company reported reserves for loan and lease losses of

$1.63 billion, with $202 million attributable to home loans, $184 million attributable to home

equity loans and lines of credit and $326 million attributable to the "subprime mortgage

channel." Washington Mutual disclosed that of the loans secured by residential property held in

portfolio, 38% had loan-to-value ratios of greater than 80%.

49.    The 2006 Form 10-K stated as follows regarding loan loss reserves and contingent

credit risk liabilities (emphasis added):

> **Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**
> *Allowance for loan and lease losses*
>     The allowance for loan and lease losses represents management's estimate
> of incurred credit losses inherent in the Company's loan and lease portfolios as of
> the balance sheet date. The estimation of the allowance is based on a variety of
> factors, including past loan loss experience, the current credit profile of the
> Company's borrowers, adverse situations that have occurred that may affect the
> borrowers' ability to repay, the estimated value of underlying collateral, the
> interest rate climate as it affects adjustable-rate loans and general economic
> conditions. Loans held in portfolio that are evaluated for collective impairment
> and loans held in portfolio that are individually reviewed for impairment but
> deemed not to be impaired may have both an allocated and unallocated allowance.
> Loans that are individually deemed to be impaired may only have an allocated
> allowance.
>     The allowance for loans evaluated for collective impairment is comprised
> of an allocated allowance that is computed for each portfolio based on specific
> loan portfolio metrics and an unallocated allowance that is computed based on
> certain environmental factors we believe are not adequately captured in the
> allocated allowance computations. Determining the adequacy of the allowance,
> particularly the unallocated allowance, is complex and requires judgment by
> management about the effect of matters that are inherently uncertain. Subsequent
> evaluations of the loan portfolio, in light of the factors then prevailing, may result
> in significant changes in the allowance for loan and lease losses in future periods.
>     The allowance is comprised of an allowance for individually impaired
> loans, as well as an allowance for other individually unimpaired loans that share
> common risk characteristics that, in the aggregate, have incurred a probable loss
> on a collective basis. The determination of common risk factors that indicate a
> probable loss on a collective basis is complex and requires significant judgment
> by management about the shared risk characteristics that suggest a probable loss.
>     The allowance for loan and lease losses is reported within the
> Consolidated Statements of Financial Condition and the provision for loan and
> lease losses is reported within the Consolidated Statements of Income.
>     The estimates and judgments are described in further detail in the
> subsequent section of Management's Discussion and Analysis – "Credit Risk
> Management" and in Note 1 to the Consolidated Financial Statements –
> "Summary of Significant Accounting Policies."
> *Contingent Credit Risk Liabilities*
>     In the ordinary course of business, the Company sells loans to third parties

and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.**

Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value. Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

50.    The 2006 Form 10-K contained numerous disclosures concerning the use of loan-to-value ratios in assessing credit risk, including the following statements:

Under the heading "Credit Risk Management":

Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country. A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

***

As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance. The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value

ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses.

Under the heading "Features of Residential Loans":

> Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan-to-value calculation.

Under the Section "Impact of External Risk Factors":

> *Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*
> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.
>
> ***
>
> *Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater than 80 percent*
> Instead of undertaking cash-out refinance transactions, many borrowers elect to utilize accumulated equity in their homes by borrowing money through

either a first or second lien home equity loan or line of credit. The existence of a first lien mortgage loan and second lien home equity loan or line of credit made to one borrower and secured by the same property, most often arises when the Company:

• Originates the first lien mortgage loan and second lien home equity loan or line of credit at the same time (so called "piggyback" loans);

• Originates or purchases the first lien mortgage loan and at a subsequent date originates a second lien home equity loan or line of credit;

• Originates a second lien home equity loan or line of credit subordinate to another lender's first lien mortgage loan.

***

The balance of home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent at origination totaled $15.59 billion at December 31, 2006 and accounted for 36% of the Company's home equity volume in 2006. Substantially all of the loans and lines of credit in this portfolio had a combined loan-to-value ratio at origination of between 80 and 90 percent.

To compensate for the increased credit risk in the home equity portfolio that arises where the combined loan-to-value ratio at origination is greater than 80 percent, the Company typically charges such borrowers a higher rate of interest than would be charged if the combined loan-to-value ratio at origination was less than 80 percent. The Company also buys pool mortgage insurance that insulates it from the risk of default on those home equity loans or lines of credit where the combined loan-to-value ratio at origination is greater than 90 percent.

51.    The 2006 Form 10-K provided the following disclosure concerning the Company's internal controls, which stated that the Company's management found the internal controls adequate:

### Management's Report on Internal Control Over Financial Reporting

The management of Washington Mutual, Inc. and subsidiaries (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets. The Company's internal control structure contains monitoring mechanisms, and actions are taken to correct deficiencies identified.

There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal control can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control may vary over time.

Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets as of December 31, 2006. This assessment was based on criteria for effective internal control over

financial reporting, including safeguarding of assets, described in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes that, as of December 31, 2006, the Company maintained effective internal control over financial reporting, including safeguarding of assets.

52.    The 2006 Form 10-K included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

53.    The 2006 10-K also incorporated the Company's Code of Ethics and Code of Conduct by reference, which it noted were available on Washington Mutual's website.  As of November 4, 2007, the Company's Code of Ethics stated as follows:

> The Chief Executive Officer, President, Chief Financial Officer, Controller, and each business segment or business line president, chief financial officer and controller and persons determined to be performing similar functions (collectively, the "Senior Financial Officers") of Washington Mutual, Inc. (together with its subsidiaries and affiliates, separately or collectively, as the context may require, the "Company") have an obligation to the public, the Company, and themselves to maintain the highest standards of ethical conduct.

> The Code of Ethics for Senior Financial Officers (the "Ethical Code") provides fundamental principles to which the Senior Financial Officers are expected to adhere and advocate. These principles are designed to deter wrongdoing and to promote:

> Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities Exchange Commission (the "SEC") and in other public communications made by the Company;
> Compliance with applicable governmental laws, rules and regulations;
> The prompt internal reporting to an appropriate person or persons identified in the Ethical Code of violations of the Ethical Code; and Accountability for adherence to the Ethical Code.

> This Ethical Code supplements the Company's Code of Conduct and reflects our Corporate Values to be Fair, Caring, Human, Dynamic,and Driven.  The Senior

Financial Officers are expected to abide by the Ethical Code as well as the Company's Code of Conduct and all other applicable Washington Mutual policies and guidelines referred to in the Company's Code of Conduct.

### Financial Reporting and Disclosure

Senior Financial Officers will seek to promote fair, accurate, timely, and understandable disclosure in the reports and documents the company files with or submits to the SEC. The Company seeks to provide disclosure to the investment community that is not only in conformity with applicable rules of the SEC, but that also fairly presents to investors the financial condition and results of operations of the company. Senior Financial Officers shall seek to promote ethical behavior by other company officers and employees involved in financial reporting.

### Consequences of Violations

Any violation of this Ethical Code may result in disciplinary action including, but not limited to, the following:

Disciplinary action (up to and including suspension or termination of employment);

Pursuit of any and all remedies available to the Company for any damages or harm resulting to the Company from a violation, including injunctive relief; and

Referral of matters to appropriate legal or regulatory authorities for investigation and prosecution.

### Reporting of Violations

Any employee of the Company who becomes aware of actual or potential infractions of this Code of Ethics or who has concerns regarding questionable accounting or auditing matters involving the Company or a Senior Financial Officer should submit a report to the Audit Committee by calling 1-800-214-8771. An operator is available to take your report and direct it to the appropriate person for investigation and response. This service is confidential and anonymous.

### Requests for Waivers and Changes in Ethical Code

Waivers of this Code of Ethics may only be granted by the Audit Committee of the Board of Directors of the Company. The Audit Committee will not grant waivers except under extraordinary circumstances. Any waivers that are granted shall be publicly disclosed on a timely basis. In addition, any changes to this Ethical Code shall be publicly disclosed on a timely basis.

### Annual Certifications

Annually each Senior Financial Officer shall certify in writing his or her

Doc. 158816

31

compliance during the prior year with this Code of Ethics.

**Evaluation**
The Audit Committee shall evaluate annually the effectiveness of this Code of Ethics and recommend and adopt changes as necessary.

54.     As available on Washington Mutual's website as of November 4, 2007, the

Company's Code of Conduct stated as follows, in relevant part:

**Introduction**
Washington Mutual's Code of Conduct applies company wide. It addresses issues that concern Washington Mutual, Inc., and all of its subsidiaries (collectively, "Washington Mutual" or the "Company") and applies to the members of the Board of Directors as indicated, and to all employees, including officers, regardless of which Washington Mutual company employs them.
                                                                    ***

**Honesty and fair dealing**
The Company expects its employees to do their jobs with absolute honesty and integrity. The federal and state agencies that regulate many of Washington Mutual's various bank and non-bank subsidiaries require Washington Mutual to maintain a financial bond covering all affected employees. The bond does not, however, cover any employee that Washington Mutual knows has committed certain dishonest or fraudulent acts. Acts of dishonesty may result in the Company terminating the offender's employment.

**Fair dealing**
Washington Mutual strives to ensure that all of its actions are guided by absolute honesty, integrity and fairness. The Company believes that cooperation, trust and shared objectives are vital to its success. As a result, you are expected to deal fairly with Washington Mutual's customers, suppliers, competitors and employees. You may not take unfair advantage of anyone else through manipulation, concealment, abuse of confidential information, misrepresentation of material facts or other unfair business practice.

**Accuracy and completeness of Company records**
Washington Mutual has established very high standards for service and performance. As a Washington Mutual employee, you must maintain all Company records within your control completely and accurately, including time reporting records. You may not structure accounts or other corporate records so as to avoid reporting or signing authority requirements, nor may you misrepresent a transaction to make it appear more beneficial to the Company or anyone else than it really is. Washington Mutual considers falsifying or misrepresenting Company accounts and records to be the equivalent of fraud.

***

**Compliance with laws, rules and regulations**

As a financial services company, Washington Mutual operates in a highly regulated business environment. Accordingly, you are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to you in your position with Washington Mutual. If you have any doubt, you should talk to your manager or compliance officer, or the Company's Legal Department, to determine and understand the applicability of the laws, regulations and Company procedures and policies that apply to your position.

55.    The January 17, 2007 and March 1, 2007 statements referenced above were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

c.    Defendants' attribution of the increase in loan loss provision to Washington Mutual's credit card business created the false impression that provision and reserves on home loans were adequate;

d.    The Company's reported contingent risks and liabilities were understated as investors who purchased non-performing loans based on inflated appraisals may force Washington Mutual to repurchase such nonperforming loans resulting in undisclosed losses and liabilities;

e.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

f.    The Company's substantive disclosures concerning the adequacy of its internal controls were materially false and misleading in light of the intentional inflation of

appraisals by Company executives;

        g.      The Company failed to disclose that its Code of Ethics and Code of

Conduct were being knowingly violated through the intentional manipulation of the appraisal

process, in violation of legal and ethical standards; and

        h.      Defendants Killinger's and Casey's certifications under Sections 302 and

906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

      56.      On April 17, 2007, after the close of the financial markets, Washington Mutual issued

a press release to report its financial results for the first quarter of 2007, which stated as follows in

relevant part:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of
> $784 million, or $0.86 per diluted share, compared with net income of $985 million,
> or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85
> million after tax partial settlement related to Home Savings goodwill litigation.
> Based on these earnings and the company's strong financial position, the Board of
> Directors increased the cash dividend on the company's common stock for the 47th
> consecutive quarter to 55 cents per share.
>
> "Our Retail Banking, Card Services, and Commercial groups continued to post strong
> results in the first quarter as we successfully attracted a growing number of new
> customers to our expanding national banking franchise," said Kerry Killinger, the
> company's chairman and CEO. "Overall, we delivered solid results in the first quarter
> despite the challenging interest rate environment and slowing housing market."
> "Our Home Loans business was challenged during the first quarter by difficult market
> conditions," he added. "Over the past 12 months, we have taken a number of prudent
> actions to reduce our exposure to the subprime mortgage industry. These actions,
> along with a diversified business mix, limited our exposure to the mortgage market's
> downturn and position us well to expand and grow as market conditions improve."
>                                      \*\*\*
> -- Decrease in home loan volume reflects strategic actions. The decline in home loan
> volume from the fourth quarter was the result of the proactive steps the company has
> taken to reduce its subprime exposure through this point in the cycle. Subprime

mortgage production for the first quarter was down 51 percent from the same quarter in 2006. The decline in home loan volume, year over year, also reflected the company's decision to exit its traditional correspondent business.

57. On May 10, 2007, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on April 17, 2007 and disclosed that the Company's portfolio of home loans held for sale was $26.9 billion; loans held in portfolio included $93.5 billion of home loans, $53.4 billion in home equity loans and lines of credit, $17.6 billion in subprime home loans and $2.8 billion in subprime home equity loans and lines of credit. The Company reported reserves for loan and lease losses of $1.5 billion.

58. The May 10, 2007 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

59. Defendants' April 17, 2007 and May 10, 2007 disclosures, referenced above, were materially false and misleading because:

a. Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b. The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c. The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d. The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

   e.  Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

   60.  On July 18, 2007, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the second quarter of 2007, which stated as follows in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. Continued strong performance led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.
>
> "We delivered record growth in our retail banking, credit card and commercial businesses during the second quarter. **Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year,"** said Chairman and CEO Kerry Killinger. **"I'm pleased with the job our employees are doing in growing the franchise, delivering best-in-class customer service, as evidenced by our recent J.D. Power award recognition, and focusing on improving our operating efficiency."**

   61.  On August 9, 2007, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on July 19, 2007 and disclosed that the Company's portfolio of home loans held for sale was $19.3 billion; loans held in portfolio included $88.5 billion of home loans, $55.8 billion in home equity loans and lines of credit, $17.6 billion in subprime home loans and $2.9 billion in subprime home equity loans and lines of credit. The Company reported reserves for loan and lease losses of $1.56 billion.

   62.  The August 9, 2007 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form

10-Q.

63.    Defendants' July 19, 2007 and August 9, 2007 disclosures, referenced above, were

materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP

standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans

issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were

materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's substantive disclosures omitted to disclose that appraisals

used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.    Defendants Killinger's and Casey's certifications under Sections 302 and of

the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values,

financial misstatements, and substantive false statements and omission of material information.

**The Market Begins to Learn the
<u>Nature and Magnitude of the Wrongdoing</u>**

64.    On October 17, 2007, after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the third quarter of 2007, which stated as

follows in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that third quarter 2007 net income of $210
> million, or $0.23 per diluted share, compared with net income of $748 million, or
> $0.77 per diluted share, in the third quarter of 2006. **The company attributed the
> decline to a weaker housing market and disruptions in the capital markets.**
>
> "We're disappointed with our third quarter results but they reflect the increasingly
> difficult market conditions that are challenging the banking industry," said WaMu

Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, **and we continued to adapt our Home Loans business to meet market conditions.**" Killinger added that the company remains focused on executing its long-term growth plans.

* * *

-- Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.

-- The company also increased the provision for loan losses for credit cards to $323 million from $229 million in the second quarter reflecting a higher level of delinquencies and a lower level of anticipated recoveries.

65.    During the Company's October 17, 2007 conference call with investors, Defendant Casey disclosed that Washington Mutual's "allowance for loan and lease losses [was] $1.9 billion at quarter end, up 21 percent from the end of the second quarter."

66.    With respect to the outlook for the balance of the year, during the October 17, 2007 conference call Defendant Casey stated as follows:

As we consider our credit provisioning outlook for the remainder of the year, let me just say that I have never seen housing credit conditions change so significantly over such a short period of time. Nor can I remember a period when there was less clarity about near-term housing and credit trends.

As I discussed in detail earlier, we have seen a sharp deterioration in the housing market since our second quarter earnings call and a further acceleration of adverse trends in our portfolio since we updated our guidance last in September. The guidance I provide you today is based on our best thinking given the facts that are currently available. However, we expect the market will continue to change quickly.

The main drivers of our credit provision are the level of delinquencies and charge-offs in our portfolio, both of which rose sharply in the third quarter as home prices declined in many of our major markets. Based on our current view of the macro environment for housing and our own portfolio data, we expect delinquencies

and charge-offs in our portfolio to increase further during the fourth quarter.

Considering the weakening housing market and adverse trends in the third quarter, our best estimate at this time is that charge-offs in our portfolio will increase between 20 and 40 percent in the fourth quarter and that our total 2007 provision will be between $2.7 and $2.9 billion.

67.    Defendants' October 17, 2007 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's statements regarding loan loss reserves and provision for credit losses failed to disclose that a material portion of such asset impairments was related to loans issued based on inflated appraisals;

e.    The Company's disclosures concerning anticipated asset writedowns to be taken during the fourth quarter reflect that past asset balances were overstated due to the improper use of inflated appraisals; and

f.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated.

68.    Despite Defendants' continuing failure to disclose the improprieties related to Washington Mutual's manipulation of the home mortgage market, the market did begin to realize that there was a significant deterioration in Washington Mutual's balance sheet and home loan

business that was not entirely attributable to those reasons provided by the Company. This decline was noted in an October 31, 2007 commentary by Jonathan Weil of Bloomberg:

> Oct. 31 (Bloomberg) -- If you think the worst is over for mortgage lenders, a close look at Washington Mutual Inc.'s balance sheet should dispel that notion pretty quickly.
>
> The largest U.S. savings and loan stunned investors on Oct. 17 when it said it would set aside as much as $1.3 billion this quarter to cover anticipated loan losses. The news came the same day Washington Mutual announced a 72 percent drop in third-quarter net income to $210 million.
>
> Since then, Washington Mutual's stock has fallen 15 percent. And at $28.11, the Seattle-based thrift now trades for only slightly more than its book value, or assets minus liabilities, while its dividend yield is a whopping 8 percent.
>
> The signal from the market: Washington Mutual's dividend and book value aren't sustainable -- and with good reason.
>
> Washington Mutual has paid more than $1.9 billion in cash dividends over the past year, including $485 million last quarter. Meanwhile, the real wonder is that Washington Mutual's forecast for fourth-quarter loan-loss provisions wasn't substantially higher.
>
> First, a brief accounting primer: Loan-loss allowances are the reserves that lenders set up on their balance sheets in anticipation of bad loans. Provisions are the expenses lenders record to boost their loan-loss allowances. As loans are written off, lenders record charge-offs, reducing their allowances.
>
> For the third quarter, Washington Mutual recorded $967 million in loan-loss provisions and $421 million in net charge-offs. Those and other actions brought the company's loan-loss allowance to $1.89 billion at Sept. 30, up from $1.56 billion at June 30.

### Looks Light

> As for the fourth quarter, Washington Mutual predicted that provisions would be $1.1 billion to $1.3 billion and that charge-offs would increase 20 percent to 40 percent.
>
> To see why even $1.3 billion in provisions looks light, consider Washington Mutual's $57.86 billion of so-called option- ARM loans, which make up 24 percent of Washington Mutual's loan portfolio. These adjustable-rate mortgages were popular during the housing bubble, because they give customers the option of postponing interest payments, which the lender then adds to their principal balances.
>
> As of Sept. 30, the unpaid principal balance on Washington Mutual's option ARMs exceeded the loans' original principal amount by $1.5 billion, meaning the customers owed $1.5 billion more in principal than what they originally borrowed. By comparison, that figure was $681 million a year earlier, when Washington Mutual had $67.14 billion, or 16 percent more, option ARMs on its books.

Look to the end of 2005, and the trend becomes even starker. Back then, Washington Mutual had even more option ARMs on its balance sheet, at $71.2 billion. Yet the unpaid principal balance exceeded the original principal amount by only $160 million -- and that was up from a mere $11 million at the end of 2004.

### Deferring Pain

The deferred interest from option ARMs also boosts Washington Mutual's earnings, part of a process known as negative amortization, or ``neg-am.'' That's because option-ARM lenders recognize interest income when customers postpone their interest payments, even though the lenders got no cash.

For the nine months ended Sept. 30, Washington Mutual recognized $1.05 billion in earnings as a result of neg-am within its option-ARM portfolio. That represented 7.2 percent of Washington Mutual's $14.61 billion of total interest income year-to-date. By comparison, neg-am contributed 1.8 percent of Washington Mutual's interest income for all of 2005 and just 0.2 percent for 2004.

What's going on here? Either the borrowers postponing their interest payments are doing so as a matter of choice, by and large, or they can't afford to pay them. Common sense suggests it's the latter -- and that there's serious doubt Washington Mutual ever will collect the $1.5 billion of postponed interest that its option-ARM customers have added to their original principal balances.

### No Questions

Yet the $1.1 billion to $1.3 billion of fourth-quarter provisions that Washington Mutual predicted -- for the company as a whole -- wouldn't even cover the $1.5 billion of tacked-on principal. The trend among Washington Mutual's option ARMs shows no sign of slowing, either.

Through a spokeswoman, Libby Hutchinson, Washington Mutual officials declined to comment. She said the company's executives aren't fielding questions until their next meeting with investors on Nov. 7.

Then there's the bigger picture. While Washington Mutual's loan-loss allowance rose 22 percent to $1.89 billion during the 12 months ended Sept. 30, nonperforming assets rose 128 percent to $5.45 billion. So even if Washington Mutual adds $1.3 billion in provisions next quarter, its loan-loss allowance still won't be anywhere close to catching up.

To be sure, Washington Mutual executives have some latitude over the timing of the company's loan-loss provisions. Yet they also may have a monetary incentive to push losses into 2008.

Under the formula Washington Mutual's compensation committee will use to determine executive bonuses this year, 40 percent is weighted toward 2007 earnings-per-share targets, according to the company's latest proxy. Goals related to non-interest expense and non-interest income each count for 25 percent, while ``customer loyalty'' goals count for 10 percent.

Postponed Reckoning

The proxy didn't disclose the specific goals for those performance measures. Still, it stands to reason that Washington Mutual executives would come closer to hitting the EPS goal if they minimize loan losses this year.

On its Web site, Washington Mutual says the reason it no longer provides EPS forecasts to the public is that ``many believe EPS guidance tends to focus management on near-term rather than long-term performance.''

The same, of course, is true for executive bonuses that are tied heavily to yearly EPS targets. If Washington Mutual's management is more focused on near-term performance now, as the numbers suggest, this might help explain it.

69.     As noted in this article, on October 18, 2007, following Washington Mutual's October 17, 2007 announcement of third quarter results and disclosure of additional anticipated asset writedowns, the stock declined by $2.55, or 7.8%, from its October 17, 2007 closing price of $33.07 per share. This decline continued through October 31, 2007 when Washington Mutual shares closed at $27.88 each, down a total of $5.19 per share, or 15.7%, since the release of third quarter financial results.

**The First American Complaint Provides Further Information About Defendants' Fraudulent Scheme**

70.     As detailed above at length, on November 1, 2007 New York Attorney General Andrew Cuomo filed the First American Complaint which alleges a complex scheme undertaken by senior Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT.

71.     The degree of pressure exerted by Washington Mutual executives demonstrated by these allegations illustrates that this was not an isolated incident, but a systematic manipulation by of the appraisal process by Defendants. This scheme caused the overstatement of assets subsequently written down by Washington Mutual during the third quarter of 2007, anticipated future writedowns during the fourth quarter of 2007 and other false statements, as

alleged above, during the Class Period.

72.    The allegations in the First American Complaint partially revealed to the market the fraudulent scheme undertaken by Defendants.  After absorbing this news, shares of the Company's stock sank on November 1, 2007 and November 2, 2007, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88  per share closing price on October 31, 2007.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and October 31, 2007. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.    At all relevant times, the market for Washington Mutual securities was an efficient market for the following reasons, among others:

a.    Washington Mutual securities met the requirements for listing, and were listed, on the New York Stock Exchange ("NYSE"), an efficient and automated market;

b.    During the Class Period, millions of shares of Washington Mutual securities were traded on the open market;

c.    As a regulated issuer, Washington Mutual filed periodic public reports with the SEC and the NYSE; and

d.    Washington Mutual was followed by numerous securities analysts

employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

75.    As a result, the market for Washington Mutual securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Washington Mutual's Share price. Under these circumstances, all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

76.    This action is properly maintainable as a class action because:

a.    The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, Washington Mutual securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

b.    Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased Washington Mutual shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.    A class action is superior to other available methods for the fair and

44

efficient adjudication of the claims asserted herein.  As the damages suffered by the individual

Class members may be relatively small, the expense and burden of individual litigation make it

virtually impossible for the Class members individually to redress the wrongs done to them.  The

likelihood of individual Class members prosecuting separate claims is remote;

      e.     The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class.  The questions of law

and fact which are common to Plaintiff and the Class include, among others:

      i.     whether the federal securities laws were violated by defendants'

acts as alleged herein;

      ii.     whether statements disseminated to the investing public and to

Washington Mutual's shareholders during the Class Period misrepresented material facts about

the operating results and financial condition of the Company;

      iii.     whether defendants acted with knowledge or with reckless

disregard for the truth in misrepresenting and/or omitting to state material facts;

      iv.     whether, during the Class Period, the market price of Washington

Mutual securities was artificially inflated due to the material misrepresentations and/or non-

disclosures complained of herein;

      v.     whether the defendants participated in and pursued the common

course of conduct complained of herein; and

      vi.     whether the members of the Class have sustained damages and, if

so, what is the proper measure thereof.

      77.     Plaintiff anticipates no unusual difficulties in the management of this action as a

class action.

## NO SAFE HARBOR/ADDITIONAL SCIENTER ALLEGATIONS

78.    As alleged herein, the Defendants acted with scienter because at the time that they

issued public documents and other statements in Washington Mutual's name, they knew or

recklessly disregarded the fact that such statements were materially false and misleading, or

omitted to disclose material facts.  Moreover, the Defendants knew such documents and

statements would be issued or disseminated to the investing public, knew that persons were

likely to rely upon those misrepresentations and omissions, and knowingly and recklessly

participated in the issuance and dissemination of such statements and documents as primary

violators of the federal securities laws.

79.    As set forth in detail throughout the Complaint, the Defendants, by virtue of their

control over, and/or receipt of Washington Mutual's materially misleading statements, and their

positions with the Company which made them privy to confidential proprietary information

concerning Washington Mutual' s improper appraisal practices, and used such information to

artificially inflate Washington Mutual financial results.  The Defendants created, were informed

of, participated in, and knew of, the scheme alleged herein to distort and suppress material

information pertaining Washington Mutual's improper manipulation of appraisals.  With respect

to non-forward looking statements and omissions, the Defendants knew and recklessly

disregarded the falsity and misleading nature of that information, which they caused to be

disseminated to the investing public.  The statutory safe harbor provided for forward-looking

statements under certain circumstances does not apply to any of the false statements pleaded in

this Complaint. None of the statements pleaded herein are "forward-looking" statements and no

such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

80.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Washington Mutual who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

81.    Plaintiff repeats and realleges each and every allegation above, as if set forth in

Doc. 158816                                    47

full herein.

82.    Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Washington Mutual securities.

83.    The purpose and effect of defendants' plan, scheme and course of conduct were to artificially inflate the price of Washington Mutual's securities and to artificially maintain the market price of Washington Mutual securities.

84.    The Individual Defendants, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Washington Mutual personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

85.    As a result of the foregoing, the market price of Washington Mutual securities was artificially inflated during the Class Period. In ignorance of the falsity of the defendants' statements concerning the operating results and performance of Washington Mutual, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or

the integrity of the market price of Washington Mutual securities during the Class Period in purchasing Washington Mutual securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

86.    Had Plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Washington Mutual securities at the artificially inflated prices that they did.

87.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Washington Mutual securities in ignorance of the financial risk to them as a result of such nondisclosures.

88.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

89.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual, their control over, and/or receipt and/or modification of Washington Mutual' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Mutual, participated in the fraudulent scheme alleged herein.

90.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

91.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

92.    By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Washington Mutual securities during the Class Period.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT

93.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

94.    During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of Washington Mutual and their specific acts, was a controlling person of Washington Mutual within the meaning of Section 20(a) of the Exchange Act.

95.    Each Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and Washington Mutual concealed from Plaintiff and the other members of the Class during the Class Period.

96.    Each of the Individual Defendants had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing Washington Mutual to disseminate the false and misleading information referred to above.

97.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

98.    By virtue of the conduct alleged above, the Individual Defendants are liable to the Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Washington Mutual's securities during the Class Period.

**WHEREFORE,** Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor

of Plaintiff and the other members of the Class for all losses and damages suffered as a result of

the acts and transactions complained of herein, together with prejudgment interest from the date

of the wrongs to the date of the judgment herein;

      E.     Awarding Plaintiff the costs, expenses, and disbursements incurred in this action,

including reasonable attorneys' and experts' fees; and

      F.     Awarding Plaintiff and the other members of the Class such other and further

relief as the Court may deem just and proper in light of all the circumstances of this case.

### JURY DEMAND

      Plaintiff demands a trial by jury.

Dated: New York, New York
       November 5, 2007

By: _____

**WOLF POPPER LLP**

Robert C. Finkel (RF 2373)
James A. Harrod (JH 4400)
845 Third Avenue
New York, NY 10022
Tel.: 212.759.4600
Fax : 212.486.2093

Attorneys for Plaintiff

# Exhibit 5

Upon attempting to transmit a portable data format copy of the Complaint in this matter for filing on the Court's ECF system, the system indicated that the document was security protected and was unable to be accessed.

A copy of the Complaint may be found at http://csgrr.com/cases/wamu/complaint.pdf (last visited January 4, 2008).

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT L. GARBER, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO. 07-cv-11422** |
| vs. ) | |
| WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, STEPHEN J. ROTELLA, and THOMAS W. CASEY, ) ) ) ) | CLASS ACTION COMPLAINT <br><br> **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff, Robert L. Garber ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Washington Mutual, Inc. ("Washington Mutual" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Washington Mutual's securities between April 18, 2006 and December 10, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks.  The Company is a savings and loan holding company who

owns two banking subsidiaries, as well as numerous non-bank subsidiaries.  The Company has four operating segments: the Retail Banking Group, which operates a retail bank network of 2,225 stores; the Card Services Group, which operates credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets, and the Home Loans Group, which engages in single-family residential real estate lending, servicing and capital markets activities.

3.      On October 17, 2007, after the market closed, Washington Mutual shocked investors when it reported its third quarter 2007 financial and operational results.  For the quarter, the Company reported earnings per share ("EPS") of $0.23, against $0.92 EPS for the second quarter 2007.  In addition to disclosing that it had suffered a 72 percent drop in net income, the Company also stated that it would set aside up to $1.3 billion in the following quarter to cover its loan losses.  Further, during the third quarter of 2007, the Company significantly increased its loan loss provision to $967 million, compared to the $372 million reported in the prior quarter.

4.      On this news, the Company's shares fell $2.55 per share, or over 7.7 percent, to close on October 18, 2007 at $30.52 per share, on unusually heavy trading volume.  The following day, the Company's shares fell an additional $1.43 per share, or 4.7 percent, to close on October 19, 2007 at $29.09 per share.

5.      Then on November 1, 2007, the New York Attorney General sued First American Corporation and its subsidiary eAppraiseIT ("EA") for conspiring with Washington Mutual to inflate real estate appraisals.  According to the Attorney General, in April 2006, EA began providing appraisal services for Washington Mutual, which then became EA's biggest client. Within weeks, the Company began complaining to EA that its appraisals were not high enough

and pressured EA to exclusively employ a new panel of appraisers that Washington Mutual had hand-selected as "Proven Appraisers." This set of appraisers was chosen by Washington Mutual specifically because they inflated property appraisals, which enabled the Washington Mutual greater profit from these higher appraisals as they could close more home loans at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for Washington Mutual.

6.      On this news, the Company's shares fell an additional $2.13 per share, or over 7.6 percent, to close on November 1, 2007 at $25.75 per share, on heavy trading volume.

7.      Then on November 2, 2007, *MarketWatch.com* reported that Washington Mutual may have to set aside $412 million to $2.1 billion in extra reserves in response to the New York Attorney General's lawsuit.  The article detailed that "if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price."  Further, the lawsuit "raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans will be put back to [the Company] from bondholders on the basis of fraudulent appraisals and [the Company] would be forced to put bad loans back on its balance sheet."  One analyst estimated that the value of mortgages that could be "put back" to Washington Mutual could reach $33 billion, which would require additional reserves of $412 million, or $0.30 per share.

8.      On this news, the Company's shares fell an additional $1.94 per share, or over 7.5 percent, to close on November 2, 2007 at $23.81 per share, on heavy trading volume.

9.      Then on November 7, 2007, *MarketWatch.com* further reported that Washington Mutual indicated that its 2007 credit losses could amount to between $2.7 billion to $2.9 billion, almost double the estimates that the Company provided July 2007.  The Company's revised

estimates came on the heels of a ratings downgrade by Fitch Ratings, who revised its outlook on the Company from "stable" to "negative."  On this news, the Company's shares fell an additional $4.19 per share, or over 17.3 percent, to close on November 7, 2007 at $20.19 per share, on heavy trading volume.

10.     Finally, on December 10, 2007, after the close of the market, the Company disclosed that it expected to report a net loss for the fourth quarter of 2007.  This was primarily the result of the Company increasing its fourth quarter 2007 charge-offs and delinquencies in its loan portfolio.  The Company stated that it expected its fourth quarter provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of the expected fourth quarter net charge-offs.  Going forward, the Company stated that it expected its first quarter 2008 provision for loan losses to be in the range of $1.8 to $2.0 billion, and that it expected loan loss provisions through the end of 2008 "to remain elevated, generally consistent with its expectation for the first quarter of 2008."  Additionally, the Company announced that it was offering $2.5 billion in convertible preferred stock, that its Board of Directors intended to reduce the quarterly dividend rate to $0.15 per share (compared to its most recent quarterly dividend rate of $0.56 per share), and that it would discontinue all remaining lending through its subprime mortgage channel.

11.     On this news, the Company's shares fell an additional $2.46 per share, or over 12.3 percent, to close on December 11, 2007 at $17.42 per share, on unusually heavy trading volume.

12.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.  Specifically, defendants failed to disclose or indicate the following:  (1) that the

Company had failed to adequately disclose the extent of its exposure to anticipated losses and defaults in its lending portfolio; (2) that contrary to earlier representations, the Company had failed to adequately reserve for losses as conditions in the credit and housing markets deteriorated; (3) that the defendants had engaged in a conspiracy with First American and EA to artificially inflate the appraised value of homes for certain mortgages to artificially inflate the Company's reported loan-to-value ratios; (4) that the Company's lending portfolio and the mortgages that it issued were substantially riskier than they were represented to investors to be; (5) that as a result, the Company's investment portfolio was impaired; (6) that, as a result of the above, the Company would be forced to take substantial charges in subsequent quarters to remedy such failures; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

13.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Washington Mutual has offices in this Judicial District, and the Attorney General of State of New York is currently investigating the Company for alleged misconduct.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, Robert L. Garber, as set forth in the accompanying certification, incorporated by reference herein, purchased Washington Mutual's securities at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Defendant Washington Mutual is a Washington corporation with its principal executive offices located at 1301 Second Avenue, Seattle, Washington.

20.     Defendant Kerry K. Killinger ("Killinger") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

21.     Defendant Stephen J. Rotella ("Rotella") was, at all relevant times, the Company's President and Chief Operating Officer ("COO").

22.     Defendant Thomas W. Casey ("Casey") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and an Executive Vice President.

23.     Defendants Killinger, Rotella and Casey are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Washington Mutual's

reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks.  The Company is a savings and loan holding company who owns two banking subsidiaries, as well as numerous non-bank subsidiaries.  The Company has four operating segments: the Retail Banking Group, which operates a retail bank network of 2,225 stores; the Card Services Group, which operates credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets, and the Home Loans Group, which engages in single-family residential real estate lending, servicing and capital markets activities.

### Materially False and Misleading
### Statements Issued During the Class Period

25.     The Class Period begins on April 18, 2006.  On this day, the Company issued a press release entitled "Washington Mutual Reports First Quarter 2006 Earnings Per Share of 98

Cents; Board of Directors Increases Cash Dividend to 51 Cents; WaMu Free Checking(TM) Account Fuels Record Account Growth; Card Services Drives Strong Cross-Sell Results."

Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE: WM) today reported first quarter 2006 net income of $985 million, or $0.98 per diluted share, compared with net income of $902 million, or $1.01 per diluted share, in the first quarter of 2005.
>
> Washington Mutual's Board of Directors declared a cash dividend of 51 cents per share on the company's common stock, up from 50 cents per share in the previous quarter. Dividends on the common stock are payable on May 15, 2006 to shareholders of record as of April 28, 2006.
>
> **"We are very pleased with our first quarter results,"** said Kerry Killinger, Washington Mutual chairman and chief executive officer. **"The company's strong performance demonstrates the benefits of our continued diversification and enhanced operational focus.** This past quarter we had particularly strong results in Retail Banking and Card Services."
>
> **"These businesses added customers at a record pace and delivered significant revenue and earnings even in this difficult interest rate environment,"** Killinger added.
>
> * * *
>
> - **Strong credit quality results in lower provisioning. The company's credit performance continued to reflect the favorable consumer and housing environment.** The credit card portfolio, in particular, demonstrated very low loss levels and stable delinquency rates. The change in bankruptcy law during last year's fourth quarter precipitated a spike in filings in that quarter which led to an unusually low level of charge-offs this quarter and contributed to a much lower provision for Card Services during the quarter.
>
> * * *
>
> - **Lower provision reflects continuing strong credit quality. The provision for loan and lease losses was $82 million in the first quarter compared with $217 million in the previous quarter.** Card Services had a lower provision on a linked quarter basis due, in part, to a 40 percent decline in net charge-offs. During

last year's fourth quarter, the company saw an unusually large
number of credit card charge-offs due to a surge in bankruptcy
filings in anticipation of the new bankruptcy law.
Nonperforming assets as a percentage of total assets were up
slightly totaling 59 basis points at quarter end, compared with
57 basis points at the end of the prior quarter and the end of the
first quarter a year ago.  [Emphasis added.]

26.     On May 10, 2006, Washington Mutual filed its Quarterly Report with the SEC on

Form 10-Q.   The Company's 10-Q was signed by Defendant Casey, and reaffirmed the

Company's financial results previously announced on April 18, 2006.    Additionally, the

Company's, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the
Company's Chief Executive Officer and Chief Financial Officer,
has evaluated the effectiveness of the Company's disclosure
controls and procedures as of the end of the period covered by this
report. Based on such evaluation, the Company's Chief Executive
Officer and Chief Financial Officer have concluded that, as of the
end of such period, the Company's disclosure controls and
procedures are effective in recording, processing, summarizing and
reporting, on a timely basis, information required to be disclosed
by the Company in the reports that it files or submits under the
Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of
the Company's disclosure controls and procedures on an ongoing
basis, which may result in the discovery of deficiencies, and
improves its controls and procedures over time, correcting any
deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of
the Company's internal control over financial reporting on an
ongoing basis, which may result in the discovery of deficiencies,
some of which may be significant, and changes its internal control
over financial reporting as needed to maintain their effectiveness,
correcting any deficiencies, as needed, in order to ensure the
continued effectiveness of the Company's internal controls. There

have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

### **Credit Risk Management**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

\* \* \*

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

27. The Company's 10-Q filed on May 10, 2006 contained Sarbanes-Oxley required

certifications, signed by Defendants Killinger and Casey, who stated:

I, [Kerry K. Killinger and Thomas W. Casey], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by

others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, [Kerry K. Killinger, the

Chief Executive Officer / Thomas W. Casey, the Chief Financial Officer] of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

28.     On July 19, 2006, the Company issued a press release entitled "Washington Mutual Reports Second Quarter Earnings Per Share of 79 Cents, 94 Cents Per Share Before the Second Quarter Impact of the Pending Sale of Mortgage Servicing Rights and Restructuring Charges; Company Announces Intention to Sell its Asset Management Company; Board of Directors Increases Cash Dividend to 52 Cents and Approves New 150 million Share Repurchase Plan."  Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.
>
> ***The company announced today a series of actions it is taking that will significantly improve the company's market risk profile, greatly accelerate the achievement of its operating efficiency goals, and be accretive to earnings in 2006 and 2007.***
>
> ***"Our retail banking and card services businesses produced excellent results and our business model is performing well in this challenging interest rate environment," said Kerry Killinger, Washington Mutual Chairman and Chief Executive Officer. "The transformational actions we're taking will make us an even more diversified bank positioned for improved financial performance as we move forward."***
>
> ***As part of the company's Home Loans strategy of focusing on higher-margin products, driving superior operating efficiency***

13

*and reducing its exposure to market risk, the company entered into a definitive agreement to sell $2.6 billion of mortgage servicing rights.* The pending sale includes all of the company's government loan servicing and a portion of its conforming, fixed-rate servicing, which is predominantly for single service customers, the majority of whom are outside the company's retail footprint. The pending sale also includes the transfer of the company's Milwaukee loan servicing operation and approximately 800 employees. In addition to the $101 million after tax adjustment booked in the second quarter, the company expects to incur additional transaction and shutdown-related costs of approximately $50 million, after tax, most of which will be incurred in the third quarter.

\* \* \*

- *Provision reflects loan growth and charge-off level.* The provision for loan and lease losses of $224 million in the second quarter reflected a modest increase in the level of charge-offs, as well as incremental loan growth. The $82 million provision and level of charge-offs in the first quarter benefited from the surge of bankruptcy-related charge-offs in the fourth quarter as consumers sought bankruptcy protection in advance of the effective date of bankruptcy reform. The provision a year ago reflected not only the benign credit environment but also the absence of the credit card portfolio. Nonperforming assets as a percentage of total assets were up slightly to 62 basis points at quarter end, compared with 59 basis points at the end of the prior quarter and 53 basis points at the end of the last year's second quarter.

\* \* \*

- *Home Loans refines business model for changing market environments. During the quarter, the Home Loans Group took several steps to further its long-term goals to diversify its product set, leverage distribution, and reduce its cost structure.* In May, the company announced that it was realigning its traditional correspondent business to a conduit structure. And, as part of streamlining its product line, the company announced that it will no longer engage in FHA and VA lending. The company's announced sale of $2.6 billion of mortgage servicing rights is consistent with the Home Loans strategy and will reduce the ratio of MSR to total stockholders' equity to approximately 25 percent. [Emphasis added.]

29.    On August 9, 2006, Washington Mutual filed its Quarterly Report with the SEC

on Form 10-Q.   The Company's 10-Q was signed by Defendant Casey, and reaffirmed the

Company's financial results previously announced on July 19, 2006.   The Company's 10-Q also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications

contained in ¶27, *supra*.   Additionally, the Company, in relevant part, stated:

> ## Controls and Procedures
>
> ### Disclosure Controls and Procedures
>
> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.
>
> In reaching the conclusion that disclosure controls and procedures were effective, management had considered the potential financial impact of control deficiencies associated with the matters giving rise to the restatement described in Note 2 to the Consolidated Financial Statements on page 7. Management believes this restatement is immaterial and was not the result of a material weakness in the Company's internal control over financial reporting. Accordingly, management has not changed its conclusion described above that the Company's disclosure controls and procedures were designed and operating effectively as of June 30, 2006.
>
> Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.
>
> ### Changes in Internal Control Over Financial Reporting
>
> Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies,

some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K/A, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

### Credit Risk Management

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

\* \* \*

### Allowance for Loan and Lease Losses

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability

to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

30.    On October 18, 2006, the Company issued a press release entitled "Washington Mutual Reports Third Quarter Earnings Per Share of 77 Cents -- Results Included Charges Associated with the Sale of Mortgage Servicing Rights and Efficiency Initiatives."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005.

Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.

***"We continue to focus on the successful execution of our strategic plan despite the challenging operating environment,"*** said Kerry Killinger, WaMu Chairman and CEO, noting that, as anticipated, the costs associated with the MSR sale announced in the second quarter and the company's ongoing efficiency initiatives impacted third quarter results. ***"Retail Banking, Card Services and the Commercial Group produced solid results, and we continue to aggressively attack our expense base by taking out excess capacity and reducing our overall cost structure."***

> *Killinger added, "We remain confident in our strategy to reposition the company and set the stage for stronger performance in 2007."*

> \* \* \*

> - *Credit exposure continues to be proactively managed.* The provision for loan and lease losses of $166 million in the third quarter reflected a slight decline in the loan portfolio and net charge-offs of $154 million. *The third quarter provision also reflected refinements to the company's reserve methodology* and adjustment of the provision related to the planned sale of $403 million of higher risk credit card accounts. Without the impact of these two items, the provision would have been similar to that of the second quarter. The provision was up compared with the third quarter of last year as prior year results did not include the company's credit card business acquired October 1, 2005. Nonperforming assets were up during the quarter and as a percentage of total assets totaled 69 basis points at quarter end, compared with 62 basis points at the end of the prior quarter and 52 basis points at the end of last year's third quarter.

> \* \* \*

> - *Company conservatively manages balance sheet.* While the company held average assets essentially flat with the prior quarter, it modestly grew balances of its targeted products of home equity lending, multi-family loans and credit cards, while reducing prime single-family residential loans. Compared with the third quarter of 2005, average assets were up 7 percent reflecting growth in targeted products and the addition of Card Services receivables. During the quarter, the company repurchased 18.8 million shares of its common stock. [Emphasis added.]

31. Also on October 18, 2006, the Company held an earnings conference call with investors and financial analysts. During this call, Defendant Killinger, in relevant part, stated:

> KERRY KILLINGER, CHAIRMAN: Despite the challenging environment impacting the mortgage banking industry, *we feel good about the proactive steps that we have taken. Our portfolio remains in very good shape and non-performing assets remain very low.*

*The housing market is clearly weakening with the pace of housing price appreciation slowing in most regions of the country. We are also experiencing somewhat higher delinquencies and loan losses, however, we began preparing for this possibility quite some time ago and took defensive actions to strengthen our portfolio. So we believe we are well prepared to weather the more difficult credit environment.*

We also believe that the expansion in our net interest margin should more than offset the higher credit costs as Tom will review with you later in his guidance for 2007.

In the meantime we continue to aggressively attack the cost structure in our home loans business during the quarter and reduce non-interest expense by 21% over the same period a year ago. This was achieved through key productivity and efficiency initiatives. The technology and offshoring initiatives currently underway are expected to result in further expense reductions in future quarters.

*Now we have significantly modified our home loan strategy to be consistent with our overall business model and continue to take appropriate actions to right size the business for the contracting mortgage lending market.*

* * *

*Now the quality of our option ARM portfolio remains strong. At the end of the third quarter the current estimated loan to value ratio on our option ARM portfolio was 57% with an average FICO of 707.* [Emphasis added.]

32. On November 9, 2006, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on October 18, 2006. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*. Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure

controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the third quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2005 Annual Report on Form 10-K/A, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

### <u>Credit Risk Management</u>

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations

under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

\* \* \*

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the existence and estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared to real estate secured loans without those features are discussed in the Company's 2005 Annual Report on Form 10-K/A, "Credit Risk Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry

historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

33.     On January 17, 2007, the Company issued a press release entitled "WaMu Reports Fourth Quarter Earnings Per Share of $1.10 and 2006 Earnings Per Share of $3.64; Announces $2.7 Billion Accelerated Share Repurchase and Increases Cash Dividend to 54 Cents."  Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE:WM) today reported fourth quarter 2006 net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income of $3.43 billion, or $3.73 per diluted share, in 2005.

> Fourth quarter 2006 earnings included an after tax gain of $415 million on the previously announced sale of WM Advisors, Inc., the company's retail mutual fund asset-management company. The gain from the sale of WM Advisors more than offset fourth quarter and full year after tax charges of $100 million and $202 million, respectively, related to the company's ongoing efficiency initiatives and after tax charges of $137 million associated with the sale in 2006 of a significant portion of the company's mortgage servicing rights and the related facility and employee transfers.

> On Jan. 3, 2007, the company entered into an accelerated share repurchase agreement with a dealer, buying back $2.7 billion of its common stock. The company also increased its cash dividend to 54 cents per common share, up from 53 cents per share in the previous quarter.

> ***"We achieved solid performances in our Retail Banking, Card Services and Commercial Group businesses in the fourth quarter and for the full year despite a difficult interest rate and operating environment, which particularly impacted the results in our Home Loans business," said Kerry Killinger, WaMu Chairman and CEO. "For the full year, we successfully reduced our cost structure and repositioned the balance sheet while continuing to expand our consumer and small business banking franchise.*** In 2006, we opened a record 1.23 million net new checking accounts, added a record 848,000 net new retail households and experienced

strong cross-sales of the WaMu credit card to our retail banking customers."

Killinger noted that opportunities to grow the balance sheet at attractive risk-adjusted returns are limited, making the accelerated share repurchase transaction a superior use of capital.

*"Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future," Killinger added. "Those decisive actions have positioned us well to deliver stronger operating performance in 2007."* [Emphasis added.]

34. On March 1, 2007, Washington Mutual filed its 2006 Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants Killinger and Casey, and reaffirmed the Company's financial results previously announced on January 17, 2007. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*. Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

*The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures* as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company* in the reports that it files or furnishes under the Securities Exchange Act of 1934.

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an*

*ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. ***There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

\* \* \*

## Credit Risk Management

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

The Finance Committee of the Board of Directors, by means of a broad set of policies and principles contained in the Company's Enterprise Risk Management Policy, exercises oversight over the framework for the Company's credit risk management activities. The Credit Risk Management Committee, chaired by the Chief Credit Officer, is comprised of business line chief risk officers, and senior finance, treasury and portfolio management professionals. This Committee is responsible for management of the Company's credit risk within stated credit limits and portfolio performance metrics, to ensure alignment with the Company's credit risk appetite. The Credit Risk Management Committee is also responsible for developing credit policy and recommending credit concentration limits to the Enterprise Risk Management Committee, approving corporate credit standards, overseeing the delegation of credit authority and ensuring compliance with credit policy, standards and limits. The Chief Credit Officer's primary responsibilities include directing the activities of the Credit Risk Management Committee, monitoring the credit quality of the Company's loan portfolio, determining the reasonableness of the Company's allowance for loan and lease losses, reviewing and

approving large credit exposures, and delegating credit approval authorities.

*In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk.* As an example of proactively managing credit risk, from time to time the Company sells delinquent and nonperforming loans. These sales have had the effect of accelerating the liquidation of these assets, thereby enabling the Company to deploy its capital more effectively, while assisting the Company in reducing the ratio of nonperforming assets to total assets.

*Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country.* A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

*Certain categories of residential loans held in the Company's portfolio, the most significant being Option ARM loans, have features that may result in increased credit risk when compared with residential loans without these features.* Loans with these features, to the extent material to the Company, as well as any compensating factors and mitigating circumstances that reduce the credit risk arising from these features, are discussed in more detail in the section of Management's Discussion and Analysis – "Features of Residential Loans."

*As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance.* The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses.

\* \* \*

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.

The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.

\* \* \*

*Contingent Credit Risk Liabilities*

*In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached.* When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. *If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made to the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.*

*Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value.* Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

\* \* \*

## Features of Residential Loans

*Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent*, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan

amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan-to-value calculation.

* * *

## Underwriting and Risk Mitigation

*The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures. Risk attributes and compensating factors, which may include an applicant's credit score, the loan-to-value ratio, loan size, and debt-to-income ratio, are taken into consideration as part of the underwriting and pricing processes.* The Company's practice of not offering Option ARM loans through its subprime mortgage channel and of selectively selling Option ARM loans to secondary market participants has further limited the potential for credit risk in its Option ARM portfolio.

* * *

## Impact of External Factors

*Certain external factors have, over the last five years, contributed to a reduction in the credit risk inherent in the Option ARM portfolio.* Among the two most significant economic factors affecting the Option ARM portfolio are prepayment rates, which operate to reduce the risk of payment shock in the portfolio caused by recasting events, and changes in housing prices, which affect current loan-to-value ratios. The risk of payment shock is reduced when Option ARM borrowers prepay their loans prior to the occurrence of the first recasting event. Although in 2006 housing prices experienced a decrease in the rate of appreciation nationally and declines in some geographic markets in which the Company lends, over the past five years, housing prices have generally appreciated and have served to mitigate credit risk in the Option ARM portfolio. Housing price appreciation levels experienced during the past five years may not continue.

*Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*

*Loan-to-value ratios are a key determinant of future performance.* Home loans with loan-to-value ratios of greater than

80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. ***This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.*** At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

***The Company actively monitors conditions in housing markets in which it has a concentration of home loans.*** Geographic concentrations are taken into account when deciding which home loans to sell in the secondary market. ***Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance.*** This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance.

***Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater than 80 percent***

* * *

***To compensate for the increased credit risk in the home equity portfolio that arises where the combined loan-to-value ratio at origination is greater than 80 percent, the Company typically charges such borrowers a higher rate of interest than would be charged if the combined loan-to-value ratio at origination was less than 80 percent. The Company also buys pool mortgage insurance that insulates it from the risk of default on those home equity loans or lines of credit where the combined loan-to-value ratio at origination is greater than 90 percent.*** [Emphasis added.]

35.     On April 17, 2007, the Company issued a press release entitled "WaMu Reports First Quarter Earnings Per Share of $0.86 and Increases Cash Dividend to 55 Cents."  Therein, the Company, in relevant part, stated:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of $784 million, or $0.86 per diluted share, compared with net income of $985 million, or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85 million after tax partial settlement related to Home Savings goodwill litigation.
>
> Based on these earnings and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 47th consecutive quarter to 55 cents per share.
>
> "Our Retail Banking, Card Services, and Commercial groups continued to post strong results in the first quarter as we successfully attracted a growing number of new customers to our expanding national banking franchise," said Kerry Killinger, the company's chairman and CEO. ***"Overall, we delivered solid results in the first quarter despite the challenging interest rate environment and slowing housing market."***
>
> "Our Home Loans business was challenged during the first quarter by difficult market conditions," he added. ***"Over the past 12 months, we have taken a number of prudent actions to reduce our exposure to the subprime mortgage industry. These actions, along with a diversified business mix, limited our exposure to the mortgage market's downturn and position us well to expand and grow as market conditions improve."*** [Emphasis added.]

36.     On May 10, 2007, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on April 17, 2007.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*.  Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2006 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

* * *

Management is responsible for balancing risk and reward in determining and executing business strategies. In 2006, the Company reduced its exposure to market risk and correspondingly increased its tolerance for credit risk. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

## Credit Risk Management

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions, and the existence and strength of any guarantor support.

As explained in the introductory paragraphs of the "Credit Risk Management" section of the Company's 2006 Annual Report on Form 10-K, the Company believes that loan-to-value ratios are one of the two key determinants in determining future loan performance.

\* \* \*

## Allowance for Loan and Lease Losses

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared to real estate secured loans without those features are discussed in the Company's 2006 Annual Report on Form 10-K, "Credit Risk

Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

37.     On July 18, 2007, the Company issued a press release entitled "WaMu Reports Second Quarter Earnings Per Share of $0.92, up 16 Percent; Increases Cash Dividend to 56 Cents."  Therein, the Company, in relevant part, stated:

WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. Continued strong performance led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.

***"We delivered record growth in our retail banking, credit card and commercial businesses during the second quarter. Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year,"*** said Chairman and CEO Kerry Killinger. "I'm pleased with the job our employees are doing in growing the franchise, delivering best-in-class customer service, as evidenced by our recent J.D. Power award recognition, and focusing on improving our operating efficiency."

\* \* \*

- ***Home Loans' results improve.*** Second quarter results for Home Loans were a loss of $37 million, an improvement from a loss of $113 million in the prior quarter as a result of more stable market conditions for subprime loans in the second quarter. Net losses from the sales of subprime mortgage loans

and adjustments to reflect changes in market values of loans held for sale totaled $38 million. In addition, the company decreased the value of its subprime residuals by $93 million for a combined total loss for the quarter of $131 million, or about half the $252 million in losses recognized in the first quarter.

\* \* \*

- **Home Loans shows improvement in a difficult environment.** While the quarter's $37 million loss was an improvement from the loss of $113 million in the prior quarter, the difficult mortgage environment continues to pressure results. Net losses from the sales of subprime mortgage loans and adjustments to reflect changes in market values of loans held for sale totaled $38 million, which was a substantial improvement from net losses of $164 million in the first quarter. During the second quarter, the company reduced the value of its subprime residuals by $93 million to a balance of $79 million at quarter end. This decline in fair value was similar to the first quarter and reflected the poor performance of subprime loans and the slowdown in home price appreciation.

- **Prime business continues to improve.** Gain on sale for the prime portion of the business remained strong, but was down slightly primarily on lower sales volume. MSR valuation and risk management results improved during the quarter with the rise in long-term interest rates and lower net hedging costs. [Emphasis added.]

38.     On August 9, 2007, Washington Mutual filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant Casey, and reaffirmed the Company's financial results previously announced on July 18, 2007.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶27, *supra*.  Additionally, the Company, in relevant part, stated:

**Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this

report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2006 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

\* \* \*

Management is responsible for balancing risk and reward in determining and executing business strategies. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

### <u>Credit Risk Management</u>

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and

derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions, and the existence and strength of any guarantor support.

During the first half of 2007, deteriorating conditions in the U.S. housing market and increased payments on certain adjustable-rate mortgages that repriced upward at the expiration of their fixed rate periods have resulted in increased balances of nonaccrual loans and higher charge-offs. The combination of lower volumes of home sales transactions, longer marketing periods, growing inventories of unsold homes and increased foreclosure rates has exerted downward pressure on housing prices in many parts of the country, resulting in declining home price appreciation rates in many markets and absolute declines in property values in certain markets. Faced with these conditions, some borrowers have been unable to either refinance or sell their properties and consequently have defaulted on their loans. In certain circumstances, especially with loans that were funded more recently, these factors have resulted in increased severity of loss on residential loan charge-offs as lower collateral values on foreclosed properties have been insufficient to cover the recorded investment in the loan.

As explained in the introductory paragraphs of the "Credit Risk Management" section of the Company's 2006 Annual Report on Form 10-K, the Company believes that loan-to-value ratios are one of the two key determinants in determining future loan performance.

\* \* \*

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Determining the adequacy of the allowance

is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared with real estate secured loans without those features are discussed in the Company's 2006 Annual Report on Form 10-K, "Credit Risk Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

39.     On October 5, 2007, the Company issued a press release entitled "Washington Mutual Q3 Net Income Impacted by Market and Credit Environments."  Therein, the Company, in relevant part, stated:

Washington Mutual, Inc. (NYSE:WM) announced today that a weakening housing market and disruptions in the secondary market through the end of the third quarter will result in a decline in net income of approximately 75% from the prior year quarter, subject to the finalization of third-quarter 2007 results.

The expected decline in third quarter net income results principally from the following items that are reported on a pre-tax basis:

- The third-quarter loan loss provision will be approximately $975 million, which exceeds net charge-offs for the quarter by approximately $550 million. The provision reflects ongoing weakness in the housing market, primarily as it affects subprime and home equity loans, as well as growth in the company's loan portfolio;

- Downward adjustments of approximately $150 million, related to approximately $17 billion in held-for-sale mortgage loans that were transferred to the company's investment portfolio due to secondary market conditions;

- Net losses of approximately $150 million in the company's trading securities portfolio, including market valuation adjustments on capital markets assets, retained interests on credit cards and other residual interests; and,

- Impairment losses of approximately $110 million on investment grade mortgage-backed securities in the company's available for sale portfolio.

WaMu Chairman and CEO Kerry Killinger said, "While we're disappointed with our anticipated third-quarter results, we look forward to an improved fourth quarter as we continue to see good operating performance in our Retail Banking, Card Services and Commercial Group businesses."

Killinger added that the company continues to have the liquidity and capital necessary to grow the company's businesses and support its current dividend, as it continues to execute its long-term strategic plans.

Washington Mutual is providing preliminary information about its third-quarter results prior to its scheduled earnings announcement date in light of the impact of the very challenging market environment. No further details will be provided concerning the company's third-quarter performance until its regularly scheduled earnings release on Oct. 17, 2007. In the conference call following its earnings release on Oct. 17, the company will update its 2007 earnings drivers, including its updated expectations for loan loss provisioning levels in the fourth quarter of 2007. [Emphasis added.]

40.     The market did not react negatively to this news, as the Company's announcement

regarding its loan loss provisions, adjustments and losses was in line with other banks' recent announcements concerning loss provisions, adjustments and losses in connection with their loan exposure.

41.     The statements contained in ¶¶ 25 – 39 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company had failed to adequately disclose the extent of its exposure to anticipated losses and defaults in its lending portfolio; (2) that contrary to earlier representations, the Company had failed to adequately reserve for losses as conditions in the credit and housing markets deteriorated; (3) that the defendants had engaged in a conspiracy with First American and EA to artificially inflate the appraised value of homes for certain mortgages to artificially inflate the Company's reported loan-to-value ratios; (4) that the Company's lending portfolio and the mortgages that it issued were substantially riskier than they were represented to investors to be; (5) that as a result, the Company's investment portfolio was impaired; (6) that, as a result of the above, the Company would be forced to take substantial charges in subsequent quarters to remedy such failures; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

42.     On October 17, 2007, the Company shocked investors when it issued a press release entitled "WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents."  Therein, the Company, in relevant part, stated:

> WaMu (NYSE:WM) announced today **third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in**

*the third quarter of 2006.* The company attributed the decline to a weaker housing market and disruptions in the capital markets.

"We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, and we continued to adapt our Home Loans business to meet market conditions." Killinger added that the company remains focused on executing its long-term growth plans.

* * *

- *Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.* [Emphasis added.]

43.    On this news, the Company's shares fell $2.55 per share, or over 7.7 percent, to close on October 18, 2007 at $30.52 per share, on unusually heavy trading volume. The following day, the Company's shares fell an additional $1.43 per share, or 4.7 percent, to close on October 19, 2007 at $29.09 per share.

44.    Then on November 1, 2007, the New York Attorney General issued a press release entitled "NY Attorney General Sues First American and its Subsidiary for Conspiring with Washington Mutual to Inflate Real Estate Appraisals; Washington Mutual (WaMu) Demanded Appraisers Who Inflated Property Values; Internal E-Mails Show eAppraiseIT Executives Knew Their Scheme Was Illegal: 'We have agreed to roll over and just do it.'" The press release, in relevant part, stated:

Attorney General Andrew M. Cuomo today announced that he is suing one of the nation's largest real estate appraisal management companies and its parent corporation for colluding with the largest savings and loan in the country to inflate the appraisal values of homes.

*In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation, caved to pressure from Washington Mutual ("WaMu") to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.*

"The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo. *"The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."*

As First American acknowledged in its 2006 annual report, appraisal fraud can damage the entire housing market, including consumers and investors alike. Consumers are harmed because they are misled as to the value of their homes, increasing the risk of foreclosure and hindering their ability to make sound economic decisions. Investors are hurt by such fraud because it skews the value and risk of loans that are sold in financial markets.

*In April 2006, EA began providing appraisal services for WaMu, which became EA's biggest client. Within weeks, WaMu began complaining to EA that its appraisals were not high enough. WaMu pressured EA to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers." This set of appraisers was chosen by WaMu specifically because they inflated property appraisals. WaMu profited from these higher appraisals because they could close more home loans, at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for WaMu.*

Attorney General Cuomo's investigation uncovered a series of e-mails between executives at EA, First American, and WaMu that

show EA officials were willingly violating state and federal appraisal independence regulations to comply with WaMu's demands:

- On February 22, 2007, in response to a description of the WaMu "Proven Appraiser" program as one in which "we will now assign all Wamu's work to Wamu's 'Proven Appraisers'… [and] Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value," eAppraiseIT's president told senior executives at First American: ***"we have agreed to roll over and just do it..."***

- On April 4, 2007, eAppraiseIT's executive vice president stated in an e-mail to First American: "we as an AMC [Appraisal Management Company] need to retain our independence from the lender or it will look like collusion… eAppraiseIT is clearly being directed who to select. The reasoning… is bogus for many reasons including the most obvious – the proven appraisers bring in the values."

- On April 17, 2007, eAppraiseIT's president wrote an e-mail to First American explaining why its conduct was illegal: "We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."

- E-mail evidence also shows that WaMu pressured EA to inflate appraisals as a condition for doing future business together:

- On September 27, 2006, First American's vice chairman reported that a WaMu executive told him: "if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship…"

Attorney General Cuomo continued, "Just as my office stepped in when colleges and loan companies were profiting at students' expense, this lawsuit and my ongoing investigation into the mortgage industry should send a clear message: companies must play by the rules or they will have to account for their misdeeds."

Attorney General Cuomo's lawsuit seeks to end the illegal relationship between First American and EA and WaMu. It also seeks penalties and disgorgement from First American and EA. The lawsuit alleges that First American and EA violated appraiser independence laws, which regulate the conduct of real estate appraisers. The lawsuit was filed in the Supreme Court of New York, New York County. [Emphasis added.]

45.     On this news, the Company's shares fell an additional $2.13 per share, or over 7.6

percent, to close on November 1, 2007 at $25.75 per share, on heavy trading volume.

46.     On November 2, 2007, *MarketWatch.com* published an article entitled "WaMu

vulnerable on securitized mortgages?"  The article, in relevant part, stated:

> **Likely to set aside extra reserves if appraisals found fraudulent: analyst**
>
> ***Washington Mutual may have to set aside some $412 million to $2.1 billion in extra reserves if a lawsuit filed by New York state's attorney general against the mortgage lender succeeds***, a Keefe Bruyette & Woods analyst estimated on Friday.
>
> Attorney General Andrew Cuomo announced the suit on Thursday, alleging that ***First American Corp. (FAF) and its eAppraiseIT unit had been "colluding" with Washington Mutual (WM) also known as WaMu, to inflate the appraisal value of homes***.
>
> WaMu suspended its relationship with eAppraiseIT and said it has no incentive to have appraisers inflate home values. First American said the complaint "has no foundation in fact or law."
>
> ***If Cuomo succeeds in proving eAppraiseIT's appraisals on WaMu home loans were fraudulent, that could create big problems for the Seattle-based lender***, KBW's Frederick Cannon wrote in a note to clients.
>
> After lenders like WaMu originate home loans, they are often packaged up into mortgage-backed securities and sold to institutional investors around the world. The process gets the loans off the lenders' books, freeing them from the risk that those loans may default and also providing fresh cash to make more new mortgages.
>
> ***But if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price. If the assets have suffered delinquencies and have dropped in value, the lender takes a financial hit.***
>
> * * *
>
> **'Considerable risk'**
>
> ***The lawsuit filed by Cuomo "raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans***

43

*will be put back to WaMu from bondholders on the basis of fraudulent appraisals and WaMu would be forced to put bad loans back on its balance sheet," Cannon said.*

*"In such a scenario, WaMu would have to buy the loans back at par and then mark them to market on its balance sheet."*

Cannon also questioned WaMu's assertion that it has no incentive to inflate the appraised value of homes that it lends against.

For mortgages that the company originates and then keeps on its balance sheet, the assertion is valid. But for home loans that WaMu sells as mortgage-backed securities, such an argument can be dubious, he said.

*"For loans that a bank plans to sell, high appraisals support a greater amount of loans that can be sold, and loan officers are generally paid on volume," Cannon explained.*

*"Further, if a mortgage loan is sold it is generally accepted by the lender that they have passed on the default risk to the security holder," he added. "Therefore, it would seem that there indeed could be an incentive for loan officers and the bank to push for inflated home values in the case of sold loans."*

Cuomo's suit claims that eAppraiseIT provided appraisals or appraisal reviews on roughly 262,000 properties for WaMu between April 2006 and October 2007. If the average loan size was $200,000 to $300,000, this would account for between $52.4 billion and $78.6 billion of loans, Cannon estimated.

*During the period in question excluding October 2007, WaMu originated $275.4 billion of real-estate loans, selling $172.5 billion as mortgage-backed securities. As a result, the loans appraised by eAppraiseIT could account for 19% to 29% of loan production, the analyst wrote.*

*The value of mortgages that could be "put back" to WaMu may be about $33 billion, Cannon estimated. That may require additional reserves of $412 million, or the equivalent of 30 cents a share, he said.*

*In a worst-case scenario -- in which inflated appraisals were systemic throughout WaMu -- the lender might need to set aside an extra $2.1 billion, or $1.57 a share, of reserves, he added.*
[Emphasis added.]

47.     On this news, the Company's shares fell an additional $1.94 per share, or over 7.5

percent, to close on November 2, 2007 at $23.81 per share, on heavy trading volume.

48.     Then on November 7, 2007, *MarketWatch.com* published an article entitled

"WaMu now expects up to $2.9 billion in credit losses; More staff cuts at lender are possible, as

mortgage volume may keep sinking."  The article, in relevant part, stated:

> Washington Mutual Inc. said on Wednesday that ***2007 credit losses could amount to between $2.7 billion to $2.9 billion, almost double the estimates it made in July*** when the subprime meltdown began wreaking havoc in U.S. mortgage markets.

> Washington Mutual (WM) also said that ***it expects first-quarter credit losses to be in line with those in the fourth quarter***, according to executives at an annual investors' conference in New York.

> Shares of Washington Mutual fell rapidly to their lowest levels in 20 years after the company issued its latest forecast. By midday in the session, the lender's stock had dropped 19%. Shares closed down 17.3% on more than five times their average daily trading volume.

> * * *

> ***In 2008, Washington Mutual projects between zero and 5% growth.*** It also sees noninterest expenses of $8.5 billion at the high end for 2008.

> * * *

> "It would appear that they've got enough cash on hand, but that relies on the visibility going forward," he commented. "As they look forward into the next year, Washington Mutual is going to have to be able to quantify their exposure to credit losses. If they can't do that, then that puts the dividend in much greater jeopardy."

> Loan sizes and property values are also in flux, Washington Mutual executives cautioned, making any more concrete predictions difficult. They now say that additional staff cuts might be necessary.

> But Killinger said that he saw signs of improving liquidity in credit markets.

> At the same time, Chief Financial Officer Thomas Casey warned that overall expenses in 2007 could turn out to be greater than a

broad range Washington Mutual had given in its third-quarter conference call.

In mid-October, Washington Mutual reported that its third-quarter net income had been slashed by more than two-thirds from a year earlier, due to weakening housing- and capital-market conditions. The firm's net for the period ended Sept. 30 was $210 million, or 23 cents a share, compared with $748 million or 77 cents a share for the same period a year ago.

\* \* \*

The revised estimates came on the heels of a ratings downgrade by a leading credit agency. Fitch Ratings on Tuesday revised its outlook on Washington Mutual to negative from stable.

Separately, New York Attorney General Andrew Cuomo moved forward with his probe of the mortgage industry. According to reports by Dow Jones Newswires, the regulator's office has expanded its investigation to include Fannie Mae (FNM) and Freddie Mac (FRE) , the country's largest mortgage financing firms.

\* \* \*

The New York regulator's office has charged that a unit of First American Corp. (FAF) worked with Washington Mutual to use a list of preferred appraisers. That had the impact of inflating mortgage appraisals, according to Cuomo's staff.

\* \* \*

There's been concern that if appraisals for WaMu mortgages are found to have inflated property values, the company might be forced to buy back those loans at their original value.

WaMu said late Wednesday that it has a "very rigorous process" of dealing with repurchase requests and reckons it's "adequately reserved" for such liabilities.  [Emphasis added.]

49.     On this news, the Company's shares fell an additional $4.19 per share, or over

17.3 percent, to close on November 7, 2007 at $20.19 per share, on heavy trading volume.

50.     Then on December 10, 2007, after the close of the market, the Company issued a

press release entitled "WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend,

Resize Home Loans Business and Cut Expenses to Fortify Capital Base." Therein, the

Company, in relevant part, stated:

- ***Expects Net Loss for Fourth Quarter 2007 With Non-cash Writedown of Home Loans Segment Goodwill***

- Non-cash Writedown Will Not Affect Key Capital Ratios or Liquidity

Washington Mutual, Inc. (NYSE:WM) announced today a series of actions designed to address the unprecedented challenges in the mortgage and credit markets by strengthening the company's capital and liquidity and accelerating the alignment of its Home Loans business with its retail banking operations.

These actions include:

- ***A capital offering of convertible preferred stock with aggregate proceeds of approximately $2.5 billion;***

- A major reduction in company-wide noninterest expense of approximately $500 million for 2008 as a result of a substantial resizing of its Home Loans business and reduced corporate support expense; and

- ***A significant change in the strategic focus of its Home Loans business in response to a changed market.***

***In addition, the company said its Board of Directors intends to reduce the quarterly dividend rate to $0.15 per share from its most recent quarterly dividend rate of $0.56 per share.***

"A substantial infusion of new capital, significant expense reductions, the major change in our home loans business, and our planned dividend reduction all combine to further fortify WaMu's strong capital and liquidity position," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "These actions will also better position us to pursue various initiatives, particularly in our leading retail banking business -- which is at the core of our business strategy."

The company will generate approximately $3.7 billion of tangible equity as a result of the proposed capital issuance and the intended reduction in the common dividend in 2008.

The company believes these actions, together with a significant reduction in noninterest expense, should ensure that it has the financial strength to address difficult conditions in the credit and housing markets in 2008.

\* \* \*

WaMu will:

- *Discontinue all remaining lending through its subprime mortgage channel;*

- *Close approximately 190 of 336 home loan centers and sales offices;*

- *Close nine Home Loans processing and call centers;*

- *Eliminate approximately 2,600 Home Loans positions, or about 22 percent of its Home Loans staff;*

- *Eliminate approximately 550 corporate and other support positions; and*

- *Close WaMu Capital Corp., its institutional broker-dealer business, as well as its mortgage banker finance warehouse lending operation.*

These expense reduction steps will result in approximately $140 million in additional expenses in the fourth quarter. WaMu is targeting company-wide noninterest expense at or below $8.0 billion for 2008.

The resizing of its Home Loans business will be accompanied by an acceleration in WaMu's previously announced strategy to expand its focus on mortgage lending directly to customers through its retail banking stores and other retail distribution channels. It will also add bank loan consultants to support its profitable retail store network.

**Non-cash Charge to Write Down Goodwill**

As a result of the fundamental shift in the mortgage market and the actions the company is taking to resize its Home Loans business, *WaMu will incur a fourth quarter after-tax charge of approximately $1.6 billion for the writedown of all the goodwill associated with the Home Loans business.* This non-cash charge will result in a net loss for the fourth quarter of 2007, but will not affect the company's tangible or regulatory capital or liquidity.

**Increasing Loan Loss Provision Ahead of Charge-Offs**

Continued deterioration in the mortgage markets and declining housing prices have led to increasing fourth quarter charge-offs and delinquencies in the company's loan portfolio. As a result, the company now expects its fourth quarter provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of expected fourth quarter net charge-offs.

***The company currently expects its first quarter 2008 provision for loan losses to be in the range of $1.8 to $2.0 billion, reflecting an increase in provision well ahead of charge-offs, which are also expected to increase significantly during the quarter.*** The first quarter range reflects the company's current view that prevailing adverse conditions in the credit and housing markets will persist through 2008.

***While difficult to predict, the company also currently expects quarterly loan loss provisions through the end of 2008 to remain elevated, generally consistent with its expectation for the first quarter of 2008.*** The company noted that there may be some additional variation depending on the level of credit card securitization activity during any quarter.

**Capital Offering**

***As described above, the company has also commenced a capital offering of an aggregate of $2.5 billion in a new series of convertible preferred stock.*** Lehman Brothers, Morgan Stanley & Co., Credit Suisse and Goldman, Sachs & Co. are serving as joint book-running managers of the offering. [Emphasis added.]

51.     On this news, the Company's shares fell an additional $2.46 per share, or over 12.3 percent, to close on December 11, 2007 at $17.42 per share, on unusually heavy trading volume.

52.     As the *Associated Press* later reported on December 11, 2007:

**WaMu Shares Fall on Outlook Worries**

**WaMu Shares Crumbles After It Slashes Dividend, Cuts Jobs and Plans Massive Stock Offering**

Washington Mutual's move to slash staff and launch a massive stock offering to shore up its finances may smack of desperation,

analysts said Tuesday as the bank's shares tumbled nearly 12 percent.

*The stock price of the nation's largest savings and loan fell sharply a day after it said it would close offices, lay off more than 3,000 workers, and cut its dividend. It also worried investors by saying it would set aside up to $1.6 billion for loan losses in the fourth quarter and sell $2.5 billion worth of convertible preferred stock.*

WaMu has not yet priced its offering, but Friedman, Billings, Ramsey analyst Paul Miller wrote in a note to investors that he has heard it could yield 8 percent to 8.5 percent; Bear Stearns analyst David Hilder estimated the dividend rate closer to 10 percent.

*"We believe that cost could wipe out all of WaMu's 2008 earnings," Hilder wrote, calling the stock offering and dividend cut "desperate measures."*

Other recent deals support analysts' concerns that the stock sale will prove expensive for WaMu.

* * *

*Converting preferred shares into common stock dilutes their value for existing stockholders. In a research note, Citi Investment Research analyst Bradley Ball estimated the WaMu deal will add 106.4 million shares to the float, diluting current prices by about 12 percent.*

WaMu shares fell $2.46, or 12.4 percent, to close at $17.42 Tuesday.

*What's more, analysts said Tuesday that WaMu's $2.5 billion cash infusion may not be enough. FBR's Paul Miller wrote that he expects the company to try to raise more money in coming months.*

*After cutting 1,000 jobs and dismantling much of its subprime mortgage operation in September, Seattle-based WaMu will now get out of the business entirely.* The company said Monday it will close about 190 of its 336 home loan centers and sales offices, shut down nine call centers and eliminate 2,600 home loan workers and 550 corporate and support jobs.

*The company also said it will shutter WaMu Capital Corp. and rely on third party broker-dealers to sell mortgage-backed securities.*

These changes, meant to address what WaMu called "unprecedented challenges in the mortgage and credit markets," will save the thrift $140 million in the fourth quarter. *But the company still expects to post a loss, due in part to a $1.6 billion charge for the writedown of goodwill associated with the shrinking home loans business.*

*On top of that, WaMu now expects to set aside between $1.5 billion and $1.6 billion in the fourth quarter for future loan losses, up from the $1.1 billion to $1.3 billion predicted by executives in early November.*

*For the first quarter of 2008, the company said it expects loan losses to total $1.8 billion to $2 billion. Loan losses will remain high throughout the year, WaMu added.*

*"The magnitude of the new loss guidance for 2008 is disconcerting," wrote Morgan Stanley analyst Kenneth Posner in a research note.*

*The company also slashed its quarterly dividend to 15 cents per share from its most recent dividend of 56 cents per share*, for savings of more than $1 billion.

*Moody's Investors Service downgraded several long-term and short-term ratings for WaMu and said in a statement that the move "was based on its view that credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated." The credit rating agency said it doesn't expect WaMu's profitability to begin to recover until 2010.*

*Fitch Ratings also downgraded WaMu's credit ratings*, saying it expects further weakening of quality in its residential mortgage portfolio and moderate deterioration among the bank's consumer loan portfolios, including its credit card portfolio. [Emphasis added.]

53. Also on December 11, 2007, *Bloomberg* reported:

**Washington Mutual Will Take $1.6 Billion Writedown**

Washington Mutual Inc., the biggest U.S. savings and loan, will *write down the value of its home-lending unit by $1.6 billion in the fourth quarter and cut about 6 percent of its workforce as mortgage-market losses increase*.

Washington Mutual, led by Chief Executive Officer Kerry Killinger, also *slashed its quarterly dividend to 15 cents a share*

*from 56 cents and forecast a loss for the quarter*, according to a statement yesterday from the Seattle-based bank. ***Provisions for bad loans will be $1.5 billion to $1.6 billion, more than the $1.3 billion the company previously predicted.*** It plans to shutter 190 of 336 home-loan centers.

***Fitch Ratings and Moody's Investors Service Inc. lowered Washington Mutual's credit rating, citing the firm's deteriorating mortgage assets. The bank has lost 56 percent of its market value this year, the worst performance in the 24-member KBW Bank index, amid declining U.S. housing prices and record home loan delinquencies. Washington Mutual said it plans to sell $2.5 billion of convertible stock to shore up capital.***

"They're clearly concerned the industry will stay in a negative mode for an extended period," said Richard Bove, an analyst at Punk Ziegel & Co. in Lutz, Florida. ***"The fact they're laying off so many people indicates they're concerned this is not just a one-time event." He rates the stock "market perform."***

Washington Mutual fell 10 percent to $17.90 as of 11:40 a.m. today in Frankfurt trading. The stock rose 4.5 percent to $19.88 in New York yesterday before the announcement.

### 2010 Recovery

***Fitch downgraded the firm's rating to A- from A, because of "worsening asset quality," and "extremely challenging conditions in the U.S. residential mortgage market." Moody's cut its rating two levels to Baa2 from A3.***

***"Credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated," and the company's profitability won't "begin to recover" until 2010, Moody's said in a statement.*** [Emphasis added.]

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Washington Mutual's securities between April 18, 2006 and December 10, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Washington Mutual's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Washington Mutual or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Washington Mutual; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

60.    The market for Washington Mutual's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Washington Mutual's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Washington Mutual's securities relying upon the integrity of the market price of Washington Mutual's securities and market information relating to Washington Mutual, and have been damaged thereby.

61.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Washington Mutual's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

62.    At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Washington Mutual's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Washington Mutual and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

63.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

64.     During the Class Period, Plaintiff and the Class purchased Washington Mutual's securities at artificially inflated prices and were damaged thereby.  The price of Washington Mutual's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

65.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual, their control over, and/or receipt and/or modification of Washington Mutual's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Mutual, participated in the fraudulent scheme alleged herein.

66. Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 857,622 shares of the Company's stock for gross proceeds of $38,142,563. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| October 3, 2007 | Vuoto, Anthony | 1,827 | $35.89 | $66,000 |
| September 17, 2007 | Ballanger, Melissa J. | 1,100 | $35.53 | $39,000 |
| August 15, 2007 | Schneider, David C. | 1,187 | $32.57 | $39,000 |
| June 15, 2007 | Corcoran, James B. | 1,590 | $43.07 | $68,000 |
| May 22, 2007 | Brooks, Alfred R. | 3,000 | $43.82 | $131,000 |
| May 11, 2007 | Baker, Todd H. | 3,879 | $42.87 - $42.88 | $166,000 |
| May 1, 2007 | Killinger, Kerry K. | 50,000 | $42.00 - $42.13 | $2,103,000 |
| April 20, 2007 | Horvath, Debora D. | 3,003 | $42.65 | $128,000 |
| March 30, 2007 | Baker, Todd H. | 857 | $40.38 | $35,000 |
| March 30, 2007 | Horvath, Debora D. | 1,723 | $40.38 | $70,000 |
| March 30, 2007 | Casey, Thomas W. | 1,246 | $40.38 | $50,000 |
| February 21, 2007 | Brooks, Alfred R. | 1,838 | $45.10 - $45.11 | $83,000 |

| February 15, 2007 | Farrell, Anne V. | 1,233 | $44.90 | $55,000 |
|---|---|---|---|---|
| February 13, 2007 | Casey, Thomas W. | 11,032 | $44.76 - $44.77 | $494,000 |
| February 1, 2007 | Horvath, Debora D. | 4,830 | $44.97 - $44.98 | $217,000 |
| February 1, 2007 | Killinger, Kerry K. | 50,000 | $44.59 - $44.73 | $2,233,000 |
| February 1, 2007 | Schneider, David C. | 2,308 | $44.59 | $103,000 |
| January 26, 2007 | Baker, Todd H. | 2,396 | $45.31 | $108,563 |
| January 26, 2007 | Brooks, Alfred R. | 662 | $45.31 | $30,000 |
| January 26, 2007 | Porter, J. Benson | 2,371 | $45.31 | $107,000 |
| January 26, 2007 | Horvath, Debora D. | 1,737 | $45.31 | $79,000 |
| January 26, 2007 | Casey, Thomas W. | 3,968 | $45.31 | $180,000 |
| January 26, 2007 | David, Daryl D. | 6,567 | $45.31 | $298,000 |
| January 26, 2007 | Rotella, Stephen J, | 4,557 | $45.31 | $206,000 |
| January 26, 2007 | Killinger, Kerry K. | 16,130 | $45.31 | $731,000 |
| January 26, 2007 | Chapman, Fay L. | 1,640 | $45.31 | $74,000 |
| January 22, 2007 | Matthews, Philip D. | 1,440 | $45.00 | $65,000 |
| January 19, 2007 | Brooks, Alfred R. | 1,984 | $44.67 | $89,000 |
| January 19, 2007 | Woods, John F. | 1,155 | $44.67 | $52,000 |
| January 19, 2007 | Porter, J. Benson | 3,933 | $44.67 | $176,000 |
| January 19, 2007 | Horvath, Debora D. | 6,433 | $44.67 | $287,000 |
| January 19, 2007 | Casey, Thomas W. | 14,300 | $44.67 | $639,000 |
| January 19, 2007 | Saunders, Joseph W. | 1,006 | $44.67 | $45,000 |
| January 19, 2007 | David, Daryl D. | 6,266 | $44.67 | $280,000 |
| January 19, 2007 | Rotella, Stephen J, | 16,666 | $44.67 | $744,000 |
| January 19, 2007 | Killinger, Kerry K. | 12,021 | $44.67 | $537,000 |
| January 19, 2007 | Schneider, David C. | 4,166 | $44.67 | $186,000 |
| January 19, 2007 | Chapman, Fay L. | 5,000 | $44.67 | $223,000 |
| December 15, 2006 | Woods, John F. | 1,464 | $45.23 | $66,000 |
| December 15, 2006 | Cathcart, Ronald J. | 1,568 | $45.23 | $71,000 |
| November 6, 2006 | Horvath, Debora D. | 6,483 | $42.68 | $277,000 |
| November 1, 2006 | Killinger, Kerry K. | 50,000 | $42.28 - $42.46 | $2,119,000 |

| October 3, 2006 | Saunders, Joseph W. | 11,665 | $42.92 | $501,000 |
| August 15, 2006 | Schneider, David C. | 821 | $44.05 | $36,000 |
| August 1, 2006 | Killinger, Kerry K. | 50,000 | $44.34 - $44.55 | $2,222,000 |
| August 1, 2006 | Killinger, Kerry K. | 1,688 | $44.40 | $75,000 |
| July 21, 2006 | Killinger, Kerry K. | 126,470 | $45.50 | $5,754,000 |
| May 30, 2006 | Casey, Thomas W. | 22,155 | $45.32 | $1,004,000 |
| May 19, 2006 | Porter, J. Benson | 2,145 | $45.43 | $97,000 |
| May 19, 2006 | Kido, Kenneth | 2,363 | $45.35 | $107,000 |
| May 18, 2006 | Kido, Kenneth | 1,019 | $45.19 | $46,000 |
| May 16, 2006 | Porter, J. Benson | 4,391 | $46.01 - $46.02 | $202,000 |
| May 8, 2006 | David, Daryl D. | 5,154 | $46.74 | $241,000 |
| May 1, 2006 | Killinger, Kerry K. | 50,000 | $44.90 - $45.00 | $2,248,000 |
| April 28, 2006 | Chapman, Fay L. | 162,419 | $45.00 | $7,309,000 |
| April 24, 2006 | Chapman, Fay L. | 102,766 | $44.17 - $44.40 | $4,551,000 |
| | **TOTAL** | **857,622** | | **$38,142,563** |

## Applicability of Presumption of Reliance: Fraud On The Market Doctrine

67. At all relevant times, the market for Washington Mutual's securities was an efficient market for the following reasons, among others:

(a) Washington Mutual's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Washington Mutual filed periodic public reports with the SEC and the NYSE;

(c) Washington Mutual regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Washington Mutual was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for Washington Mutual's securities promptly digested current information regarding Washington Mutual from all publicly-available sources and reflected such information in the price of Washington Mutual's securities.  Under these circumstances, all purchasers of Washington Mutual's securities during the Class Period suffered similar injury through their purchase of Washington Mutual's securities at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

69.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Washington Mutual who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Washington Mutual's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

72.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Washington Mutual's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

73.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Washington Mutual's financial well-being, business relationships, and prospects, as specified herein.

74.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Washington Mutual's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Washington Mutual and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Washington Mutual's securities during the Class Period.

75.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

76.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Washington Mutual's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

77.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Washington Mutual's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Washington Mutual's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Washington Mutual's securities during the Class Period at artificially high prices and were damaged thereby.

78.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Washington Mutual was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Washington Mutual securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

79.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
#### Violation of Section 20(a) of
#### The Exchange Act Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     The Individual Defendants acted as controlling persons of Washington Mutual within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84. As set forth above, Washington Mutual and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 19, 2007                Respectfully submitted,

                                        BRODSKY & SMITH, LLC

                                        By: *s/ Evan J. Smith, Esquire*
                                        Evan J. Smith, Esquire
                                        240 Mineola Boulevard
                                        Mineola, NY 11501
                                        Phone: 516-741-4799
                                        Fax: 516-741-0626
                                        Email: esmith@brodsky-smith.com

                                        Alfred G. Yates, Jr., Esquire
                                        Gerald L. Rutledge, Esquire
                                        LAW OFFICE OF ALFRED G. YATES JR, PC
                                        429 Forbes Avenue, 519 Allegheny Building
                                        Pittsburgh, PA 15219
                                        Phone: (412) 391-5164
                                        Fax: (412) 471-1033
                                        Email: yateslaw@aol.com

                                        **Attorneys for Plaintiff.**